The Estate of James Rivett

vs.

Waukesha County

---

Deposition of:

Peter Angilello

July 13, 2022

*Vol 01*

---



PHIPPS REPORTING

*Raising the Bar!*

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 1 of 119    Document 69

UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

THE ESTATE OF JAMES RIVETT
By its Personal Representative
Peter Angilello,

         Plaintiff,

          vs.             Case No. 21-CV-972-bhl

WAUKESHA COUNTY,
KEVIN REILLY and
BREGITTA PEAVY,

         Defendants.

----------------------------------------------------------------

Remote ZOOM Deposition of PETER ANGILELLO

Wednesday, July 13th, 2022

9:06 a.m. - 4:01 p.m.

at

Montello, Wisconsin

Job No. 258474A
Stenographically Reported by Rosanne E. Pezze, RPR/CRR
Certified Realtime Reporter

Page 2

Remote ZOOM Deposition of PETER ANGILELLO, a witness in the above-entitled action, taken at the instance of the Defendants, pursuant to Chapter 804 of the Wisconsin Statutes, pursuant to Notice, before Rosanne E. Pezze, RPR/CRR, Certified Realtime Reporter and Notary Public, State of Wisconsin, at 50 West Montello Street, Montello, Wisconsin, on the 13th day of July, 2022, commencing at 9:06 a.m. and concluding at 4:01 p.m.

A P P E A R A N C E S:

    GREGORY R. WRIGHT LAW OFFICES, S.C., by
      Ms. Jenna Ashbeck
      Mr. Erik Johnson
      50 West Montello Street
      P.O. Box 280
      Montello, Wisconsin  53949-0280
      608-960-9951
      jashbeck@gregwrightlaw.com
      ejohnson@gregwrightlaw.com
      Appeared via Zoom on behalf of Plaintiffs.

    GASS TUREK, LLC, by
      Ms. Linda V. Meagher
      241 North Broadway Street, Suite 300
      Milwaukee, Wisconsin  53202
      414-223-3300
      meagher@gassturek.com
      Appeared via Zoom on behalf of Defendants.

Page 3

I N D E X

EXAMINATION                  PAGE
By Ms. Meagher. . . . . . . . . . . . . .4

E X H I B I T S

EXHIBIT NO.               PAGE NUMBER
Exh. 1 Newspaper article entitled "Green Bay marketing firm abruptly closes" (Bates PLTF 00028-00030). . . . . . . 140
Exh. 2 Handwritten letters (Bates PLTF 03767-03776). 217
Exh. 3 Resume for James Rivett. . . . . . . .230
Exh. 4 Letter to God. . . . . . . . . . . . .230
Exh. 5 Letter to Peter (blue crayon - 3 pages). . 231
Exh. 6 Letter to Peter (green and turquoise - 2 pages). . . . . . . . . . . . . 232
Exh. 7 Letter to Peter (orange - 2 pages). . . . 233
Exh. 8 Letter to Peter (purple - 1 pages). . . . 234
Exh. 9 Letter to Peter kept on desk (green - 2 pages). . . . . . . . . . 234
Exh. 10 Color photo (Bates DSCN2337). . . . . . 237
Exh. 11 Color photo (Bates DSCN2338). . . . . . 238
Exh. 12 Informal Administration (2 pages). . . . 249
Exh. 13 2018 Tax return regarding Khrome (Bates PLTF 2367). . . . . . . . . . 251

    (Original exhibits attached to Original transcript; copies of exhibits are attached.)

R E Q U E S T S

(By Ms. Meagher)

Request for Mr. Rivett's CV. . . . . . . . .17
Request for copies of letters. . . . . . . 76
Request for letters. . . . . . . . . . . 88
Request to request from people you gave letters to to get copies of whatever he wrote. . . . . .89
Request for Pete's therapy records. . . . . 91
Request that phone company recreate texts. . .154
Request to look at photos for year of cottage visit. . . . . . . . . . . . . . . 219
Request for documentation of payments. . . . 243
Request from accountant; proceeds from Khrome and costs or other basis. . . . . . . . . . . 251

Page 4

TRANSCRIPT OF PROCEEDINGS

PETER ANGILELLO, having been first duly sworn remotely on oath, was examined and testified as follows:

E X A M I N A T I O N

BY MS. MEAGHER:

Q  Please state your name.

A  My name is Peter Michael Angilello.

Q  And what is your current address?

A  146 East Mission Road, Green Bay, Wisconsin, 54301.

Q  And is that the same home that you lived with Mr. Rivett in?

A  Yes.

Q  Have you ever had your deposition taken before?

A  No.

Q  And I'm going to assume your lawyer spoke to you about the rules, but I want to go over those with you.  Okay?

A  Yes.

Q  So, number one, you have to answer verbally, so you're doing a good job so far.  You can't shake your head or say hm-mmm or uh-huh, okay, because the court reporter can't get that down.  Okay?

A  Yes.

Page 5

Q  If you don't understand a question, let me know and I will restate it or the court reporter can reread it.  But if you answer the question, I'm going to assume you understood it.  Okay?

A  I understand.

Q  All right.  And if you need a break at any time, let me know and we'll take a break, 'cause this could go on for a bit of a while.  So any time you need to use the bathroom or eat something or something like that, let me know.

A  Yes, I understand.  Thank you.

Q  And who do you currently live with?

A  I currently live with my partner, Terry Price, P-R-I-C-E.

Q  All right.  I understand that Mr. Price is a barber by trade?

A  By trade, but he actually works at a school for children with disabilities now.

Q  Okay.  But when you met him he was working as a barber?

A  Correct.

Q  And you met him in Ashland or Asheville, North Carolina --

A  North Carolina, um-hmm.

Q  -- when he was working as a barber?

Case 2:21-cv-00972-BHL   Filed 03/31/22   Page 3 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

A   Yes.

Q   And when was that?

A   Let's see, December of 2019.

Q   And when did he move to Wisconsin?

A   Officially like July of 2020.

Q   And he's lived with you ever since then?

A   Yes.  Maybe June --

Q   I'm sorry?

A   June of 2020.  And, yes, he has lived with me.

Q   And between December of 2019 and June of 2020, you made trips back and forth to see each other?

A   Yes.

Q   And where does he work?  What school does he work at?

A   It's called Syble Hopp, S-Y-B-L-E, H-O-P-P.

Q   And does he struggle with any mental health issues?

A   None that I'm aware of.  He has some anxiety, but --

Q   Is he seeing a therapist for that?

A   No.

Q   Did you get any life insurance after Mr. Rivett died?

A   I'm sorry.  You kind of cut off a little bit.

Q   Sure.  Did you get any life insurance after Mr.

Rivett died?

A   Yes.

Q   How much did you get?

A   Oh, man.  I'm not exactly sure of the amount.  I want to say like 60,000.

Q   And you inherited the home?

A   Yes.

Q   You inherited the sale of Khrome?

A   Yes.

Q   You got a 401(k) from Mr. Rivett?

A   Yes.

Q   How much was that -- how much was that worth?

A   I'm sorry.  I didn't prepare for like numbers.  I would say around 100, maybe, or between -- maybe 60, maybe 60 or 75.  I'm not exactly sure.

Q   So Mr. Rivett had only saved between 60 and 65,000 in his 401(k) at the time he died at age 60?

A   I think there was a certain amount that was set aside because he started a new business, so there was that -- yeah, there was that amount.  And there was supposed to be a buyout through his old work, but that never was ever officially legalized between he and his business partner.  So basically that was pretty much a wash.

Q   All right.  Any other --

A   He had to start over, basically.

Q   Okay.  Any other money that he -- that you received after Mr. Rivett's death?

A   Life insurance, the life insurance, sale of the business.  And yes, there was that -- I don't think it was called a 401(k), but there was that pool of money, but I think that was about -- about it.

Q   What is your educational background?

A   I have a --

Q   Can you tell me where you went to college.

A   Okay.  Yep.  I graduated from UW-Green Bay in -- I had an elementary education certification, and then I had a major in environmental education, and then I have a master's in educational leadership from UW-Oshkosh.  And I worked for 30 years, more or less, as a librarian, 15 years -- 14 years as a youth librarian with the county library and then about 15 years through the school system.  I was a school librarian.

Q   Is it true that you have no training in mental health?

A   No.  I have no training in mental health.

Q   Okay.  So that's correct?

A   Yes.

Q   All right.  Hold on one second.  I got to mute my telephone.  Hold on one second.  I'll be right back.  Sorry about that.  All right.

    How much did you get from the sale of Khrome?

A   300,000.

Q   And I know you had prostate cancer at some point. How are you doing in terms of your health?

A   So far so good.  Thank you for asking.

Q   What's your prognosis?  Are you cured at this point as far as the doctors are concerned?

A   Yeah.  I recovered.  Recovered, um-hmm.

Q   And when did you first get a diagnosis of prostate cancer?

A   It was the end of July of 2018.

Q   Okay.  And you were hospitalized at some point for being septic; is that true?

A   Yes.  I had a biopsy that -- that wasn't -- didn't work out correctly, and then I went septic.  And I was in the hospital from -- I can't remember the specific date in July, but through about August 6th or so that I came home.  I was in for about a week.

Q   Is it correct that you married Mr. Rivett on June 24th, 2016?

Case 2:21-cv-00972-BHL   Filed 03/31/22   Page 4 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

A  2016, correct.

Q  And do you have any plans to marry Mr. Price?

A  No.

Q  And why not?

A  It's too early at this time to make any decision like that.

Q  Okay.  What year did you retire from the school district?

A  2015.

Q  When in 2015?  At the end of the school-year?

A  Yes, June.

Q  And then -- go ahead.

A  I'm sorry.

Q  That was one rule I didn't really say to you, which is we can't talk over each other.  We're both doing it.  Sorry about that.  We have to wait till each one of us is finished, but go ahead.

A  Okay, okay.  No.  I still do work for the Green Bay Public Schools as a substitute teacher.

Q  So you retired as the librarian in June of 2015, correct?

A  Yes.

Q  And your only other earned income since that time has been as a substitute teacher?

A  Yes.  I also worked part-time one summer or two

summers at a greenhouse, a friend's greenhouse, but the majority of my income now is through substitute teaching.

Q  And how much do you think you earn per year substitute teaching?

A  I want to say about 12,000.

Q  Okay.  So since you retired have you made about 12,000 per year?

A  Well, during COVID, you know, they weren't doing -- taking substitutes, so I didn't earn much during that year.  But generally I've worked fairly often, you know, since my retirement and more since Jim's passed away.

Q  And was that your retirement plan, that you would work as a substitute teacher after you retired?

A  Not as often as I am, but I've done more because of Jim's death.

Q  All right.  And so in 2016 did you work as a substitute teacher?

A  Yes, um-hmm.  Part of that was my emeritus.  So you earn a certain percentage of your salary if you work for 45 days, so some of that was part of that program.  But yeah, in 2016 I did part of my emeritus and then part substitute teaching.

Q  What does emeritus mean in terms of your formal

work?

A  You earn -- if you've worked for a certain number of years for the school district, you earn a certain percentage of your last year's salary.  And I was hired later, so I earned 75 percent of my last year's salary.  And you have to work so many days within three years.

Q  As a substitute teacher or as a librarian?

A  Whatever they can put you in.  It used to be your choice, but now it's their choice.

Q  And what about 2017; how often did you work then?

A  I would say about the same.  I mean, I would say between 12- to $15,000 a year.

Q  And then what about 2018?

A  Not very much.  I might have done a few days, but that was when everything had happened and my life was pretty full with trying to sell Khrome and dealing with my cancer diagnosis and a number of other things.

Q  What about the first semester of 2018?

A  I was still subbing before Jim's death.

Q  And then what about 2019, were you working then?

A  Yes.  I was working up until -- pretty much up until COVID hit I was working as much as I could.

Q  Okay.  And you get a pension from the school,

correct?

A  Yes.

Q  Do you have health insurance?

A  Yes, through my employer.  I pay for that, though.

Q  Okay.  Was that part of the retirement package or how did that work?

A  I -- I earned -- my six days were counted toward my health insurance, so some of that was paid my first year or year and a half, and then since then I've had to pay into it myself.

Q  Okay.  But it's at a reduced rate?

A  Yeah.  I mean, it's through the school, so we're still considered part of that group insurance.  I pay now about $920 a month roughly.

Q  And was Mr. Rivett on your insurance, or did he have his own insurance?

A  He had his own insurance.  Because we weren't married until 2016, so he had his own insurance.  It was through his former business up until that business ended and he started his own business, and then he was on the Marketplace insurance.

Q  Okay.  So from 2014 when he left Arketype, he went to the Marketplace.  And then did he stay there until his death or did he go on your insurance?

A  No, no, he did not go on my insurance.

www.phippsreporting.com
(888) 811-3408

Q Okay. So you always had separate insurance?

A Yes. Yeah, I wasn't able to get -- I think -- well, I wasn't able to get him on my insurance up until it would have been until 2016 most likely. I'm not exactly sure why we didn't, but I didn't. I think 'cause I was already retired and I wasn't able to add him on after I retired.

Q Okay. So Mr. Rivett's dad passed away in September of 2011; is that correct?

A Did you say 2011?

Q Yes.

A Yes, yes.

Q And his mom died in July of 2017. '17?

A Yes, July 4th.

Q And then he has two sisters and a brother, right?

A Correct.

Q Tell me who was the oldest.

A The oldest is Julie.

Q All right. And then where does -- where did Mr. Rivett fit in there?

A Jim was the third.

Q Okay. So was Jean next in line, second?

A Jean is second in line, and then Jim, and then John is his youngest brother.

Q Now, I read somewhere that you had adopted two

girls at some point; is that correct? Or were you fostering them, or how did that work out?

A No. We called them our adopted daughters, but they -- they were not our, I mean, officially legally adopted daughters. One was a young woman who lived in our apartment building and who -- they were in their early 20s and she was basically the product of a one-night stand. And she didn't have any father figure, so we kind of took her under our wing. And then we walked her down the aisle when she got married, and we considered her like a daughter. And then another young woman who was an exchange student that lived with us from Lithuania, we considered her and her family like our family.

Q Okay. So was the first woman you were talking about, is that Milda, or is that the exchange student?

A Her name is Bridgit Yunker.

Q So Bridgit was the one that lived in your apartment building that you --

A Yes. We knew Bridgit from the time she was like five years old.

Q And Milda was the foreign exchange student?

A Correct.

Q And she ended up moving to Green Bay?

A Yes. And we introduced her to a friend and someone that worked with Jim, and they were married, and we were able to witness the birth of their son. They invited us to be there because they considered us their dads, their extra dads. Milda's father died when she was six or seven, and so we were -- kind of considered her -- she considered us her dad, too. We've been dads to many people over the years.

Q So did she stay in Green Bay after her foreign exchange program was done, or did she go back to Lithuania, or what happened there?

A She went back to Lithuania for about a year to complete her college degree. And then she went -- her husband Jason went there. They were married there and then, you know, they lived apart separately for about a year, I believe, before she moved back to the United States.

Q And did Jason work at Arketype, or did he work at Khrome or both?

A He worked with Jim, actually, at a previous business to Arketype. It was called Goltz & Associates. And Jim kind of helped him get that job because he knew Jason's uncle. And so they

had a very long relationship as well.

Q So are you saying G-O-U-L-D & Associates, or how do you spell that?

A Goltz is spelled G-O-L-T-Z & Associates.

Q All right. Did Mr. Rivett have a resume or a CV that I can get ahold of, or not?

A I was asked by my counsel to put together a resume, and I did that to the best of my knowledge.

MS. MEAGHER: Okay. Do you have a copy of that, Jenna?

MS. ASHBECK: I do. I think it was produced to you, Linda, but I can make a note to send you another one.

MS. MEAGHER: Oh, it was produced to me? I'll look for that during a break. Let me make a note.

BY MS. MEAGHER:

Q So how old is Jason?

A Now?

Q Yes.

A I'd say he's about 47, and Milda is about 44 or 45 now. And they were in their early 20s when we first met them.

Q You say she was a foreign exchange student. She

Case 2:21-cv-00972-BHL   Filed 03/31/22   Page 6 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 18

was going to college at Green Bay, or where was she going to college?

A She -- it was a program through a university in Lithuania where she was able to work in Martha's Vineyard for a couple of years. We met her and her brother at a commitment ceremony of some friends in Harper's Ferry, Virgina. And then when she told us that she wasn't able to get the same job the following summer, we told her to come to Door County and come and work in the Martha's Vineyard of Wisconsin and live with us. So she chose to do that.

Q So she commuted from Green Bay to Door County?

A The plan was that, but then we wanted her to have more time with us, so we found her a job in Green Bay.

Q Okay. How many times -- you know who Kevin Reilly is, right?

A Yes.

Q All right. How many times do you think you spoke with Kevin Reilly prior to August 22, 2018?

A August 22, 2018. I remember that there were some gentlemen that were at the station, but I don't remember ever talking to Kevin before that time.

Q So you could have but you just don't remember; is

Page 19

that fair?

A Yes.

Q And you would call pretty much on a daily basis and talk to the staff at Waukesha County Mental Health, correct?

A You were kind of cutting off just a little bit. Could you repeat that?

Q Sure, sure. You would call pretty much at least once a day and talk to staff at Waukesha County Mental Health about Mr. Rivett; isn't that true?

A Not calling. I mean, I would -- I would visit Jim during that time during the visiting hours, and that's when I would have conversations with the staff. I didn't really directly call any of them until that night before other than the social worker that was to be my direct contact.

Q Are you saying that you remember specifically not calling, or you just don't know either way?

A I do not -- I do not remember calling any staff people before -- during the week. It was mainly regular face-to-face conversations.

Q Okay. Let's go through, if we could, Mr. Rivett's history of suicidal threats and ideations and gestures. Okay?

A Yes. Sure.

Page 20

Q So you provided an answer to defense Interrogatory No. 21, a list of different times that Mr. Rivett had suicidal ideations or gestures, correct?

A Yes, I did.

Q And how did you come up with that list?

A Based on my best memory that I could think of.

Q Did you ever look at Mr. Rivett's medical records?

A Did I ever see his medical records? Is that what you're asking me? No, I never saw his medical records.

MS. ASHBECK: Linda, I'm sorry. Go ahead, Pete.

A No. So I haven't seen his medical records, yeah.

MS. ASHBECK: I just want to put on the record, Linda, that this set of interrogatories was also compiled with the assistance of counsel.

MS. MEAGHER: Sorry. So are you saying, Jenna, that you answered the questions for him, or he came up with it based on his memory?

MS. ASHBECK: He came up with it based on his memory, and then we went over the ones in the medical records, but he did not see them. He did not see the records; we went over them with him. And he can confirm that that summary is correct.

Page 21

BY MS. MEAGHER:

Q So, in other words, you put together something based on your memory, then your lawyers went through the records and said what about this time, and then you agreed, yeah, I remember that.

Is that basically what happened?

A I gave them -- I gave my counsel the memories that I could remember.

Q Right. But then they added to your memories by looking at the records and then going through the records with you and saying but there was also this time and this other time, and then you agreed with that, that refreshed your memory, and then they wrote that in there.

Is that a fair recollection of what happened?

A Well, I saw all the interrogatories, the complete thing before I signed it, and read everything before I signed it.

Q But the point is that your lawyer added to your memory? In other words, you had a list of times where there were suicidal ideation or gestures, and then your lawyers added to it by looking at the medical records; is that correct?

A I didn't add anything to the interrogatories

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 7 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 22

myself. I just made a list of what I presented to them, and then they added some things. My understanding is they added some things from the medical records, I was able to review that and sign it. But no, I wouldn't have -- there was nothing that I added to it. I just was able to give my answers as clearly as I could to my counsel.

Q All right. And do you have any document, memorandum, diary, or anything that would help you refresh your memory about what was going on in 2018 or any time, you know, anything related to his suicidal ideations or threats or what happened related to this lawsuit?

A I don't have -- I didn't keep any kind of journal. Jim never kept any kind of journal. It's based on my best memories that I could, you know --

Q So you didn't have a diary that you wrote in and he didn't have a diary he wrote in; is that correct?

A Not -- no, hm-mmm.

Q Okay. So my understanding is working at Arketype was a pretty toxic environment for him; is that correct?

A Towards the end, yes, um-hmm. He was --

Page 23

Q Go ahead.

A He was involved in -- he had a business partner that had some addiction issues, and he left the business to go get help right around 2009 during the recession. So then Jim had to not only be the creative director, but he also took over the role as president. So that was a pretty stressful time for him.

Q Okay. The records seem to say that that relationship was pretty toxic for at least ten years. Does that seem fair?

A I would agree with that.

Q And the person who was toxic was Paul Meinke?

A Meinke is his last name. It's pronounced Meinke, M-E-I-N-K-E.

THE STENOGRAPHER: I'm sorry. I didn't hear you. M-E --

THE WITNESS: Oh. It's spelled M-E-I-N-K-E.

THE STENOGRAPHER: Thank you.

BY MS. MEAGHER:

Q And it's pronounced Meinke?

A Meinke.

Q Meinke, okay. All right. So he had -- was he addicted to alcohol, or what was his issue?

Page 24

A Alcohol mostly, um-hmm.

Q What else?

A He had some issues with like Xanax, overprescribing, taking. And he brought some toxic energy to the workplace where some of the employees would just walk out. And it was agreed upon by Paul's domestic partner, who was also the business manager, that Paul just take some time out of the business. So it was, you know, a constant worry of Jim's to try and hold this business together because Paul was the majority owner of the business.

Q And Paul's partner is Kurt?

A Correct. Kurt Anderson. Anderson, A-N-D-E-R-S-O-N.

Q So when did Mr. Rivett become president?

A I would say around 2009.

Q And then did he stay president until he left in December of 2014?

A Yes. And when you say "he left," he was actually fired.

Q Right. We'll get into that.

A Yeah, okay.

Q When he got fired in December of 2014, he was still the president, correct?

Page 25

A Yes.

Q And when did Mr. Meinke come back to the business?

A It was relatively soon before then, so -- before Jim left. So I would say like the month before, roughly. I mean, this all -- all kind of -- he didn't even come into the business. But the day that Jim was let go was the day that he declared himself president again.

Q So he actually left the business, wasn't at the business between 2009 and 2014?

A Yes, correct.

Q And did he ever come into the business at any time during that time period, or not?

A He had some volunteer positions on a couple of boards, as I remember. So he would come in, he had an office there and would do some work, but basically he was asked not to participate in the daily activities of the business.

Q And when did they remodel the church and make that their office?

A The church was purchased, I believe, around 2007, I want to say. And I was part owner of the church building itself. It was restored right around that -- right around that -- 2007, 2008, roughly. And they had just kind of moved into the building

Case 2:21-cv-00972-BHL   Filed 03/31/22   Page 8 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 26

Q So the remodeling took place between 2007, 2009?

A I would say that is as close as I can remember.

Q Okay. And the company that owned the building, what was that called?

A It was called Dos Espiritu. D-O-S, and then capital E-S-P-I-R-I-T-U. Dos Espiritu. And it was basically four of us that owned the building; Jim, myself, Paul Meinke and Kurt Anderson. And the business basically paid for the mortgage of the building and the utilities and that sort of thing. So the business supported the building.

Q Did you and Mr. Rivett invest any personal funds into the remodeling of the business or into the business at any time?

A No. It was all -- it was all from the business.

Q All right. And there was some sort of documentary that was made. What was that about?

A They did several documentaries, but the main one that you may be referring to is called Westbound. It was like the last larger documentary that they had been working on. It was their first attempt to move into some longer kind of feature -- feature films, documentaries, that sort of thing, to expand their business opportunity.

Page 27

Q And my understanding is that you and Mr. Rivett invested in that documentary?

A Our time. I know he did time. But he found a lot of people from the community that invested money into the project. So we -- I don't remember us ever contributing anything to produce that.

Q So if he says he put in 50 grand into this project, you didn't know anything about that?

A I don't know anything about that.

Q Okay. You'd agree that after the church was remodeled and they moved in in 2009, up until Arketype closed in August of 2018, that the company pretty much financially struggled the entire time?

A I would agree with that.

Q And that caused a lot of anxiety for Mr. Rivett when he was working there between 2009 and 2014?

A Um, well, the -- when Arketype -- when he was gone from Arketype, Jim was the face of that company. So we were afraid that, you know, clients would start to leave, which is what happened. Jim took like 15, I believe, of the former employees of Arketype with him to Khrome, and then I think about 85 percent of the clients went from Arketype to Khrome.

Page 28

So, you know, it was kind of like, you know, we were afraid -- Jim was always afraid to be too successful in Khrome because that meant that business was being pulled away from Arketype, which helped support, you know, the building and everything. And when -- when Arketype went bankrupt and closed their doors, then I think Jim started to get more, you know, more anxious, because it's like we were told by our real estate attorney that the bank would most likely come after the person who had the most money, which would have been Jim and his business. So...

Q Okay. But my question is a little bit different, which is: During the time that Mr. Rivett worked at Arketype between 2009 and when he was fired in December of 2014, the fact that the company was struggling caused a lot of anxiety for Mr. Rivett, correct?

A Yeah. Well, during the recession, of course, they were struggling, and Jim didn't want to let any of the employees go. So he tried -- that's where I think his stress was, trying to find ways to keep everyone employed. And then, you know, they were able to pull out of that eventually and they were doing quite, you know, well after the recession up

Page 29

until Jim's, you know, when he left.

Q When did -- why did -- strike that.

Why did Mr. Rivett decide that he wanted to buy the company Arketype? What was going on that he wanted to buy it?

A Well, in his conversations with some business leaders and friends of his, they had -- they had put together -- there was a longer buyout time period. I think it was like over a ten-year time period that eventually Jim would buy Paul out. And then this group of his leaders said -- told Jim that that's an awfully long time and they would be willing to help Jim buy Paul out immediately so that he wouldn't have to deal with that stress.

So there was a group, I don't know how many men, maybe five or six business leaders in town that gave -- that offered to give Jim a certain amount, I want to say off the top of my head around 600,000 to buy-- buy Paul out so he wouldn't have to deal with that.

Q Okay. But was Mr. Meinke coming back and saying he was coming back, or what was making him at that point want to buy him out?

A What had happened was that Jim put the proposal, a

www.phippsreporting.com
(888) 811-3408

Page 30

new proposal to Paul, and Paul seemed a little shocked that Jim would want him out of the business totally. And he told Jim that he would want some time to think about it. And all of Jim's supporters said, you know, this is going to go great, I mean, someone's being offered $600,000 for their business. You don't have to worry about anything. But Jim was always concerned about how Paul would react to different things, and Paul's reaction was more what Jim expected and not what the other business -- his business friends had expected, and Jim was asked to leave.

And what had happened then, then that group of business people said, Jim, well, we didn't expect that, but we can help support you to get a new business up and running. And, you know, if you decide to do that, you should do that soon so that you don't lose clients and you don't lose staff, that sort of thing. So they helped support Jim. And he was able to --

Q So these other people actually invested in Khrome?

A Yes.

Q Okay. But for Mr. Rivett, he realized at some point that he really couldn't even buy out Mr. Meinke, right?

Page 31

A Not without that -- not without the help -- so that's why there was that extended -- like a ten-year time period because he didn't have the money, we didn't have the money to do anything sooner than that.

And -- and the thought, I think, of Jim of having to still be in business with Paul over that longer time period added a lot of stress. So knowing that he had this group of supporters, that did help relieve the pressure, but I think he had a sense that things would not go quite as well as everyone else thought they would for him.

Q So my understanding of the contract was that Mr. Rivett could not buy out Mr. Meinke unless he wanted to do that, and under the contract that they had, it was completely up to Meinke whether he would have to pay back Mr. Rivett for the business until the business closed. Is that true?

A Could you restate that? I'm not --

Q Sure. My understanding is the way the contract worked was, Mr. Meinke had complete control over whether or not he had to pay off Mr. Rivett, and he only had to pay off Mr. Rivett when the business closed?

Page 32

A By contract, you mean the original --

Q The agreement, yes.

A The original agreement, partnership, was a very -- I didn't really understand it because I wasn't a part of it, was a very initial agreement that was never like formally done, anything legal. So Paul was like 60 percent owner and Jim was 40 percent owner. But when all of this happened, basically Paul could do whatever he wanted to do and didn't owe Jim anything. If that -- I don't know if that answers your questions, but that -- that was my understanding.

Q Right. But in terms of the terms of the contract, you're really not clear about what they said; is that fair?

A You know, there was -- there was a very informal agreement that was put together. I did read that. I've seen that, but I don't remember all the details of it other than, you know, it was not -- it was not written in Jim's favor at all. And it should have been taken care of at some point.

But to understand the history, they were -- we were friends with Paul and Kurt for over 30 years, so there was that understanding, you know, that Paul would do the right thing when

Page 33

it was time to do the right thing. But, you know, it didn't work out that way.

Q So when Mr. Rivett left, then Mr. Meinke threatened lawsuits because Mr. Rivett took some of the employees and took some of the clients, correct?

A You cut out again a little bit. But --

Q When Mr. Rivett left or was fired, Mr. Meinke threatened lawsuits or litigation because Mr. Rivett took some of the clients and some of the employees, correct?

A There was some -- there was some threat of doing something against Jim for taking employees -- I can't remember the term now. But -- but that was not -- that didn't go anywhere. He wasn't able to do anything regarding that.

Q But that caused Mr. Rivett to have some emotional anxiety and stress?

A Right. And I would say part of it was because Jim was a very loyal person and he considered his employees like family. And he would worry about the people that he couldn't take with him and he wondered how they were doing. And then as they got -- as the business lost money, they let people go and he would always worry about, you know, how

www.phippsreporting.com
(888) 811-3408

they were doing and if they found new employment, that sort of thing.

Q During the years that Mr. Rivett was the president, did he ever talk to you about misappropriation of money, like using the credit card, that sort of thing?

A Not --

MS. ASHBECK: I'm just going to object to the form of the question, but you can go ahead, Pete.

A Oh, okay. He became more nervous about that towards the end of his life. You know, when he started Khrome, he had some ideas in his head that he did something wrong. Jim, again, like I said, is a very loyal person, and he wanted Paul to get better and he wanted Paul to get the help that he needed. And so, you know -- and the rules, I think, between them, I mean, were fairly lax as far as what they would use a credit card for. You know, Paul -- the business manager was Paul's domestic partner and Jim never saw a lot of the final numbers until Kurt and Paul had a chance to look through them. So there was always, especially towards the end, there was more of like, okay, where is some of this money going.

And Jim did -- when he started to ruminate more about doing -- doing something wrong, it was -- you know, I remember two specific things. He had a credit card that he went -- a business credit card that he went to Florida on. He was actually working from Florida, but they -- Paul and Kurt, had said, you know, you've been carrying the load here, just take the card, go to Key West, take some time off and do that. And Jim says, you know, he always felt like, you know, okay, well, I bought a shirt on the credit card and I don't really remember if I paid that back. And then things like that.

So he -- you know, he started ruminating about things that weren't necessarily validated. And I would tell Jim, you know, that, you know, if Paul and Kurt wanted to file some charges against him, if he had, quote/unquote, "misappropriated" any funds, they would have had to have done that. It had been almost three or four years when Jim had already started ruminating more and more about that. But yeah.

BY MS. MEAGHER:

Q So my question was a little bit more narrow, which is --

A Okay.

Q -- during the time that Mr. Rivett was president, between 2009 and 2014, during that time did he ever talk to you about misappropriation of money in terms of using the credit card or cash from the business or something for -- something for personal reasons rather than business reasons --

A No.

Q -- during that time frame?

THE STENOGRAPHER: Was there an objection?

MS. ASHBECK: No. You're good.

BY MS. MEAGHER:

Q Did he ever talk to you about Mr. Anderson discussing with him concern about him using the credit card for personal reasons?

A No.

Q Have you ever talked to Mr. Meinke or Mr. Anderson since Mr. Rivett's death to ask them about whether this was -- whether there was any basis for this idea that there was misappropriation of the credit card or something else?

A No.

Q Have you spoken to Mr. Meinke or Mr. Anderson since Mr. Rivett's death?

A To Mr. Anderson, yes. But to Mr. Meinke, no.

Q Okay. And what were the discussions with Mr. Anderson?

A That was mostly related to the building, because the church building had been up for sale, so I had to -- and I was dealing -- I was the main person dealing with the realtor and handling, you know, utility bills. And I was paying for most of that, you know, myself because they couldn't afford to pay -- I think they were paying the utilities and I was paying water and lawn maintenance and snow removal, that sort of thing. So I had to have discussions like that with them -- with him. I'm sorry, not them. But Paul, after Jim's death, didn't make -- want to have any contact.

Q You've known Mr. Rivett since -- how old were you when you met?

A 1980, so 22.

Q And how old would he have been?

A Let's see. So I would have been 23 and he would have been 22, I think.

Q Okay. And I know he had been sexually molested by a neighbor. What was that about?

A What was it about or when?

Q Yeah, when did it happen and what occurred?

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 11 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

A   He was about in second grade, and it was a neighbor down the street who I think Jim told me that it happened for a period -- time period of about a year.  And he never told anyone in his family until -- probably till he was older, I would say, I think he told his mom.  He never told his dad, but he did tell his mom and his sisters and brothers, but not until he was older.

He went through a program for sexual abuse survivors for men probably in his 30s.  And he felt like it was helpful for him to bring some closure to that time period in his life.

Q   Sorry.  How old was the neighbor?

A   He was like -- I think 17 or 18, something like that, I want to say.

Q   And how did he -- did Mr. Rivett go to his house or apartment or how did this even occur?

A   Yes.  It was -- I think the family lived in the home, so he would go down to his apartment or his house.

Q   So Mr. Rivett would go to the 17- or 18-year-old's house or apartment?

A   Yes.

Q   Okay.  And he did this how many times, do you

think, in a year?

A   I -- I don't remember.  I would assume it happened at least two or three times if it made that large of an impact on him.

Q   Okay.  And I know -- when did Mr. Rivett come out as gay?  How old was he?

A   I would say around -- yeah, the time that we -- well, not the time that we met.  But 1983, '84.  And coming out wasn't like -- it was a very stressful time frame because he lived in his hometown, and so that process took a while.  He -- so it took a while.

Q   And where did you grow up?

A   I grew up in Janesville, Wisconsin.

Q   But you met together at a camp; is that right?

A   Yes, the YMCA camp in 1980.

Q   My understanding is after he came out he went through some sort of conversion therapy?

A   No, it wasn't conversion therapy.  He was seeing a Christian counselor, and I was actually seeing the same counselor but separately.  And we separated for a short time period, because she had told me that she had thought that Jim had labeled himself too early.  But then we still were together.  And later on this counselor apologized to us and said

that she learned -- had learned a lot since that time.  But it wasn't conversion therapy.  She was actually very helpful to Jim.  He had a lot of anxiety, and he was grateful not to have to be put on any medication or anything.  So he just kind of worked through that -- that process.

Q   You would agree that Mr. Rivett didn't like being on medications; is that true?

A   I would agree with that.

Q   And with -- so pretty much the entire relationship, which was about 35 years, Mr. Rivett had problems with anxiety.  True?

A   It would spike.  I mean, I would say the greatest was when he was coming out and then at the end of his life.  The other bouts, you know, if there was work stress or there was other kinds of stressors, you know, family illness or whatever, you know, he found a way to channel his anxiety in productive ways, so, you know, artistic, social relationships, community projects.  So he was -- people would nickname -- called him Mr. Electric because he was just always doing something, wanted to be in the middle of everything.

So he was able to channel a lot of his anxiety and never really needed the

medication.

Q   Did he go through counseling in his 20s and 30s?

A   Well, like I mentioned in his -- yeah, in the mid-20s with the one counselor, and then he was in that group therapy session for sexual abuse survivors.  And then he had -- when he was going through a lot of the issues with Paul, trying to deal with that, he started to see a counselor who he had a long relationship with, probably four to five years, and his name was Bob -- Bob Johnson.

Q   What about before Bob Johnson, did he have a therapist?

A   He might have seen one for a short time in the same building.  I think he and actually Paul went to see a therapist in the same building to kind of work out some of the issues that they were having between themselves.  And then Paul started -- I mean, I'm sorry, Jim started seeing someone separately when Paul was kind of out of the business.

Q   Who was the person that Mr. Rivett and Mr. Meinke saw together?

A   I remember it was a woman.  I'm sorry, I don't remember her name.  I'm pretty sure she was in the same building, and that's how Jim got connected

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 12 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 42

to -- to Bob Johnson. I'm not exactly sure.

Q And where was the group therapy session done for the sexual abuse? What was that through?

A Honestly, I can't remember the name, the name of it.

Q Okay. Anybody else that he saw in terms of a therapy?

A None that haven't been documented that I'm aware of. I know he's -- he went to see a priest when he was struggling, Bishop Morneau, for a little while, had some conversations with him.

Q What was Mr. Rivett's faith in terms of religion?

A He was raised Catholic.

Q All right. So looking at the records that we do have, which we obviously don't have all the records, but it looks like as far back as March or April of 2008 he had random thoughts of suicide but no ideation.

Were you aware of that?

A 2008. I don't -- I was not aware of that at the time. He might have expressed that to Bob possibly. And I know that's kind of when a lot of the stress was happening, you know, with his business partner and buying the new building and all that sort of thing.

Page 43

Q This is -- I'm looking at record GWL0109022. I believe -- was he seeing Bob Johnson back then?

A I'm assuming it was around that time. He had a long, a long history seeing him.

Q Okay. And then -- this is August 28, 2009 he reported that he had some suicidal fantasies.

Were you aware of that?

A No. I didn't attend any appointments with Jim with Bob Johnson up until after everything kind of happened with Arketype and then Khrome. And when he was pretty, you know, stressed and fragile, I would attend, not all, but a number of the appointments with Jim to learn how I could be supportive.

Q And that page is GWL010888.

So before 2008, are you aware of Mr. Rivett ever having suicidal thoughts or ideations?

A No.

Q And my understanding of your testimony today is that you were not aware that he even had suicidal thoughts in 2008; is that fair?

A Yes, that's fair.

Q All right. And then, as I said, there was one -- he had mentioned suicidal fantasy on August 28th,

Page 44

2009. On September 11th, 2009, he told Mr. Johnson that he continued to struggle with suicidal ideation. This is Page WL010886 [sic].

Are you aware of that?

A No.

Q And he said it was directly related to financial struggles of the company.

A If -- I would imagine that's what happened then, because that's when, you know, the recession was going on and -- starting to go on and there was, you know, big shoes to fill. He was fulfilling two roles at Arketype.

Q So Mr. Rivett did not tell you of any of these suicidal ideations --

A No.

Q -- is that true? What I said is true?

A Yes, what you said is true.

Q All right. And then on December 29th, 2009, and this is GWL10885, he told Mr. Johnson he had a particular breakdown this morning where he envisioned the picture of a noose and what scared him about that, he knows he could never go get a gun but he does have access to a rope.

Were you aware of that?

A No.

Page 45

Q This is on March 13th, 2012. He told Mr. Johnson that he recently had some passive suicidal ideations. No plans or means. And this is Page FHW0135.

Were you aware of that?

A No. And again, I did not attend any counseling sessions with Jim and Bob, so what was between them was between, you know, their conversation.

Q Right. But the question is just: Did Mr. Rivett tell you that he was having these suicidal ideations, or you knew nothing about this?

A No, I did not.

Q Okay.

A You know, I would -- I would know about his appointments, and sometimes I would ask him, you know, how things went, and, you know, if it was helpful and stuff, but he never mentioned anything like that specifically to me.

Q You would agree that Mr. Rivett over time, there were multiple inpatient recommendations for him and he did not want to do that. True?

MS. ASHBECK: Object to the form of the question. You can go ahead and answer.

A Could you repeat that, please, Linda?

MS. MEAGHER: Let's test Ms. Pezze and

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 13 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

Peter Angilello
July 13, 2022

Page 46

see how she's doing over there.

(Question read.)

MS. ASHBECK: Same objection. Go ahead.

A   My best memory is that it was, I believe, his psychiatrist, Dr. McMann, may have always suggested that that was always an option. But I don't remember anyone saying he needed to be in an inpatient treatment facility, like saying -- like for sure it was always an option, always something that he could go to.

BY MS. MEAGHER:

Q   Would you agree that he was -- he did not want to do inpatient therapy, that was something he did not want to do?

A   I would say probably not. He was -- he had never been in a hospital ever for anything other than maybe an emergency visit or two. So I know doctors and hospitals did scare him.

Q   Okay. And you could easily be persuaded by Mr. Rivett not to convince him to go to the hospital; is that fair?

A   You know, I -- I would -- I would listen to what he would say, and I did not, you know -- he wouldn't really convince me necessarily, but he would say, you know, like I'm doing okay, I'll be

Page 47

fine, let's just go do what we were going to do or whatever, you know. But yeah.

Q   So -- okay. So Dr. -- is it Dr. Christeson? Is that how you pronounce her name?

A   Dr. Christeson, um-hmm.

Q   Dr. Christeson reported that you were easily persuaded by Mr. Rivett not to go to the hospital. You would disagree with that?

A   Could you repeat that, please.

Q   Sure. If Dr. Christeson said that you were easily persuaded not to have him go to the hospital, you would agree with that, correct?

A   Not on the day that we were there that last day. I mean, I was -- I was in agreement that he needed some kind of help, whether that be inpatient in Green Bay or, you know, involuntary.

Q   I'm talking about in the past. For example, when he made suicidal gestures, he could convince you that he was okay and didn't need to go to the hospital; is that fair?

A   I would say that would be fair.

Q   All right. So going back to October -- I'm sorry, August 19th, 2014. Mr. Johnson again. GWL018466. Mr. Rivett was saying he was having some suicidal ideations but he made a commitment not to hurt

Page 48

himself, but he said he was afraid to go into the hospital at this point.

Were you aware of that?

A   No.

Q   He also said that he would reduce his schedule, professional and personal, at least for over the next few weeks.

Were you aware of that?

A   You were cutting out again. I'm sorry.

Q   Sure. He also said he was afraid to go -- I'm sorry. Strike that.

He also said that Mr. Rivett is going to reduce his schedule, professional and personal, for at least over the next few weeks.

Were you aware of that in 2014?

A   Not -- not that conversation. I know that Bob had --

Q   Were you aware -- I'm sorry.

A   I know that -- I know that Bob had suggested that he take, you know, some time off and, you know, 'cause that was a pretty stressful time for him. He was also --

Q   Go ahead.

A   2014 is when he also did a very big community thing. He was raising -- he did this Dancing With

Page 49

Our Stars and raised like 200,000 for the Red Cross. And he was just kind of -- Jim was kind of burning himself out that year, because he knew that this whole buyout thing was coming up and he didn't really want to face that. So he was trying to do, you know -- put energy elsewhere. And I would assume that Bob would have said something to him to the effect of taking care of yourself and not trying to burn yourself out.

Q   This is from May -- I'm sorry. Strike that.

This is from April 7th, 2015. GWL010825. Mr. Johnson again. Mr. Rivett said that I might attempt suicide if it gets to be too much like my mentor Bob Gould, G-O-U-L-D, or my friend Scott.

Who is Bob Gould [sic]?

A   Yeah, it's actually Bob Goltz, G-O-L-T-Z. He was the business -- he was the owner of the company that Jim had worked for previous to starting at Arketype. And Bob took his life. And that had a really severe effect on him, because Bob was a mentor in many ways. And then the other person's name you mentioned was?

Q   We'll go through that. Scott. But let's go back to Bob. Okay.

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 14 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 50

So when did Mr. Rivett leave that company?

A Okay. I would say like around 1997, roughly. Jim had spent a year in Costa Rica in 1996 doing some volunteer work. And then he came back, worked for a short time at Goltz, and then Paul Meinke approached him about working for him and becoming eventually partners at Arketype. So for not much longer -- Bob Goltz took his life like right after Jim kind of started working at the other place.

Q And when do you think he started working at Arketype?

A Arketype. I would say like 1997 or 1998.

Q Okay. And how did Mr. Goltz commit suicide?

A He shot himself.

Q Okay. And then the other person was his friend Scott. Who was that?

A I don't remember if his name was Scott, but his chiropractor that he had been going to see quite a bit. He was moving into a new building and he had a lot of stress, too, and he hung himself, I believe, in his home, and I know that affected Jim a lot as well.

Q And when did that happen?

A Oh, gosh. Well, uncannily, Khrome's first office

Page 51

was the same building where this gentleman's office was. Maybe 2014 or '15, I want to say that might have happened.

Q And I'm sorry. What was Scott's last name?

A I don't remember if his name was Scott, but he was Jim's chiropractor.

Q Oh, okay. And --

A I think his name was Kevin, actually.

Q Okay. And is that --

A Yeah. I --

Q Go ahead. I'm sorry.

A Yeah. He had -- I don't know if the person got -- whoever wrote those notes, he had another chiropractor after Kevin. His name was Scott. But the chiropractor that took his life, his name was Kevin, I want to say, and I don't remember his last name off the top of my head.

Q And his office was in the same office where Khrome was?

A Yeah. He never actually moved into that office because he took his life before that was to happen. But then they -- Khrome moved into the same building, not the same office, I don't think, but I remember Jim always feeling kind of uncomfortable about being there in that same

Page 52

building and, you know, having that memory.

Q Did he -- I'm sorry. Did he commit suicide at the office or at home?

A At home, I believe.

Q Okay. And did you and Mr. Rivett own Khrome, the building, or was that leased?

A That was leased.

Q All right. So anyway, back to this note from Mr. Johnson on April 7th, 2015. At that point he talked about, Mr. Johnson did, talked about the idea of Mr. Rivett going into a hospital for a short stay to get him stabilized.

Were you aware of that discussion?

A What date was that, Linda?

Q That's April 7th, 2015.

A Honestly, I don't remember. By that point I was already attending a few of the sessions with Bob just to see how I could support. I don't remember that necessarily or if I was at that appointment.

Q Let me see. Yes. Actually, you were at this appointment.

A Okay.

Q Okay. So you do remember or you don't remember that one?

A I don't remember that specific conversation.

Page 53

Q Okay. And then October -- I'm sorry, strike that.

January 8th, 2016 there was an incident, and this is reported in Mr. Johnson's note of that date, GWL010803, which you would have attended.

And it says, "Pete threw away Jim's items when Jim talked about giving up; well, then you won't need these."

Do you remember that?

A He -- what was the conversation again? Could you repeat that?

Q Sure. It says, "Pete admits that he is," meaning Mr. Rivett, "is becoming more assertive and challenging" -- I'm sorry -- strike that.

It says, "Pete admits that he," meaning you, "is becoming more assertive and challenging Jim as exhibited by his throwing several items of Jim's when on Sunday Jim began talking about giving up; well, then, Jim, you won't need these."

Do you remember that?

A I don't remember that specific conversation, but I know that my patience wasn't always probably what it could have been.

Q Going through this with Mr. Rivett was

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 15 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

overwhelming for you, wasn't it?

A   Yes, at times.

Q   And were you seeing your own therapist?

A   Yes, I was.

Q   And who were you seeing?

A   Wendy Chaput.

Q   How do you spell that last name?

A   That was always a hard -- I believe it's C-H-A-P-U-T.  And she was with the employee resource center.  I had seen her for at least maybe a year before Jim died.

Q   Did you see anybody else during the time period of 2009 to 2017?

A   No.

Q   Did you see anybody with Mr. Rivett as a marital counseling therapist?

A   Not -- no.  Just like I had mentioned that I attended some of Bob Johnson's meetings, I attended some with Dr. McMann, some with Dr. Koster, and then all of the appointments with Dr. Christeson, I was there.

Q   All right.  This is one from Dr. McMann, so from Bellin, and this is dated -- hold on one second. Actually, this is from Wendy Zeratsky, Z-E-R-A-T-S-K-Y, at Bellin.  She's a nurse.  It's

a telephone encounter.

"He called and said that thoughts of hurting himself were worsening."  This is BPC0050.

Were you aware of that?

A   I know I wasn't always there when he called, but I know he would call Dr. McMann's nurse often and usually regarding like medications that were seeming to have some bad effects.  And they would either, you know, reassure him or say this is a typical side effect, or they would say, you know, they would talk to Dr. McMann and he would make an adjustment.

Q   June 3rd, 2016, he had strong thoughts of using a garbage bag to commit suicide.  BP0056.

Were you aware of that?

A   I don't remember any -- a conversation like that. Was that a specific provider that he was with or --

Q   Yeah.  That was Dr. McMann.

A   I don't remember that.

Q   July -- I'm sorry.  July 28, 2016, he was having daily suicidal ideations.  This is, I think, with Mr. Johnson.  Hold on.  No.  It was Julie Feld. Is that her name?

A   F-E-L-D?

Q   Yes.

A   Yes.  He saw her for maybe two times, I want to say, after Bob left American Foundations and he went somewhere else, Jim went to see Julie.  And I believe I was there for at least one of those appointments.  And then he -- he didn't particularly care for her style or whatever.  They didn't click.  So I'm not sure who he was seeing at the time.  I think Dr. McMann still.  I think he was still seeing him.

Q   Okay.  But do you remember that he was having suicidal thoughts most days?

A   I wouldn't say most days, but, you know, he was -- he was having continued on and off; some days would be good, he would get up, get in the shower, get to work.  And some days, you know, he struggled.

Q   Were you aware, though, that he told a doctor that he was having suicidal ideations most day?

A   I don't remember that.

Q   All right.  Going to September 1st, 2016.  I think this is an appointment with Ms. Feld again.  This is W-L -- I'm sorry, strike that.  GWL1010769.  He said, "I just think it would be better if I just

ended it."  And apparently you were at the session.

Do you remember that, him making that complaint?

A   I would -- I would say yes, I do remember that.  I don't remember real -- like I remember he would say that fairly often to -- other times when we were with some other providers, like he was just exacerbated.  He was tired of taking medications. He was tired of trying this.  He wanted to get better so bad, but it just wasn't happening fast enough for him.

Q   All right.  April 12th, 2017.  This is with Dr. McMann, Page BPC0087.  "He's having thoughts of suicide.  It's the only way to end my pain."

Were you present for that or aware of that one?

A   I know that he said that to me sometimes.  I don't know if I was at that appointment specifically, but I know he would say things like that to me.

Q   Okay.  And how frequently would he say those things to you?

A   Again, it depended on the day, depended on the week.  Some weeks he would be fine.  Not fine, but he would -- you know, he was able to manage, and

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 16 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

then sometimes he would struggle.

Q   Did you ever call the doctor when he would make those comments to you?

A   Yes.  Well, Dr. --

Q   Any doctor.

A   Yeah.  I would call -- Bob Johnson is the person that I felt the most comfortable with, because he had had such a long history.  And I would talk about, you know, ways that I could support, what should I do.  I talked with my own therapist.  You know, the messages, honestly, I would get would be relatively mixed.  You know, some of them would say, you know, inpatient was always an option, you know, what they're going to be doing is adjusting medications.  And a lot of what I heard from providers is, you know, Jim, you have anxiety, you have grief, unresolved grief that you haven't dealt with, you know, this is going to get better in time.  So it was hard to know, honestly, how serious to take it.

Sometimes he would sound like the "boy who cried wolf," and he would say something -- like I remember one time specifically he said, oh, I can't take -- I can't take my life today because it's my sister's birthday.  And it's

like, Jim, I remember even asking my therapist, I said, is this like the "boy who cried wolf"?  Is this -- you know, how serious do I take this?  And I said how can -- and I don't think people who take their lives are this rational to think about it's someone's birthday so I can't do it, to some days where I was scared, I was frightened, and I would, you know, we would do what we were told; we'd call Bellin, we would go through the safety check.

And it was usually on the weekends that this would happen, 'cause the weekends were hard for him because there wasn't a set schedule.  And they would go through all of the, you know, things that they did in a safety check and said, you know, how do you feel, do you feel safe at home this weekend with Pete.  And Jim would say yes.  And then they'd say, well, you're all checked in, you can come in if you need to.

So, you know, I mean, honestly, you know, Linda, I -- I did the best I could with the resources that I had and with what I knew.  You know, I never thought that this would be how everything would end.

Q   Did you ever call 911 at any time related to Mr.

Rivett?

A   No, I didn't.  I really didn't know about the police safety checks until later, but I never really called 911.

Q   When you say "I never really called," it makes it sound like you might have called or tried to call.  So am I correct that you never called 911 related to his suicidal ideations or gestures; is that fair?

A   Yes, that's correct.

MS. ASHBECK:  Hey, Linda, would you mind if we took a five-minute break quick?

MS. MEAGHER:  Yeah, sure, sure.  No problem.

MS. ASHBECK:  Thank you.  I have to use the restroom.

MS. MEAGHER:  No problem.

(Brief recess taken from 10:31 a.m. to 10:37 a.m.)

MS. MEAGHER:  All right.  Going back on the record.

BY MS. MEAGHER:

Q   So there was an appointment for May 3rd, 2017 -- I'm sorry, strike that.

That was a telephone call, May 3rd,

2017 to Wendy Zeratsky at Dr. McMann's, the nurse, BPC0098.  This is when you called saying that Mr. Rivett "is the worst I've seen him.  He's very frustrated with not feeling better.  He is making comments to Pete about wanting to hurt himself.  Pete is on his way home now.  Was advised to call intake if patient is in danger of hurting himself.  Pete said he really doesn't want to go to inpatient due to the stigma."

All right.

Do you remember that phone call?

A   Did you say I made the phone call to Wendy or Jim made the phone call to Wendy?

Q   You did.

A   Okay.  I did call the nurse a couple of times.  So, yeah, I do remember talking about that.

Q   And was this the incident where Mr. Rivett had put a belt around his neck, hung it from the top of an interior door to see what it would be like, and then the belt had let loose and he fell backwards?

A   And can you tell me the date of that one again, Linda, please?

Q   The date of the phone call is May 3, 2017.

A   I don't know if those two were connected, but I did -- I do remember calling, 'cause that same

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 17 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 62

summer is the summer that I remember having the first experience with him that frightened me, you know, the most, and that was the time with the belt.

Q So your answer to Interrogatory No. 21, which is on Page 13 of the answers, you said, "Summer of 2017, a specific incident I remember, I had been at work and when I returned, Jim told me that he had put a belt around his neck and hung it from the top of an interior door to see what it would be like to hang himself. The belt had let loose and he fell backwards. He was scared and headed to a friend's home."

And in this one, this is a phone call to Dr. McMann's office, you say you're on your way home, so it sounded close enough that I thought maybe it was the same incident. You don't know, though?

A I don't think it would have been the same incident because that was -- he went to our friend's who have a condo on a lake, and he went to go swimming. So I don't think -- not in Wisconsin quite yet unfortunately you can go swimming, so that was probably a separate incident.

Q So when he had this incident of hanging the belt

Page 63

from an interior door, was that at your home that this happened?

A Yes.

Q And when he told you that, did you call 911?

A No, I did not.

Q Did you call his doctor?

A No, I did not.

Q And with regard to the other phone call, the May 2017 phone call at BPC0098, you said, "he doesn't want to go into inpatient treatment due to stigma."

What does that mean?

A Well, the stigma that he felt about going into any kind of inpatient treatment where his employees or people would think that there was something wrong, you know, wrong with him. The stigma was coming more from him and how he felt about it.

Q And why didn't you call 911?

A When? The belt hanging thing or the other time?

Q Yes, the belt hanging.

A I -- what I did was it was a little obviously shocking, you know. The incident had passed. I asked -- I tried to focus on what he did to get better or what he did to break the thoughts, because that's what I had been told, you know, to

Page 64

keep busy, make a connection with somebody.

And I said, what did you do. I focused on what was the positive thing he did. And he said he got scared of what he had tried to do, he jumped into his Jeep, he drove to our friend's, he went swimming for like an hour. And I asked him, how did you feel after you swam for an hour. He said I felt more alive than I felt in a long time. And I said, so what do you need to keep doing, and he said, I guess I need to swim. You know, I always tried to focus on what he could do trying to get him out of his head.

That was the message I got from so many providers was sticking to a schedule. Especially it's the weekends this would usually happen. You know, he didn't have work to go to so it's like keep your schedule. You know, Dr. Koster would say you had to be -- you had to do 30 minutes of exercise at a certain time. You had to be at work no later than this time. You know, so I kind of, you know, I was moved into this life coach role, but no, I did not call 911 when he did that.

Q Were you seeing Dr. Koster by then? I thought you didn't start seeing Koster until the summer of

Page 65

2017?

A No. I was just saying in general the messages that I was getting from Dr. Koster, Dr. Christeson, all the providers, basically, was to help him, because I don't think the providers really -- the message I was getting was that, you know, this was unresolved grief, this was anxiety, ruminations. You know, the way you move through those things are you do these things. So I kind of tried my role, I felt as best I could, was just to reiterate and remind him of what these different providers would tell him to do, you know, even though he didn't like to hear it from me.

Q Right. And I'm assuming that you and Mr. Rivett had talked about the idea of him going inpatient prior to this event of him, you know, putting a belt around his neck and hanging from an interior door, because you'd already told Dr. McMann's nurse that he didn't want to go to inpatient due to stigma, correct?

A I would remind Jim of what the doctors said, that that was always an option.

Q And why didn't you call Mr. Rivett's doctor to tell him about, meaning Dr. McMann, to tell him

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 18 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 66

about the fact that he had done this suicidal gesture?

A   I was not always at all of those appointments. So I don't -- I probably -- if I didn't, there's no record of that, I didn't. I should have. I -- I didn't, and I don't know if he brought that up with Dr. McMann at all or not.

Q   But you -- you agree you did not -- if there's no record, you didn't make the phone call, right?

A   Yeah. I would agree with that, yes.

Q   And was one of the reasons you didn't call, you were afraid that they would require inpatient treatment and Mr. Rivett didn't want that?

A   No, no. I think my -- the reason why I would not do that is because I wanted the best for him. I wanted -- I also agreed, I think, with a lot of the providers that a lot of this was just things that he had to move through, through, you know, talk therapy. And, you know, the message that I was getting was that he goes to an inpatient, there's, you know, the fear that he had of being hospitalized. There was emphasis on the medications, which a lot of the providers would say, you know, they were trying to steer him away from because they felt like he didn't necessarily

Page 67

need all the things that he was on. So that could have been where my head was at the time.

Q   Was the belt incident the first suicidal gesture that you're aware of?

A   That was the -- that was the one that woke me up to realize, you know, that scared me the most.

Q   All right. Were there any before that?

A   I don't necessarily remember the order specifically, and that's where I kind of made a list. But there was maybe one or two times when he would put his pills in his hand and show them to me and say, you know, I could take these all at once and I would -- I would do you a big favor and you wouldn't be burdened with me.

And then we would talk, put everything back, and then I'd call, usually I'd call -- not Dr. Johnson, I'd call Bob Johnson, and then he would say, well, take the pills, you know, tell him you're going to hide them for a while until he feels like he can manage that on his own. And then that's what I would do. I would hide them in a certain place and then give him his pills.

Another time that I mentioned at least once when he took a knife and he was going

Page 68

to look like he was going to slash his wrist, and I just talked to him. You know, I said, Jim, you don't even like knives. You know, it's hard to remember the specifics because, you know -- but he would put the knife away. And so the pills were one thing. The knives. The use of the belt or the necktie, as I remember maybe at least two or three times. And then the time, you know, in the car going to Dr. Christeson's office were probably the main things. There could have been others. But...

Q   So when did this belt incident happen, do you think?

A   It would have been probably the summer of 2017. He was struggling a lot with his -- I don't remember -- I think it was after his mom passed away, and then also his brother had been there for the funeral, and they were really close, and then he went back to California. And that was hard on him. And, you know, like I had mentioned, he went swimming, so I'm assuming that was that whole day, that July date.

Q   Who were the friends that he went to visit with?

A   There were friends of ours who I mentioned live in the condo on -- you know, it's just a private

Page 69

lake, condo association lake, and they said to come to the condo any time and just go swimming, that he didn't have access to the pool.

Q   What were their names?

A   Oh, I'm sorry. I'm sorry. Curt, with a C. C-U-R-T, Evans, E-V-A-N-S. And Mary Blake, B-L-A-K-E.

Q   There's a note in Dr. McMann's records at GWL010033 to 10036 from June 27th, 2017 where he says "has chronic suicidal thoughts, suicidal gestures two weeks ago."

Do you think that would have been the belt incident, or you don't know?

A   If it was two weeks before, that would have been like May. I don't think he would have gone.

Q   This is June 27th, so it could have been middle of June.

A   Oh, that might have been. You know, my recollection was July of 2017 was the most challenging month because of his mom's death and all of that happened.

Q   Okay. It also says -- so you said after that he did put a belt around his neck at least three other times that he told me about.

And so what would happen with

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 19 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

regard to that?

A Sometimes he'd say belt. Sometimes he would say a necktie. And I don't remember recalling -- talking to anyone at any of his appointments about it, but we -- they were almost like, you know, he wanted to test it out or see what it would feel like. And then we would talk again, like what did he do to not follow-up on that, and we would kind of talk it through. And then we would kind of move -- move on with whatever we needed to do.

I tried not to focus so much on that and then tried to think about what we could do to move him through those things. 'Cause like I think almost all of them would happen on the weekends when he struggled the most. Then --

Q So on June 5th he called the nurse, who is Joe Becker, BPC014, and said his suicidal thoughts had increased and they were almost nonstop.

So were they pretty much nonstop that summer?

A They were intensifying, yes. His mom's illness, her death -- yeah, that was a hard summer. I don't remember if he was taking a couple different medications around then and he was being weaned off of one and taking another. We wouldn't have

seen Dr. Koster before that time. But, yeah, that summer was particularly a challenging one.

Q And the therapist noted that he was significantly suicidal at this point, and they talked to him about he can always call inpatient, intake department if he feels he cannot keep himself safe. This is BPC0115.

When did the incident happen that he would pour medication -- a bottle of medication in his hands and say I could just take this, all the pills at once. Did that happen sporadically over a time period, or when did that start?

A I remember that maybe twice, I want to say, and I don't -- honestly, I don't remember specific dates. I didn't keep like a journal or a diary of any of those, but they -- they seemed to, you know, be all kind of -- in a certain time frame.

Q So he did that before and after the belt hanging incident or only after, or don't you remember?

A I don't remember specifically, no.

Q August 2nd, 2017. This is GWL010048. He was having thoughts of suicide, specifically hanging himself. And you were present for that.

Do you remember that?

A That would have been with Dr. McMann then?

Q Yes.

A Um-hmm.

Q Do you remember that?

A I know there were some conversations about, you know, suicidal ideations and things like that with Dr. McMann. I don't remember specifically that particular one or that date or anything like that, but I would say I probably went to at least three-quarters or a half of his appointments with Dr. McMann.

Q Okay. September 15th with Dr. McMann, GWL010062. He's fighting off dark thoughts of suicide.

Were you there for that one, or do you remember those type of complaints?

A I do remember him having conversations with Dr. McMann about that. I don't remember that one specifically, but it -- they came up, you know, not often, but fairly frequently with him. I know Dr. McMann would always do a check-in with him regarding that I think almost every time that I was there.

Q And this is -- now I'm going to October 21st, 2017, GWL010073. "For the last two days the patient has felt suicidal, like I would be better off dead."

Is that something he would say to you pretty frequently, like he felt that he would be better off dead?

A Yes. And frequently -- I mean, when he was feeling -- when he was feeling the most fragile, I mean he would always -- he would say -- that would be the message that I would hear is that you would be better off -- everybody would be better off without me being here.

Q And it says, "Patient really does not want to come inpatient and feels that he can be safe until he sees Dr. Cagle again on Monday. Writer explains that if he wanted to come in and be admitted that he could, but again, patient" -- says "patient and P, patient's partner, will call if they feel things are getting worse before Monday to have another assessment and possible admission."

Do you remember that discussion with Dr. McMann?

A Yeah. Yes, I do remember. Because those were generally the pattern that would follow when I would call, you know, over the weekend and they would do those -- that checklist and run through and say he could come in any time because he had been checked in.

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 20 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

Page 74

Q  Okay.  Now, my understanding is that around October 31st, 2018 -- strike that -- October 31st, 2017 Mr. Rivett wrote a bunch of good-bye letters.

A  2017 you said?

Q  Yes.

A  I believe my -- there was a letter that I found after he died that was dated like October 31st, 2017, I want to say, and then we found -- we found some letters in a handbag, a bag of his that was given to us after his death that he had at work.

Q  Somewhere here, I got to look for it, though, you told the crisis counselor on August 16 about these good-bye letters.
        So it suggests that you knew about the good-bye letters prior to his death, prior to Mr. Rivett's death.

A  Oh, I know what those are referring to.  We found some letters in the -- actually, not we.  Jim's brother was visiting, and I'm not sure exactly when that was.  I want to say like July or something.

Q  Wasn't that the first anniversary of Mr. Rivett's mother's death?

A  Yes, yes.  That's right.  He was -- John was visiting and we were at a cottage, and Jim had

Page 75

some books with him.  And John was reading Jim's books.  And there were some letters inside there that was -- there were just small little notes, and they were letters to like his nephews, his -- me, siblings, and then he wrote one to his mom, too.
        So I -- I didn't know if he had written those like when his mom was still alive or he wrote it to her like after she had died.  John showed me those letters.  He didn't want to approach Jim with them to confront Jim with them.  I remember taking -- I remember talking to him with the letters, and I think I told him, I don't really have a strong recollection of this, but we talked about them.  And I said, could you write gratitude letters rather than good-bye letters?  Could you change the way you are thinking about this.  And he said I could do that.  I don't remember having a conversation about them with any of the providers.  And actually, I had just kind of remembered those, you know, recently.  So...

Q  Well, first of all, where are the letters that he wrote?

A  They would probably be in the book somewhere where I have not been able to find.  I called John to

Page 76

ask him if he remembered that incident, and he took pictures of the letters, and then -- the notes -- they're not really letters -- and sent them to me.  And then I forwarded them to my counsel just recently, like within the past couple of days.

Q  Okay.  So obviously I want copies of those.
        So these are the letters that you found when the brother was visiting, right, when John was visiting?

A  Yes.

Q  And what's your memory of what they said?  Have you looked at them recently?

A  Well, yes, because -- yeah.  They were very short little notes, probably a sentence or two at the most.  You know, like sorry I wasn't able to be strong enough.  Forgive me.  That sort of thing.  You know, I don't know if sometimes, you know, 'cause I found a letter, a much longer letter from October like 31st, 2017 after he died, and, you know, nothing ever transpired between the letter writing.  I don't know if he wanted to write some things or was processing some things in case he wasn't able to make it out of his depression or whatever he was feeling, that he would have

Page 77

something to get -- left to tell people what he thought about them.
        I mean, this man was incredibly kind that even in the despairs of his, whatever he was going through, he left little notes for, you know, people and other people that he had worked with, you know.

Q  So when you discovered this, did you show this to Dr. Koster?

A  Well, I don't think we saw Dr. Koster until like November of 2017.  This would have been when John was visiting, so it would have been July.  I don't think I ever saw them.  And I --

Q  I thought this was July of 2018 that you found these letters?

A  When he --

Q  When John was visiting for the one-year anniversary of his mother's death?

A  Yeah, that's right.  I'm sorry.

Q  My question is, did you show Dr. Koster these letters?

A  2018.  I don't remember showing them to Dr. Koster, no.

Q  Did you show the letters to Dr. Christeson?

A  No.

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 21 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Q Christeson. Okay. And why not?

A When we started working with Dr. Christeson, it would have been -- I think we met with her in December of -- pardon me if I'm struggling with dates here -- December of 2017 after Dr. Koster recommended working with her. And Jim was put on a medication, Fluvoxamine, into the middle of March of 2018.

And really, from that time period when that medication kicked in until he was weaned off of it mid-July, that was the main time that we were seeing Dr. Christeson, and we would only see her once every four to five weeks. And he was doing much better, so much better.

In fact, a couple of his coworkers even commented that he had seemed to be more like himself.

So I don't think in our conversations with Dr. Christeson we ever even moved that much into suicidal thoughts and that sort of thing, because he had been doing so much better. And it wasn't really until our meeting with her on August 16th that she saw such an abrupt change in his demeanor and his affect. And, you know, that's when she was asking a lot

more of these questions.

So I think at the time, you know, I just didn't focus on them because he had been getting better. He seemed like he was starting to move out of some of the things that he was feeling. But I don't remember sharing those letters with Dr. Christeson or Dr. Koster. We might have talked about them with Dr. Koster, but again, I wasn't there for all of those meetings with him.

Q You agree with Dr. Christeson, you didn't tell her and Mr. Rivett didn't tell her that he had been having suicidal gestures and ideations the year prior to the incident on August 16th; isn't that true?

A It appeared that she didn't know as much about that. But my understanding, Dr. Koster told us that he recommended her because they had worked with other people with anxiety and people that needed some work with like cognitive behavioral therapy and that they were going to be like a tag team. And he was going to tell her what he -- you know, what he had been prescribing, and then she was going to tell him what she had been doing with him.

In fact, a couple of meetings with Dr. Koster, he was having Jim practice some of the things that Dr. Christeson was telling him to do. So, you know, I guess in my understanding, that they were talking to each other about some of these things, and I know Jim had talked to Dr. Koster about some of his suicidal ideations and that sort of thing.

So I guess, you know, he didn't really focus on that, and I didn't really focus on that in our meetings with Dr. Christeson because he had been getting much better during that time period, and because I just assumed that they were communicating with each other.

Q My question's real narrow, which is: Would you agree with Dr. Christeson's comments in her records and her notes that --

A Okay.

Q -- that she was never told until August 16th, 2018 about the fact that Mr. Rivett had been having suicidal gestures and ideations for an entire year?

MS. ASHBECK: I'm going to object to the foundation and speculation. Go ahead and answer.

A Yeah. Yes. Could you repeat that one more time

so I'm answering --

BY MS. MEAGHER:

Q Yes. You would agree with Dr. Christeson's statement that she was never told until August 16th, 2018 that Mr. Rivett had been having suicidal gestures and ideations for a year prior to that day?

MS. ASHBECK: Same objection. Go ahead.

A Yes, I would agree with that.

BY MS. MEAGHER:

Q And you never called Bellin to tell them about these good-bye letters, did you?

A Not that I'm aware of.

Q And you never called 911, right?

A Right.

Q Did you and John have a conversation with Mr. Rivett about these good-bye letters?

A With John, yes. He asked -- he came to me with the letters and said, you know, I found these in this book, what do you think we should do about them. He said he wasn't -- he didn't want to confront Jim because he didn't want to upset them -- him. He didn't know if he wrote them as whatever, you know, as a way to purge some of the things that he was feeling, because sometimes when

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 22 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 82

you're writing some of this stuff down, you kind of feel better that you're leaving something behind, as strange as that may sound. But, you know, I am grateful for the things now that he left for me and wrote for me because I have something to hold onto.

Q    Okay. Again, my question is real specific.

A    Yes. I'm sorry.

Q    Did you confront Mr. Rivett?

A    I don't remember talking -- I just remember talking to him about the letters and saying something about turning letters like this into something of gratitude instead.

Q    Did you ask him when he wrote the letters?

A    I don't remember. I just assumed after seeing -- finding them about -- that it was before his mom died, but it must have been a letter to his mom after her death if they were found at that time period.

Q    Would you agree, is it fair to say you have no idea when the letters were actually written?

A    No, I wouldn't know.

Q    Okay. And you said they're in a book.

        Was there some sort of journal that Mr. Rivett had?

Page 83

A    No. It was just a book that he had been reading.

Q    It was some book that he wrote in the margins or something, or what is that --

A    No. They were just little -- they were probably pieces of paper like this, and it looked like he had either cut them out or tore them out and then wrote little notes on them and put them inside of this book.

Q    Oh. So almost like a bookmark type thing. He put some -- and what was the book that he was reading?

A    I -- John told me what book it was. Something about -- it was a book that he was reading about -- I can't really remember the name of it. I could get the name of the book for you.

        But, you know, he brought that book along with some other books to read at the cottage for that week, and then John and Jim shared stuff that they read and then he found those. I didn't know about those letters until after John had found them. He might have even written them there that week for all I know.

Q    Okay. Do you think you asked Mr. Rivett when he wrote them and you just don't remember, or you didn't ask him?

A    I don't remember asking.

Page 84

Q    All right. What about the notes that you found after his death?

A    The notes that we found after his death were brought in his leather bag from work. It was sometime between his death and his funeral. And we were all at -- Jim's family were all there, and my niece. And then people had been, you know, coming in the house, bringing food. We were having dinner. And one of Jim's employees -- I thought -- I think it was Bobbie -- was kind of the business manager. She brought back his leather bag. And she said that they were cleaning up and -- his things at work, not cleaning up, but looking for things at his workplace, and they found on his computer, there was -- and Jim's computer's desktop was always filled with all kinds of things kind of like his brain, and it was all cleared except for a folder, one folder.

        And in the folder there were eight photos that were significant to our time together. And there was a letter inside that folder that she had printed off to give to me. And strangely, the letter, I believe, was dated like August 24th, the day after Jim died. And then, as we were digging in, there were some just personal stuff that you'd

Page 85

have in a bag.

        But inside of a zippered pouch there were a number of letters, some short, some long to different people. So there was one handwritten to me, one handwritten to John. There were some other ones that were handwritten as well, shorter ones to some other siblings. And then that bag, you know, I had put away. And then I was going down to have my surgery in Milwaukee in January of 2019 and I brought the bag with me.

        I wanted to have something of his to put my stuff in, and I always kind of was nervous, I guess you would say, to look in that bag because of the different things that we found. I had dumped everything out. I went through every pocket, zippered pouch. And then when I got to Milwaukee, I unpacked all my stuff and I found another little flap. And inside of that flap were like eight more short notes, not anything lengthier than this to other people that had helped him over the years.

        So there were letters to some of the gentlemen that helped him get started in Khrome, some other business colleagues. So there were people outside of our family that somehow he

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 23 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

Page 86

wanted to write a little note to tell them thank you. And I -- when I came back from my surgery, I went to those individuals and I gave those to those individuals. I don't have copies of any of them.

Q Have you asked the people you gave them to to see if they have copies?

A I would imagine -- I would hope that they all kept them. I know a couple people had framed them and kept them on their desk. You know, I don't know how fragile he was at that time. You know, and this, of course, would have all happened before we had even gone to Milwaukee. But he managed to, and even in his distress, to write some notes to people to thank them for what they had done for him. 'Cause I don't know -- you know, I don't know if it was a plan or I don't know if it's just 'cause he wanted -- he was afraid that --

Q That's all right. Any time you want to take a break, I understand this is difficult to get through.

A You know, I don't know if it's just 'cause he wanted to make sure he said things to people. Just like someone who's dying of cancer, we think of mental illness is like, you know, it's

Page 87

something different than. But if I had cancer or if someone had cancer, you'd want to leave something because you don't know if you're going to make it, you know. And so I don't think they were good-bye letters as much as they were "I want to tell you what I want to tell you."

Q But you've referred to them as good-bye letters in the past, right?

A I guess. I don't know how I -- yeah, I'm not sure.

Q I've seen your YouTube video where you talk about them as good-bye letters. And you remember that, right?

A I did a YouTube video?

Q Yeah. There's a YouTube video of you talking about the letters. I don't know if it was a presentation that you gave to a church or what it was.

A Oh. I took a portion of one of his letters to use at his funeral, because he talked about -- I don't remember specifically, but he talked -- he thanked everyone that had helped him. And he told everyone that he just couldn't -- couldn't do it anymore, that it got to be -- the chains just got too heavy. And so I wanted everyone to know that

Page 88

he cared about them.

There have been other presentations that I have done, you know, since that time. I might have called them a good-bye letter. I don't know. I guess -- I think of them as a way to tell people what he wanted -- wanted to say to them.

Q What was the letter that was dated on the day after his death? What was that again?

A It was a typed letter. That's the only thing -- I don't have a copy of it with me. I gave a copy to counsel. It was more a letter just to me.

Q And when did you give this letter to counsel?

A I believe it was when I gave them everything that I had had when we first started our -- our relationship.

Q Because I've never seen these letters. So I do request the letters. I'd like to look at them right now, but I may need to do a second depo once I digest these.

MS. ASHBECK: I'm just trying to look right now, Linda. These should have been produced to you.

MS. MEAGHER: Maybe we're missing it. Could be possible. What number are they?

MS. ASHBECK: What was that?

Page 89

MS. MEAGHER: You want to take a little break and try and figure out where they are in your production?

MS. ASHBECK: Yeah, let's do that. Let's take a break. I'll see if I can find them, and if I can, I can let you know where.

MS. MEAGHER: The other thing is I do want to request, and this is back on the record, I do want to request that you request from people you gave letters to to get copies of whatever he wrote. Okay?

THE WITNESS: I can do that. I remember most of the people who he wrote those to.

MS. MEAGHER: All right. Great. Okay. Let's take a little break and look for that. All right?

THE WITNESS: Thank you. Appreciate that. Okay.

(Brief recess taken from 11:19 a.m. to 11:33 a.m.)

BY MS. MEAGHER:

Q All right. Going back to the suicidal ideations. There's a note from November 7th, 2017. I'm sorry. That's what we just went through. Okay. There's a note from November 10th,

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 24 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

2017 saying that you called the nurse at Dr. McMann's office. You said you were at your wit's end. "Jim is unraveling quickly and is wondering about patient." I think you meant worried about patient. "Pete says employees are calling him saying they are concerned. He sits in meetings, doesn't say anything, they say he's checked out. They asked Pete if they should do an intervention and have him take a sabbatical from work." This is BPC0192.

Do you remember the phone call?

A   Yes, I do remember talking to somebody about that.

MS. MEAGHER: And what -- let's start with -- before I forget, Jenna. I want to put on the record, because we didn't have it on the record about this production.

So these good-bye letters were not produced in the past because you didn't think we requested them. Is that what you said earlier? I'm just trying to make sure we get this right.

MS. ASHBECK: Yeah. Looking back at it, I think the way you read it is that legally that's not what you were asking for. It's based on the request, yes.

MS. MEAGHER: So you then e-mailed it to

me. We're going to Bates stamp them and put them in the production you gave us earlier so we have everything together. Okay. So that's what's happening right now.

I also want to request Pete's therapy records, because I think they're going to be relevant to Mr. Rivett and what was going on with Mr. Rivett. So I'm going to request that too.

BY MS. MEAGHER:

Q   Okay. So going back to this note, you said he was unraveling quickly and you're worried -- it says wondering, but I think they meant worried about the patient.

What was going on at that time? This is November 10th, 2017.

A   This is the comment about a co-worker?

Q   Yes.

A   Yeah. It's -- she's a contract employee and was a close friend of Jim's. And she had called me because she said --

Q   I'm sorry to interrupt you. Who is this person we're talking about?

A   Oh, I'm sorry. I thought I said. Her first name was Carol, C-A-R-O-L, Cassell, C-A-S-S-E-L-L.

Q   Okay.

A   And she was their copyrighter but not an employee. She called me and said that she was very concerned. She was on a Zoom meeting that Jim was on. And she seemed -- he seemed like he was just totally checked out of the meeting. He wasn't contributing anything. He looked like he was just looking out the window, like he could jump any minute. He just seemed really out of his skin. And she was concerned.

And she said, you know, we -- I don't know -- I don't remember if she said some of the people from Khrome had talked or she just said she'd be willing to talk to Khrome people. But she did say we are all onboard with him getting help if he needs to take a sabbatical for the time period, we have his back. He needs to know that. Jim always felt like he couldn't leave and do that because he just started a business, and he was the face of the business there. He was reluctant to do something like that.

Q   So did anyone else at the business complain about Mr. Rivett or express concerns about him and his behavior at work?

A   Yes. There was one time one of his coworkers, we

were like at a social function, and said, you know, I would check -- because I'd known her for a long time, I would kind of check in with her, and she would -- you know, had said that he was struggling but he was doing what he could.

And, you know, I would tell Jim, you know, I'd repeat what the providers would say. You don't have to knock it out of the park every day, Jim, but you have to show up, you know, you have to show up and do what you can do.

There were a couple other people --

Q   I'm sorry. Who was that person?

A   Oh. Her name was Bobbie, B-O-B-B-I-E, Fredericks, F-R-E-D-E-R-I-C-K-S.

Q   And is that the person who gave you the briefcase with the letters in it?

A   It's -- my memory is that she brought it there. I had actually asked Carol, because I saw her recently, because I had thought it was Carol. And she said, no, she thought it was Bobbie, but she couldn't quite remember. That was right in the middle of a lot going on.

But at the same point during that time period from -- after he was on Fluvoxamine mid-March up until July, I had at least two or

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 25 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 94

three people from work tell me, you know, personally saying that they felt he was getting his mojo back and energy back. He seemed more and more like himself. And even Carol Cassell, who had called me that day -- I can't remember if you said that was March or November when he was having --

Q November 10th, yes.

A Oh. She was -- told me he had been seeming a lot more like himself and she told him that. She said, whatever you're doing, keep doing it, because it seems like you're --

Q When did she tell him that, that he was getting better?

A Better? That would have been probably in the later spring. So like April -- April, May, June. You know, I think the medication might have kicked in by then or, you know, maybe there was a -- you know, Jim did get a groove from work. So if there were lots of positive things happening, there was a lot of good news, new clients, you know, that boosted his confidence. When there was something bad that would happen or he heard about an employee thinking about moving or leaving the job, that would set him back.

Page 95

I mean, the resiliency that he would have normally had higher lows and highs, if that makes any sense to you. Didn't bounce -- didn't seem to bounce back or took things more personally.

Q Did anyone ever diagnose him as being bipolar?

A No, not that I'm aware of.

Q What about personality disorder?

A No.

Q What about schizophrenia?

A No.

Q Okay. Anyone else? Did Josh ever talk about concerns about Mr. Rivett?

A I'm not sure who Josh is.

Q I'm sorry. Who is --

A Oh, Jason.

Q Jason, I'm sorry.

A Well, Jason at that time worked remotely. They live in Schaumburg. So I don't think he saw the day-to-day kinds of things that the people who worked, you know, with him directly would see.

Q Okay. Anyone else other than Bobbie and Carol?

A Shelly would be the other person who I would have had some more communication with. Again, you know, she had worked with Jim for a long time.

Page 96

She was a good friend of ours too. So I would check in with her every now and then to see how he seemed to be doing, if he was contributing, that sort of thing.

So I had a few people that I felt like I could check in. And then also the receptionist, Joann, J-O-A-N-N, Reimer, R-E-I-M-E-R. Joann was their receptionist. So oftentimes I would check in with her every now and then when I felt a concern like in the morning, because that was when he struggled. So if I was already at work, sometimes if I'd call him and he wouldn't answer, I would call Joann and say, hey, did he make it in to work. And she would say, oh, yeah, he was a little late but he got here. And I would rest and -- okay, like, you know, he started his day. He's not at home.

Q So what's Shelly's last name?

A Oh, I'm sorry. Shelly Young, Y-O-U-N-G.

Q And what was her position?

A At that time at Khrome she was vice-president. There were two vice-presidents. Megan Murphy was the other vice-president. I think one was of sales and one was of the like creative. I'm not sure of their specific titles, but they were both

Page 97

co-vice presidents.

Q Okay. And did they ever do the intervention?

A No.

Q Okay. Did you tell them that you thought that was a good idea, or what did you tell them about the intervention?

A I told Carol that I -- you know, that whatever we can do, we should do. You know, I -- I don't know, really know -- I mean we were just kind of brainstorming things that could happen and, you know, and I was telling her what we were doing at that time. You know, I think we were just starting to work with Dr. Koster and Dr. Christeson around that time, and so that we had this new path and, you know, he was getting to be on the new medication. It -- I just -- you know, I told her, kind of updated her what we were trying to do to kind of move things forward for his help.

Q Dr. McMann at this point said that, you know, he could make a case for inpatient -- inpatient stay at this point, right? He told you that was -- it makes sense to have an inpatient stay at this point?

A Dr. McMann said that?

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 26 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Q  Yes.

MS. ASHBECK:  Just so we're clear, Linda.  At what point are you talking about?

MS. MEAGHER:  This is November 10th, 2017.

A  I don't -- I don't remember that conversation.  Was I there for that one or -- does it say?

BY MS. MEAGHER:

Q  This is -- you had called the nurse.

A  Okay.

Q  And then I think your conversations were still with the nurse, but this is what Dr. McMann was saying to the nurse.

A  Okay.

Q  And then they contacted intake at Bellin.

A  Okay.

Q  Then the nurse called you back, another nurse, and said, you know, there's possible intake, spoke to you about that option.  They spoke to both you and Mr. Rivett, and that the doctor's recommending inpatient services to stabilize the patient.  This is BPC0193.

Patient is reluctant to admit self to inpatient, and you said you had considered the options over the next few days.  You were seeing

Dr. Cagle and Dr. McMann early next week, but you both denied safety and -- concerns and would call back for inpatient treatment.

So do you remember Dr. McMann's office recommending inpatient treatment on November 10th, 2011 -- or '17?  I'm sorry.

MS. ASHBECK:  I just want to insert an objection to the fact that that option does not accurately reflect that there was another possibility discussed as well.  Subject to that, go ahead.

BY MS. MEAGHER:

Q  Right.  Let me just clarify.

I'm not saying there weren't other options.  But one option that was given to you was that Dr. McMann was recommending inpatient therapy; is that true?

A  I would say, 'cause that's one thing I remember him saying, that's always an option, you know, that's always something that we could fall back on.  You know, if we felt that we -- and that's when I think, at least two or three times, I would go through that whole -- the process of doing the safety checks, you know, with the nurse and that sort of thing.  So that could have been one of

those times.  I don't remember specifically.  But I do remember Dr. McMann was very thorough in going over different options whenever Jim was struggling.

Q  Okay.  For this one I'm going to just get to the actual note.  Hold on.  Let's see if I can get this to work.  I'm going to show you BPC0193, which is the phone call from the nurse at Dr. McMann's office from November 10th, 2017.  And it says, "Writer explained" -- can you see where I'm highlighting, where my curser is?  Can you see that?

A  Oh, yes, I can.

Q  Okay.  "Writer explained doctor is recommending inpatient services to stabilize patient."

Did I read that correctly?

A  Yes, you did.

Q  All right.  And you agree that you were told that.  True?

A  I -- if it says -- I do remember something like that, that that was always an option.  I can't remember -- so this was a phone call between the nurse and I?

Q  Yes.

A  Okay.

Q  You and Mr. Rivett.  You were both on the telephone.

A  Yeah, yeah.  He would have been on the phone line, too.

Q  All right.  Then there's a note from November 30th, 2017, which -- let me get to the right page.  This is GWL010086, in which Mr. Rivett -- this is with Dr. McMann, says that -- "I had a little in the mountains thoughts of jumping."

So he said his sadness is better.  He's smiling more.  He feels exercise is helping his mood.  Suicidal ideation is fleeting.  Denies plan.  "I had a little in the mountains thought of jumping."

Were you on vacation in the mountains at this point?

A  We were.  That was -- that was November 2017?

Q  Yeah.

A  We went out to visit his brother John in Palm Springs at that time.  And Jim -- yeah.

Q  So the same time period, this fall of 2017, was a time period that Mr. Rivett was obsessed by his health, too, isn't it?

A  Yes.

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 27 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 102

Q   Okay.  So he first -- he first thought he had ALS, right?

A   Yeah.  And then I would say it was longer than just the fall.  I would say like, you know, from -- as soon as Khrome got off and running and was successful I think is when all of the guilt, the shame, the grief, that everything kind of came pouring in.  So I would say at least that year around --

Q   So two thousand -- starting in January 2016 or January 2017?

A   Just maybe mid, midway through, because I remember he thought he --

Q   Midway what year?  Let's start with that.

A   Okay.  Roughly maybe 2016, end of 2016.  He started thinking that he had something physically wrong with him; so ALS, MS, Parkinson's.  And we would go from one doctor to the next doctor to the next doctor who basically would tell him in no uncertain terms, and one physician actually said this, that, no, you don't have any of these things, but you have the worst anxiety we've ever seen in anyone.

        So, you know, I would keep telling him, I said what -- what's wrong with -- I mean,

Page 103

you have anxiety and anxiety is bad enough.  Why would you -- but I think for Jim to have something physical to hold onto, to say, oh, this is why I feel so bad is because I have ALS, or these are why I have these symptoms, I meant to say, is because I have a disease.  And I think in some ways Jim would have felt better if he had been diagnosed with something because that would have given him a reason to why he was feeling like he was feeling.

Q   Okay.  So during -- from what I can tell from -- so you're saying -- strike that.

        You're saying the middle of 2016 this started?

A   Well, he had -- and I know he had a couple of trips at some point to the emergency room, like maybe at night, because he was having a lot of heart palpitations.  And it all -- yeah, there were a number of -- he was thinking he had something neurological first, and then the last thing was that he thought something was wrong with his heart.  And he wore -- before we would go on a trip to Palm Springs, he had worn one of those things that monitors your heart.  I can't remember what they're called.

Page 104

Q   Halter?

A   Yeah, halter.

Q   Heart halter?

A   And he wanted to get the results of that before we went on our trip, because he wanted -- he thought for sure there was something wrong with his heart.

        When he dropped off the device, he had wrote on it, "please rush" or something like that.  And he thought it would take him a number of days to get the results.

        So then another option he had was he remembered Dr. Koster, who he had done some work for in the past, and thought, well, maybe Dr. Koster can help get this information faster.  And Dr. -- so that's when he first reached out to Dr. Koster.  And then he did actually get the results back like in a day or two.  And he was so proud of himself that he came up with the way to get those results.  And then Dr. Koster had us come to his office on a Sunday, I believe it was, and I thought it would be a short visit.

        He spent like two or three hours with us and looked through all of Jim's records up to that point and said, you know, Jim, you know, I want to encourage you to try a new path.  He said,

Page 105

obviously there's nothing -- you don't have a disease, there's nothing wrong with you, but he started talking about, you know, cognitive behavioral therapy, more about, you know, trying to wean him off of some of the medications that he was on so that didn't cloud his thinking as much, his return to health as much.

        And then that kind of November started this new path working with Dr. Koster and Dr. Christeson.  And then at some point we stopped seeing Dr. McMann because Dr. Koster could prescribe whatever medication was needed and then Dr. Christeson was doing some of the therapy.

Q   Let me just get back to the one thing real quick.

A   Sorry.  I --

Q   That's okay.  For the ALS, he did the MRI, he did an EMG, all sorts of tests.  They told him he didn't have ALS.  This was in the fall of 2017.  But he didn't believe them and then he started thinking he had Parkinson's disease.  They also did some testing for that, said he didn't have that.  October 19th, 2017 you called Dr. McMann, Page BPC171, and said that you were concerned with and had questions about his behavior at work.

        So what was going on then?  This is

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 28 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 106

October of 2017.

A   Well, maybe -- I don't remember that phone call, but that could have been maybe when some of the -- when some of his coworkers would say things to me, then I would, you know, probably follow-up on that. I don't remember that specific phone call.

Q   He was -- at some point around this time he was crying about not going into work and crying to his coworkers; is that true?

A   I don't remember him crying. I don't remember him being emotional in front of his coworkers.

Q   Okay. But to you --

A   At least he didn't tell me or no one shared that with me. He would often cry in the morning or be upset because he didn't want to go because he felt like people were going to know something was wrong or people would pick up on it. And, you know, eventually he would go, but, you know, it was usually by encouragement and --

Q   So by October 16, 2017 you don't know exactly what behavior at work you were calling about at that time, or do you?

A   I don't really remember.

Q   All right. But whatever it was, it was bad enough that you felt the need to call Dr. McMann,

Page 107

correct?

A   Right.

Q   Okay. So then October 22nd, 2017, this is -- it's a Bellin record, GWL010571 to -574, he went to the ER with rapid heart rate. He was -- he said he had suicidal ideations, although he didn't have any that day, he was anxious and paranoid, and he also had paralysis in four extremities with cramps suggestive of hyperventilation syndrome.

A   Um-hmm.

Q   And he was concerned this is related to his medical conditions. So tell me about that ER appointment. And was he saying he couldn't move any of his limbs, or what was happening there?

A   I think -- I do remember someone talking to him about hyperventilation, and at least two or three times we would go to the emergency room regarding that. And I do remember him going and -- you know, anxiety -- I mean I've never experienced it myself, but to the extreme that he had, it can feel like you're having a heart attack. It can feel like, you know, from hyperventilating, you know, you could lose some of your circulation in some limbs or feel numbness or tingling. I mean, he was grasping at anything to explain why he was

Page 108

feeling so crummy.

Q   But my question is more narrow.

A   Okay.

Q   What was going on with his limbs and the paralysis? Was he saying he could not move his limbs?

A   I don't remember that. I just remember him feeling -- I remember him saying that he had a lot of weird numbness in his limbs, that he felt like he was -- like walking like not straight, you know. And so then I would say, well, why don't you show me, and then he would walk straight. So I'd say you seem to be doing okay, Jim.

So I don't know if he was trying to come up with a reason why he was feeling that way. But I'm assuming a lot of that was all his, you know, anxiety.

And at some point I remember talking with the doctor and just saying at some point you're going to have to label this as to what it is. And he just had a hard time doing that.

Q   In November of -- November 2nd, 2017, this is GWL010076 to -79, you were saying, I believe this is Dr. McMann, that you told him that the wheels

Page 109

had fallen off. That was your view of what was going on at that time.

Why did you think that?

A   Well, I think we had gotten to the point where I didn't know what else to do, you know, 'cause he was coming up with one medical thing after the next. And I really -- I was kind of at a loss for where do go from there.

Q   So going back to the suicidal ideations.

On December 6th, 2017, he said -- this is Centers for Anxiety Disorder, so this is --

A   Dr. Christeson.

Q   -- Dr. Christeson. This is 344; that he had ideations -- let's see, several times -- a couple times a week, fleeting throughout the day.

Do you remember telling her that?

A   I told her that or he told her that?

BY MS. MEAGHER:

Q   Did one of you -- (inaudible).

THE STENOGRAPHER: I'm sorry. We didn't hear you.

BY MS. MEAGHER:

Q   Did one of you tell her that?

A   I know we -- I thought we had talked somewhat

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 29 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Peter Angilello
July 13, 2022

Page 110

about suicidal ideations when he first started seeing her, but that really wasn't the focus of why we were there. And like I said, by like April -- April, 'cause he started that medication -- he started, you know, feeling better and I think by mid-March he was taking that medication. So I would assume in a couple of weeks, by April, May, he started feeling a little bit better.

Q What medication? What medication?

A He was taking Fluvoxamine, or Luvox, it's called. It's mainly to help control OCD thoughts. And I think Dr. Koster, I remember a conversation, was thinking that might help some of the ruminating thoughts that he had. And this was the medication that he -- Dr. Koster was weaning Jim off by, you know, mid to early July because he -- the genetic testing had shown that he wasn't absorbing it.

Q Who did the genetic testing?

A Well, he ordered it. I don't --

Q Dr. Koster did it. Okay.

A Yeah. I don't remember --

Q So there's an appointment with Dr. Koster for December 8th, 2017 where he says, "He then said he did not think he would kill himself today, but

Page 111

when asked about killing himself sometime this week, he said that he did not know. He also could not answer whether or not he would kill himself this weekend. I told him I felt he could be admitted for his own protection, and at first he did not respond much. I phoned Bellin psychiatric unit and I learned that a psychiatrist, Dr. McMann, is on call. I spoke with the intake nurse and arranged for Mr. Rivett to go there at 1:30 p.m. for intake."

Did you -- did he go for that? This is December 8th, 2017. GWL010103. Did you go in for intake?

A We never went in for any intake. And I don't remember that conversation with Dr. Koster, so I don't know if I was at that appointment with him or not.

Q And again -- well, the note says, "Mr. Rivett said he very much did not want to be admitted."

So would you agree that any time anybody suggested that he go for intake or inpatient therapy, he pretty much was pretty set against that, he didn't want to do that? Is that true?

A I would say that would be fair.

Page 112

Q All right. And it's also true that you never did anything to -- or take any steps that would disagree with what Mr. Rivett wanted to do in terms of his inpatient therapy?

A I took -- I took the cues from Jim, you know. And as he seemed to be doing better, you know, I didn't push for that. I -- I know he was very nervous about being intake. He hadn't even been in the hospital before for anything. So -- and the messages that we were hearing was that's kind of like a last option if you can't seem to manage, you know, anything else or you can't seem to work it through. It was always an option. I never did not hear that message.

Q Okay. But you followed Mr. Rivett's lead in terms of what he wanted to do in terms of inpatient. True?

MS. ASHBECK: I'm just going to object to the form of the question to the extent it mischaracterizes the testimony he just gave, but you can go ahead and answer.

A Can you repeat that again, Linda, please?

MS. MEAGHER: Sure. Rosanne, could you reread that.

(Question read.)

Page 113

MS. ASHBECK: Same objection.

A Yes. Yes, I -- I took my cues from Jim.

BY MS. MEAGHER:

Q Okay. Give me one second. Okay.

And did you ever suggest to him -- like did you ever say to him, you know, I need to call 911 right now? Did you ever even suggest that to him?

A No, I don't remember ever saying 911. I do remember giving the option of checking in, going to inpatient, that we've done this before, gone through the process so we can always do this. I never --

Q So you never said to him when he actually made a suicidal gesture, Jim, I'm going to have to call 911 right now because I'm concerned about you? You never said that to him?

A No.

Q All right. So why did you stop seeing Dr. McMann, or why did Mr. Rivett stop seeing Dr. McMann?

A Well, Dr. Koster, we started seeing him. Jim -- I'd totally forgotten about Jim was also seeing another -- I don't think he was a psychologist, but counselor at Bellin too. And Dr. Koster didn't think Jim was getting the proper

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 30 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

Page 114

therapeutic work with this doctor, Dr. Cagle. And then he said he wasn't sure about the medications that Jim was being put on through -- by Dr. McMann, although he felt like he had a stronger case for the medications he was being put on. But it was almost like Dr. Koster was taking the reigns over with Dr. Christeson and kind of taking a new path basically. So we stayed with Dr. McMann, I want to say, like another month or a month and a half or so before -- before we stopped seeing Dr. McMann.

Q So did you -- let's go back to Dr. Koster.
How did you start seeing him?

A Well, I explained --

Q Where did you get his -- yeah. Where did you get his name and why did you start seeing him?

A Yeah. Jim had helped Dr. Koster with some -- I'm assuming it was some graphic design work when he was starting his business as a concierge doctor, and so I think that's why -- I mean, this was the only probably doctor that he personally knew.
And when he was -- when we were supposed to go on that trip to Palm Springs, he thought Dr. Koster would be able to help him get the results of that heart halter quicker or

Page 115

somehow faster. And I think Dr. Koster kind of read into that, you know, and then looked at --

Q I'm sorry. Let's -- not to interrupt you, but let's go backwards so I'm not confused.
Where did he find Dr. Koster's name?

A I think he did some work for Dr. Koster through either Khrome or Arketype when Dr. Koster was starting his own business.

Q Oh, I'm sorry. I get it. Okay.
And what's Dr. Koster's medical background? What kind of doctor is he?

A He's a general physician. You know, he has -- he did work at Bellin, and he started his own concierge practice. And he wasn't charging Jim -- you know, like he was helping Jim and not charging him, I don't believe, the full amount that he normally would charge his clients.

MS. ASHBECK: Hey, Linda, I'm really sorry to interrupt you. I actually just had somebody walk into my office and I don't have any staff here. Can I take a quick break to see --

MS. MEAGHER: Absolutely.

MS. ASHBECK: Okay, thank you. I'm sorry to interrupt.

Page 116

MS. MEAGHER: No problem. I'll be here, so just let me know when you're done.

(Brief pause.)

BY MS. MEAGHER:

Q Did Dr. Koster make any representations to you about him, you know, being specialized in some way in mental health?

A No.

Q So you went to see him. You knew he wasn't someone who -- he wasn't a psychiatrist, correct?

A We knew he wasn't a psychiatrist.

Q And then my understanding is Dr. Koster did this 23andMe genetic testing to tell you what? What was that supposed to tell you?

A It's some kind of genetic test. I believe that Jim had it done earlier as well, but it was to test to see what medications he would absorb or not absorb. So -- and this Fluvoxamine, which he had been put on like mid-March, I want to say, showed that he wasn't absorbing it. So then he was being weaned off of that through like middle of -- beginning, middle of July. And then Jim started having a lot of side effects that I had looked up that were related to side effects of Luvox withdrawal.

Page 117

And then I would mention -- I showed Dr. Koster those lists of side effects, and he said, no, he didn't think that was the issue because Jim wasn't absorbing the medication to begin with. But Jim would -- Jim would have me several times read the side effects because it helped him be less nervous about the things that he was feeling.
But, you know, again, that would have been July. So there was, you know, the anniversary of his mom's death. You know, I was having some symptoms of prostate issues at that time. I hadn't had a biopsy yet or anything. I don't know -- I don't remember about work, if there were some stressors at work, but --

Q So was it Dr. Koster's idea because the genetic testing said it didn't help, the Luvox didn't help, that Mr. Rivett got weaned off of it, or was that Mr. Rivett's idea?

A That was Dr. Koster's.

Q Okay. So there's a note from mid-July, GWL01027, and then he didn't go back on Luvox, right?

A No, but there was some discussion that he should get back on that towards the -- you know, like latter part of July by -- by Dr. Koster's wife.

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 31 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

Page 118

She was like -- she was dealing with like supplements and things like that. And she was trying to help Jim with some supplements to help him sleep and to supplement that sort of thing. And she had suggested, well, maybe that he should be on a low dose of it because maybe he was absorbing some of it. And then Dr. Christeson's comment on the last day that we saw her also said that maybe he was absorbing some of that.

Q His symptoms seemed to increase after he went off of it, right?

A Yes.

Q Okay. And Dr. Christeson on -- I'm sorry, on August 16th said she was concerned he had stopped it and that he's not currently on an antidepressant, correct?

A Yes. I do remember her saying that at our last meeting.

Q So who is Dr. Koster's wife? What is her name?

A Michelle Koster. M-I-C-H-E-L-L-E.

Q And what's her background?

A She was a dentist, and she was having some symptoms, I can't remember, like neurological symptoms herself. And I think she -- I want to say I think she has a Ph.D. now in nutrition or

Page 119

something related to chemistry and nutrition. And she was offering some support to Jim, some supplements that he could try. You know, and it's hard to tell, it was really hard to tell if it was side effects that he was feeling or if the amount of stressors were starting to pile up. But it was hard to determine. But he did have, I remember, like 17 of the 22 side effects of Luvox withdrawal around that time.

Q But these supplements she put you on, did she ever tell you that the FDA has not approved -- that they're not controlled by the FDA? Had she ever talked to you about that when she was putting him on these supplements?

A Well, I think we were pretty much aware. I mean, most of those supplements aren't -- and they weren't anything that -- you know, they were like magnesium to help you sleep. She was -- she was, you know, doing some other kind of recommendations like things you can do to help yourself sleep rather than, you know, supplements or medications.

Q So during the fall of 2017 you agree that Mr. Rivett was, you know, crying at home, telling you he can't go to work, he's struggling to get out of bed, he's feeling hopeless, he's tired, he's

Page 120

missing work. That was all going on in the fall of 2017, right?

A I would say, yeah, um-hmm.

Q Okay.

A It was intensifying some. But the things that we were doing didn't all seem to be working real well. So I think that when this all happened in November 2017 when we met this, you know, met Dr. Koster and he started talking about this whole new path, you know, he was really trying to help Jim recognize that a lot of what he was feeling was a lot of unresolved grief, not only from his parents' death but also from, you know, 'cause he was kicked out of that building that he helped -- you know, he was pretty much in charge of restoring. He couldn't even -- Jim couldn't even drive by that church building, it bothered him so much.

So Dr. Koster would do some things where he would take Jim down to the building and they would sit in the car, and he would just talk Jim through, you know, like how he was feeling about the building. They would take some walks around the building. He was trying, I think, to help Jim move through some of that grief that he

Page 121

felt.

Q You're talking about the Arketype building?

A -- building, yes. Correct.

Q So they would go out to lunch. How often did they go out to lunch?

A I don't know. Once every couple of weeks, possibly. I think he would go and see him once a week, sometimes maybe twice a week, and they would get --

Q Were their meetings always out to lunch, or did they also have meetings at the office?

A They would have meetings at the office. Some of them that I would attend and then sometimes it would be lunch meetings and even sometimes dinner, and I would go to some of those dinners.

He was kind of acting in a lot of ways as like a life coach to him, trying to, you know, help him move through some of the things and feel like you got this, you know. In addition to all these other things that are helping, part of it is you need to -- I can't remember what it's called when you -- when you make people directly confront the things that they fear, you know. And he would. And he was making some progress and being able to talk more about the loss of his mom,

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 32 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 122

the loss of his -- of the former business, getting in his head more -- a little bit more real about what had happened. Because he was taking all of this on himself that he was the cause of everything.

Q Did he also take Jim, or Mr. Rivett, to Mr. Rivett's mom's grave?

A I don't remember that.

Q Okay. So how often did he go drive past or walk past the Arketype building?

A Dr. Koster with Jim?

Q Yes. Let's start with Dr. Koster with Jim.

A Yeah. I would say at least two or three times. I know one time he sat in the car with him. One time they walked around the block and they just talked about, you know, what things he missed about the building. And then I think -- I thought Jim had said he had him put his hands on the building to say good-bye or to write some writing exercises to help him release some of this -- this guilt that he -- and shame and loss that he was feeling.

Q Did Dr. Koster also tell Mr. Rivett to go do this himself, to go by himself and do this type of exercise?

Page 123

A I don't -- I don't remember that. I wasn't at any of those particular things, but it seemed like some of the things that he, Dr. Koster, was doing was helping Jim kind of move into reality, you know, a little bit more.

Q And when they'd go out to lunch or dinner and you were present, did they talk about the type of work that Mr. Rivett was doing for Dr. Koster? Was that ever discussed?

A Well, that had been done, you know, much earlier when he first started this --

Q Okay.

A -- business. So it generally was just like, I don't know, he would talk about everyday things. He would kind of check in with him and see how he was doing. It wasn't necessarily therapeutic at the dinners. It was just kind of check in, how are you doing, you know, hey, what progress have you been making.

It felt good to have someone -- I think, you know, Jim was a very relational person, and to have someone like take him under his wing and say, I got you, you know, I'm going to help you through this, you don't have to do this by yourself. And I think Jim really responded to

Page 124

that 'cause he was a relational type person.

Q Was one of the goals that Mr. Rivett had in seeing Dr. Koster, and then also a psychologist and not a psychiatrist, was one of his goals to get off medication?

A I know Jim never liked being on medication, but he did say when medications -- when he felt like he was being helped by them. Because I know he was on a Rexulti with Dr. McMann, and he felt benefit from that. And I can't remember if they kind of like petered out and he had to be put on something different at that time. But he did -- I do remember Jim saying that he did feel like the medication was helping him.

Q But would he complain to you about wanting to get off medication?

A Not complain necessarily. I think --

Q Yeah, go ahead. Go ahead. I'm sorry for interrupting. But expressed that concern about getting off medication?

A I know his long-term goal was to not have to be on medication. And I believe that Dr. Koster's -- that would have been his goal in time, too. And I think, actually, Dr. McMann as well, because Dr. McMann was not a medication pusher. You know,

Page 125

he -- he, you know, I really respected him as well, what he was trying to do with Jim. He was -- he was very good at what he did, too. But I think neither of them were -- neither of them were medication pushers. But that's not going to be the only thing that's going to help you.

Q So when Dr. Koster took Mr. Rivett off the Luvox, he didn't put him on something new; is that fair?

A No, he did not.

Q So what I said is correct; he didn't put him on some other medication for his -- antidepressant or anti-anxiety medicine. True?

A True.

Q Did you ever say to Jim, you know, why don't you take time off, why don't you apply for disability or social security disability? Did you ever talk to him about that?

A Well, the one thing that I tried to do, 'cause Jim would say, you know, often would be, I can't do this anymore. I can't go to work. I can't do this anymore. And I would say, Jim, you don't have to do this forever.

You know, I think he had this expectation that this was going to take -- he was going to be in it for another 10 years or 15

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 33 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 126

years. And I said -- you know, and he would say, you know, I have certain people at work that I can turn this over to. And I said, Jim, if you have a plan, that's going to probably make you feel a lot better about this, and you can have a plan and you can say to these people, you know, in five years, you know, I'm going to turn this over, and then you got to come up with an idea of what you want to do in place of it.

So we would talk, you know, talk about that kind of thing, 'cause he was pretty future orientated. I think even in all of this there still was, you know, the hope, that hope that somehow he would -- there'd be some epiphany and that he would -- you know, someone would say something to him, or he would have some experience that would make him like, oh, okay, I've got to -- I got to change the way I think about the past and I have to start doing some deep thinking. But a lot of it was trauma, too; trauma from his childhood that resurfaced, I believe, trauma from the experience with Arketype, and that guilt and shame that he felt as well.

Q So was the plan that he would retire at like 64, or what was the plan?

Page 127

A I don't think we got that far into an age, but it was more kind of we can start doing this now. I had retired in 2015 and, you know, I said we can start moving towards a plan. But a specific year or anything like that was never determined.

Q But did you expect him to be retired by the age of 65?

A I would say. Yeah, I mean the business was doing quite well. He had two women that were -- were, you know, managing things quite, you know, quite well that he could depend on that were obvious people that would take his place, and a gentleman who was a very strong, creative person. So he knew he had those people in place and that at some point this could happen.

Q Okay. And did you ever talk about, hey, Jim, this is so hard on you, I'm retired, it's not like you can't retire. Like did you ever give him that peace of mind that he doesn't have to continue working, that's not something he has to do? Did you ever tell him that?

A Well, we didn't have the financial means to be able to both retire. You know, my plan was I had done my 30 years and he had just started this -- actually, when he started Khrome was at the same

Page 128

time that I was turning in my retirement papers. So I had second thoughts about doing that, but, you know, all the people that supported Jim said, Jim, you know, you've got to get in there and you've got to make -- if you're going to do a new business, you have to do this soon after everything happened, because if you don't, you'll lose employees, you'll lose the momentum that you have built.

But based on the fact that, you know, six people gave him $25,000 to start Khrome and he paid them back within not even a year, that's how strong that business was. So I'm sure, you know -- I'm sure if we could have shown that -- how fast things were going for him, that might have helped him realize that I don't have to stay in this forever, you've got it off -- you got it running, you could be a consultant in five years or do some of your art and be a consultant. We just never quite got that far, you know, unfortunately.

Q Right. But did you -- so he started Khrome in January of 2015, correct?

A Yes.

Q Or February, around there.

Page 129

So when he's going through this in the fall of 2017 where he's crying all the time, he doesn't want to go to work, the coworkers are saying we got to do an intervention, something's happening, he needs a sabbatical, did you ever have a conversation with him at that point to say, listen, honey, why don't -- why don't you stop working, apply for disability, apply for social security disability.

Did you ever have that to give him some peace of mind that he could, if he needs to, quit working?

A I might have had some short conversations, but that really wasn't -- wasn't what I emphasized. I emphasized more of the fact that he didn't have to do it forever. Because honestly, I don't know what we would have -- I mean, we had our own expenses. We were paying like everything on that building. So it was a lot to think about that he -- you know, the thought of him just quitting was something I don't think that either of us could afford to do.

Q Well, did he have disability insurance?

A I would -- I would have -- I would have thought, yeah. I would think Khrome would have some

Case 2:21-cv-00972-BHL  Filed 03/31/23  Page 34 of 119  Document 69
www.phippsreporting.com
(888) 811-3408

Page 130

disability insurance for him.

Q So was the idea that when he did retire he could sell the business to somebody?

A To -- to a couple people in the -- that were already working for him.

Q And is that who you sold it to, or who did you sell it to?

A No. That was my first priority, but the -- there were some conflicts between the two individuals financially or their idea of what -- who was going to be doing what, and that kind of fell through. So then I went to a second option that I had.

Q And which was to sell to a competitor?

A She wasn't necessarily a competitor as much as she -- this was an enhancement to her business. And she was a pretty good friend of Jim's and a supporter in different ways. So...

Q So was the hope that Jim could sell this, you know, business even before 65, he could sell it at 62 maybe?

A I think he could have. It was doing that well.

Q Okay. So he wasn't under the impression I got to work another 10 years, that he could have, maybe, because it was doing so well, maybe he could sell it in two years and not have to run this business.

Page 131

Was that something that you kind of talked about?

A That's what we would talk about, and that's what he would talk about with Dr. Koster and some of the business, you know, guys, the gentlemen that helped him get started. You know, they were all kind of sending the same message, get it up, get it running, do your best, look at its success, you don't -- you don't have to do this forever. I guess the thought of just quitting, you know, was more than we could really do financially.

Q Sure.

A And I also kind of didn't, you know, didn't really want him -- none of us really wanted him to quit because he was so good at what he did. I guess to give him that message to just walk away from it wasn't the message we wanted to leave with him.

Q Right. But you did talk about, you know, you could work -- the business is doing so well, in two years you could sell this business, you could work as a consultant, you won't have the stress of the business, you could retire -- semi-retire at 62 even?

A Yes, um-hmm.

Q Okay. So you had those conversations with him and

Page 132

he -- he seemed interested in that idea, correct?

A That would help. That would help, I think, hm-mmm.

Q But you had these discussions with him and he seemed interested in that idea, correct?

A Yes. That -- yes. And again, you know, I'm the spouse. So when you heard that from the guys, you know, the professional that helped him get started, I think that probably meant a little bit more to him to have their encouragement and support, because I wasn't -- I wasn't a business person. So...

Q The business people who gave him money to start this business, right?

A Yes.

Q And they were telling him -- did they know that he was struggling with these issues? Or why were they telling him, hey, just get this running, then you can sell the business and retire and maybe do some consulting work?

A Yeah. Out of the six, two definitely knew that he was struggling. Because one of them helped put all of the structure of Khrome together and was kind of like an outside consultant, as like their accountant I would -- not accountant, but like a

Page 133

business consultant. And then the other person was a good friend of Jim's, Kurt Voss. And Kurt and he would get together for breakfast or whatever, and Kurt knew that he was struggling. I don't think Jim would tell him how much he was struggling on days because, you know -- but he did know. And, you know, Kurt would give him some of that encouragement that you don't have to do this forever, you know.

Q Okay. I'm sorry, who are these people? Kurt?

A Kurt with a K, Voss, V-O-S-S.

Q And he's the accountant?

A No. He is one of the people that loaned Jim the money and was the person who kind of spearheaded finding the other five people.

Q Okay.

A And the other person, his name was Gary Lofquist, L-O-F-Q-U-I-S-T. And he, I guess the best I can describe it, would be a business consultant.

Q Okay. So they knew he was struggling. They kind of gave him peace of mind to say you don't have to do this forever, get the business going, a couple years from now you could retire, sell it, and you won't have the stress as much anymore?

A Yeah. And they would tell him the message, you

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 35 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 134

know, like, hey, look it, Jim, we told you how successful you would be.  And Kurt would say, you know, these guys, referring to Arketype, they're going to be -- they're probably going to be bankrupt and out of business in a year and they would feel really -- they would feel that was really positive for Jim to hear.

Q  Yeah, yeah, yeah.

A  But at the same time Jim -- he took that more personally.  He felt bad that he was causing them to fail because he was concerned about the people that were still there.

Q  But he was also concerned that if something happened with the business, they wouldn't pay the mortgage and then you guys would be stuck with this building?

A  Yes, right.

Q  That was another concern, correct?

A  Yes.

Q  Okay.  So the hope was hopefully, you know, he could get this off the ground, he could retire 62-ish, and then, you know, sell the business, he'd have time to sell the business, get it up and running and maybe retire around 62; is that fair?

A  I would say that's fair, um-hmm.

Page 135

Q  Okay.  All right.  So going back to this August 16th situation, or going back to Dr. Christeson.

You would see her once a month?

A  Roughly.  Sometimes it was once every five weeks or once every six weeks.  I mean, I honestly wish she would have been in town.  She was very, very busy and hard to get into, but I mean, she would hit it right where it needed to be.  I mean, she was getting right to a lot of the stuff.  And he didn't like to always go because it was kind of hard conversations.  But she was bringing up a lot of things that I think that he wasn't willing to deal with or wanting to deal with.  I respect her.

Q  Okay.  And she's a psychologist, not a psychiatrist, right?

A  Yes.

Q  Okay.  And Dr. Koster is the person that gave you her name?

A  Correct.

Q  And what's your understanding of the relationship between Koster and Christeson?  How does he even know her?

A  I believe that he had worked with her on other patients that he saw that had anxiety and that

Page 136

sort of thing.  So he -- he just thought that she would be a stronger fit for Jim because of her expertise in anxiety disorders.  And, you know, he gave us her name and then said that they would be kind of tag teaming.  That's what they had done with previous clients, that that had a lot of success.  So it's like, okay, let's try a new direction here, you know.

Q  Okay.  So it sounds like in July of 2018 after he was weaned from the Luvox, Luvox, he -- and I believe this is around the time of you being hospitalized, he made a -- Mr. Rivett made a gesture of cutting his neck and whispered, "I think I'm going to do it tonight."  This is GWL010372.

Do you remember that?

A  Yes, but not exactly those words, and he didn't say it out loud.

Q  Okay.

A  He -- I was in the hospital, and he -- you know, and Jim was very, very anxious that whole time.  His lifeline was his phone, texting people back and forth on how I was doing and that sort of thing.  And then I remember that night or that afternoon specifically he came up and sat on my

Page 137

bed, which he hadn't really done yet, and he looked at me and he just made a motion like across his neck and said -- like mouthed the words like "I'm going to kill myself."  And I was like totally like shocked, you know.  And I -- sorry, this is a little hard to talk about.

But, you know, when I got home, I confronted him and said, you know, what was that all about, you know.  And he started crying and he said, I apologize.  I said, Jim, you know, I'm trying to get better for you, and how can you say something like that to me?

I'm getting better for you, for us, and that's all I ask you to do.  And he said, yeah, and he apologized and cried, and we worked it through.

But it -- it shocked me, you know, to have him do that when I was still recovering myself, you know.  I knew at that point that, you know, something was happening and -- and that I -- I often tell people it was like the stage act when you -- when people are spinning plates and you're trying to run back and forth between the different plates to keep them all up; I just -- I couldn't do it anymore.

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 36 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 138

Q   So you were in the hospital for your being septic from the biopsy screwup or whatever happened with the biopsy, correct?

A   Yes.

Q   And where were you in the hospital?

A   I was at St. Vincent Hospital in Green Bay.

Q   Okay.  Because you talked about going to Milwaukee for surgery.  Was that later in January of 2019?

A   Yes, correct.

Q   Okay, okay.  So you eventually got to a doctor in Milwaukee for surgery?

A   Correct, yeah.  I didn't want to go to have it in Green Bay based on my experience.  So...

Q   All right.  So you're in the hospital and he's in the room with you while you're in the hospital and that's when he does this?

A   Yes.

Q   And tell us -- tell me what exactly he did.  He just made the motion?

A   Yes.  He came inside of my bed, and then, you know, I think we talked about a little something, and he just had this sort of affect about him, and he just motioned across his throat and mouthed the words, "I'm going to kill myself."

        And, you know, it was kind of -- I

Page 139

don't know if it registered more deeply to me than all the other times, but it was kind of like, okay, we're at this point here, something's -- something's happening, you know.

Q   Right.  Did you -- I know you're sick at that point.

        Did you call Dr. McMann or call Bellin to tell them this was going on, or tell Mr. Rivett he should call Bellin or, you know, that he needs to be inpatient?  Did you do any of that?

A   I don't remember at that point.  Yeah, 'cause it -- I got out of the hospital on the 6th and then Arketype went bankrupt on the 8th.  And, you know, that's when the gentleman who would have been working there that kind of had set this all up with Jim losing his job said to the media that all of our problems stemmed from ten years ago when we had bad leadership, which was Jim.  So then Jim took that on, you know, on himself that it was all his fault.  So...

Q   So wait a second.  You're saying in the newspaper article?

A   I don't know if it was the newspaper article or if it was on the television article.  I hadn't seen it.  But someone had told me that the person who

Page 140

Jim had mentored and wanted to take his place at some point at Arketype, he was having conversations with Paul that he could take Jim's place.  And so that's how Jim got pushed out was that Paul wanted -- he convinced Paul to come back into the business to be president and then this other guy would run everything.  Paul wouldn't have to worry about anything.

        And so it was -- it was another, for Jim, another betrayal, another thing that he felt shame and guilt about, and it just started this whole ball kind of rolling from that -- that time up until his involuntary --

Q   So let me show you this article.

A   Um-hmm.

Q   This one's from August 21st, but it says -- Ross says -- this is Ross Mollet, M-O-L-L-E-T.  And marked as Exhibit 1, by the way.

        Is that the person you're talking about?

A   Correct.

Q   And it says, notified -- they "notified employees the business would close August 8th due to financial issues that dated back close to a decade, a former Arketype employee who managed

Page 141

day-to-day operations of the business."  He said the business was -- he said "the company was busy doing work for clients up until it closed, but that Arketype could not grow enough, or cut enough costs, to overcome its financial issues."

        So Mr. Rivett took that as blaming him for mismanagement, or what?

A   And I believe there was something, too, that Ross was interviewed on television when he said something about that leadership.  But that's all things that I heard from other people at that time.

Q   Okay.  And when did you -- when did you find out that Arketype was closing and how did you find out?

A   I think it was right around, you know, right around that time, right around the 8th.  I don't remember who told us, if it was a current employee there or a former employee, one of Jim's employees that had heard.  You know, Jim had even sent flowers to Paul and Kurt expressing, you know, his sadness that the business had closed and if there was anything that he could do, you know, for them, that he would try, you know.

Q   So did someone call you or e-mail you or you saw

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 37 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

something on TV or --

A    I'm assuming -- I'm assuming it would have been a former, you know, an employee at that place, because Jim still had some contact with some people that were still working there.  So either someone from -- they contacted us or someone, you know, that worked for Jim.  I don't recall the specifics, but I know that really deeply affected him.

Q    So when he did this suicidal gesture of cutting, slitting his throat and you were in the hospital, did you know about Arketype yet, or that was before you knew?

A    No, 'cause I believe I got out of the hospital around August 6th and I think it was announced around August 8th that the business closed its doors.

Q    Okay.  Okay.  And I have a note here that you learned as of August 10th about the bank action to close down the building or to foreclose the building of Arketype.

            Did you know about that as of August 10th?

A    Well, I know there was going to be more pressure because, you know, there was no business now to

cover, you know, the mortgage payment.  I believe they had worked out some deal with the bank to lower the mortgage payment at some point, but then, you know -- and we had already had the building up for sale.  So we, you know -- but, you know, the problem is, it's a beautiful building, but it was very unique and needed a special buyer, so it was going to take some time for that to happen, and we didn't appear to have the time then after Arketype closed.

Q    Okay.  And then so at some point, though, you did find out that the bank or that Arketype had not been paying the mortgage?

A    Yes.

Q    And how far did that go back or how long had they not been paying the mortgage?

A    I can't remember specifically, but I would say by the time they were bankrupt, I think it was at least two or three -- two to three to four months behind.

Q    As of August?

A    Yes.  And the U.S. Bank that holds the mortgage, that gentleman was getting more and more frustrated with Paul and Kurt because they wouldn't return calls.  And so -- and I was taking

most of that on myself, because I knew Jim -- we tried to keep Jim focused on Khrome.  And it was decided that I would do a lot of the stuff with the bank and trying to buffer Jim from hearing too much about all that or at least presenting it to him in a way that --

Q    Oh, go ahead.  I'm sorry.

A    -- presenting it in a way to him where it would be, you know, when I could do it on a day when I felt like he was okay, strong enough to hear that information and news, whether it be, you know, how much they were behind or how much pressure the bank was putting on us, all that sort of thing.

Q    So did you know about the pressure prior to August 8th when you found out that Arketype was closing its doors?

A    I don't think we realized like how many payments they were behind.  I know that we were feeling pressure because, you know, the building hadn't sold and there weren't -- we had even -- we had gotten rid of the previous realtor because he didn't bring anybody through the building, so we started working with a new realtor at some point.

            But it just was, you know, all of that -- all of that was this happening so quickly.

We weren't -- we weren't able -- we really didn't have a plan on how to pay for all of that now that Arketype had closed.  We had some meetings with Paul and Kurt, I think one that Jim was present, but it was usually just Kurt and I that would talk, and I would let him know what the realtor was doing.  And it all kind of fell on me.

Q    So when were these meetings with Paul and Kurt?

A    Paul and Kurt, we would have had when -- before Arketype closed, because it was -- I think there was something related to selling the building or a plan for selling the building, and Jim was very, very nervous to have to confront Paul and Kurt in person.  I did most of that.

            So that would have happened, I think, when we first were determining that the building had to be sold and who we would get to do all that and how it could be marketed.  And then pretty much after, you know, the business closed, then I was the main one having conversation with Kurt.  Paul was pretty much out of the picture.

Q    But when did you first put the business up for sale?

A    It was after Jim was fired, so I would say at least by 2015, I would think.  At some point we

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 38 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 146

had determined that, maybe the end of 2015, we had listed it first with one realtor, I'm blanking the name out, and then a different realtor.

Q So did you have a conversation with you, Mr. Rivett, Paul and --

A Kurt.

Q -- Kurt at that time in 2015?

A I believe that's when -- when we knew that Jim was out of the business and his business was doing well, and we knew that we'd have to do something -- you know, 'cause Arketype had shrunk from like 30 employees to like 10 or 12, there was no need for them to have that big of a building. So we were talking about what other things we could do, you know, renting half of the building to someone else, and then we determined to just put it up for sale to see what we could do, you know, with that.

Q Okay. So when did you find out that Arketype was not making the mortgage payments?

A Yeah. Our contact with U.S. Bank. At some point I kind of assumed that things that they were paying, because I didn't -- they pretty much cut us off of any communication even though we were partners in the building. They didn't have -- we

Page 147

couldn't see any of that.

So then at some point I know the gentleman from U.S. Bank had called me with frustration with the lack of communication, and that's when I decided that I would be kind of the contact and when I heard that they were behind in payments and that sort of thing.

Q And when was that? The summer of 2017 to summer of 2018? When do you think that was?

A Well, then they -- when they went bankrupt. So that would have been August of 2018 possibly that -- or either right before or right after, I'm thinking. You know, I think that's when we kind of had to engage more because, you know -- actually, I was the one, now that I think about it, I was the one to tell U.S. Bank that Arketype had gone bankrupt and closed their doors. He didn't even know that. He was shocked that they never had informed him. So I think -- yeah.

Q Do you think you heard from the U.S. Bank officer prior to finding out that they had closed the doors, that Arketype had closed its doors?

A No. I was the one to tell U.S. -- the U.S. Bank, Greg Smith was his name, that Arketype had gone bankrupt. He didn't know that.

Page 148

Q All right. So you didn't find out about the fact Arketype wasn't making mortgage payments until after you found out that Arketype had closed its doors?

A Yeah. We didn't have any financial information from Arketype whatsoever after.

Q And you're the one that told Mr. Rivett or Rivett about the fact that Arketype had closed its doors, correct?

A I don't remember that. I don't remember if it was a former -- a current employee of Arketype or -- you know, I think the mill -- the gossip mill would move pretty quickly amongst that circle of people, because, you know, some of the people that were still at Arketype didn't like the new leadership style.

So I'm assuming it was someone from them, they called someone from Khrome, and then he heard it from that. I don't think I would have told Jim about that, because I don't think I learned about it till after other people did.

Q Did you tell Mr. Rivett about the fact that they were behind in mortgage payments? Did he know that?

A I don't know if I talked about that, because I

Page 149

wouldn't have known all of that until after the 6th, and then Jim was hospitalized on the 16th. So I don't -- I don't know at what point for sure I heard all of that information 'cause there was so much in that month. It could have even happened, you know, after at some point. But I remember all that coming from the U.S. Bank person.

Q So there's a note from Dr. Koster that says -- this is GWL010124 to -125, that you have contacted him and that you just learned of the bank action to close down Arketype. You're concerned that James will respond poorly and wants advice about how to deliver this information. They'll come to the office for a session.

So this makes it sound like you told Mr. Rivett in the presence of Dr. Koster, but I could be wrong?

A I don't remember -- I know we talked about -- about everything with Dr. Koster. I don't remember having him there when he was told. I'm -- I'm -- my memory is that someone from Arketype or Khrome told Jim and then he told me. I think I was maybe responding, asking Dr. Koster to have like a special appointment to discuss all

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 39 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 150

Q So going back to August 3rd. This is before you knew about Arketype. There's a note that Mr. Rivett was having anxiety, out of control, and getting depressed ever since his brother left. That's brother John, right?

A Yes.

Q Now, you mentioned that you went to a cottage. Is that where you had this like anniversary of their mother's death, or what was the cottage about?

A He had come -- yeah, he had come home -- John had planned to come home that month. And I think that would have been -- this was all July, so it would have been -- yeah, sometime in July around his mother's first anniversary, I would think.

Q And why were you staying at a cottage? Did you rent someplace?

A We just rented a little cottage in Door County just to have a place to go to.

Q Oh, okay. And it was just the three of you?

A Yes.

Q Okay. And where did you stay in Door County?

A Someplace in Sturgeon Bay. We wanted it to be -- yeah.

Page 151

Q Okay. And then did you do like a Memorial for their mother, or what were you trying to accomplish during the stay at the cottage, or just to have some alone time?

A I think it was just, yeah, some alone time.

Q Okay. So then it looks like the weekend of August 11th, August 12th, 2018 he did another episode where he wrapped a belt around his neck.
Do you remember that?

A August 11th?

Q I believe it's August 11th, August 12th, but I'm just doing that based on the weekend. 'Cause he said that he had done this over the weekend.

A And this was a note from Dr. -- in Dr. Koster's records?

Q Yes.

A Yeah, I don't -- I don't remember that specifically.

Q All right. Let me look for the note. Hold on.
So you don't remember as you sit here today Mr. Rivett doing some sort of suicidal gesture with a belt?

A I don't remember anything that close to when we went to Brookfield. I don't remember. I mean, I was still -- I was still having a lot of -- some

Page 152

spiked fevers then, too. And actually, when you say -- just to go back a bit about the cottage.
For some reason my memory of it is that we went to the cottage 'cause we wanted to be close by in Sturgeon Bay, close by so if something wrong happened with his mom that we could go home. So my memory is that we were there before she passed away, like the end of June or the early -- you know, the end of June at some point. But John's memory of it is that we -- we were there the year after.
So, yeah, I don't -- that whole particular time that we were at that cottage sometimes is a little rough. I'm sorry. John thought it was in 2018, like we had gone there in July, but I thought it was 2017. That -- that particular incident or that particular event of going to the cottage, I really -- is fuzzy for me.

Q So this note that I was looking at is actually from Dr. Christeson on August 16th, 2016 where he was talking about what he had done two weeks before, so that's where we get the August 11th. Let me go back before I get to that question.
So your last appointment with Dr. Koster, from what I can tell, was on August 13th.

Page 153

Does that seem right?

A And I was there? I mean, I know he might have gone to see Dr. Koster. I know -- I know he had been seeing him quite a bit, because one of the things that Dr. Christeson said at that last appointment was that she wanted Jim to go see a therapist more frequently in Green Bay and kind of wean -- Dr. Koster is more of a medical professional and not so much -- 'cause Jim -- Jim was, like I had said, Dr. Koster was kind of being like the life coach. Jim would text him a lot or call him a lot. And they'd -- you know, they would talk on the phone and he would try to, you know, help Jim or help him think things through. And there was so much going on in that month that I think she was trying to bring it back a little bit and not make Jim feel so dependent on Dr. Koster.

Q So do you still have Mr. Rivett's phone so we could see the text that he had with Dr. Koster?

A No. I -- my phone was quite old, so I transferred my stuff to Jim's phone, 'cause his was newer, and then at some point his was no longer working well, so then I got a new phone.

Q Had you ever asked his -- have you ever asked the

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 40 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 154

phone company to see if they could recreate those texts?

A No, I haven't.

Q Okay. So I'd request that you do that. Any text that he would have had with pretty much anyone between January of 2016 -- I'm sorry, January of 2018 and the time of his death. That's the request.

Okay. So back to Koster. It sounds like you both were at the visit. This is GWL01026. And he says you were in there -- the last time was Friday, and that's when you talked about the fact that Arketype was closing and he seemed to be in a pretty good state of mind. But now you both mentioned that he was having suicidal thoughts, and Dr. Koster directed you to go to Bellin. And then Dr. Koster said that you did go to Bellin. Is that true?

Did you go to Bellin after August 13, 2018?

A No, no.

Q Do you remember him telling you to go to Bellin?

A No.

Q Would you dispute it if he says he did?

A I don't remember him telling us to do that.

Page 155

Q He said he was evaluated and not admitted, as I understand it?

A So we may have done the same thing where he made the phone call. Maybe we went home and they went through the phone call where they do the procedure to check him in if he feels like he needed to.

Q Well, I think Dr. Christeson's note seems to indicate that you just decided not to go.

So you have no memory of what exactly happened; is that fair?

A That would be fair.

Q Do you have a memory of this appointment with Dr. Koster?

A I remember talking about -- you know, I remember one incident about -- with Dr. Koster related specifically to Arketype, and Dr. Koster was getting pretty animated and a little upset. And he asked Jim, he said, Jim, who was the cause for Arketype to close, who made that happen. And Jim said, "I did." And then he would repeat it, Jim, who caused Arketype to close, and he said, "I did." And then at some point his hand slammed down on the desk and he repeated it again and hard enough that we both jumped and were a little shocked.

Page 156

And he said, tell me the truth, Jim, who caused this to happen. And then Jim said "Paul?" And then he said yes. He said, if you don't change the way you think about this, this is going to kill you. That's kind of one of our last conversations.

And that's when I kind of picked up on the fact that, you know, maybe, you know, Jim was using -- not using Dr. Koster but relying on him too much. You know, it became, like I had said, like a life coach thing, but I think that's where Dr. Christeson's comments are about, you know, less frequent text messages between the two of them, I think that's where that kind of came from. I think Dr. Koster was getting pretty frustrated that he wasn't making more progress with Jim in the way that he was thinking about things.

Q So according to Dr. Koster's note from August 13th, 2018, he said, "I reminded Mr. Rivett that for some weeks now I had felt incapable of helping him to progress. I explained that I had perceived him incapable of effective thought challenging performance of ADC exercise and even sitting with emotions. Rather than more

Page 157

forcefully insisting that he struggle with these exercises, I backed off, trying not to discourage him. Today with him in more of a crisis mode, I did direct him more forcefully and was quite effective."

So at that point was he suggesting that he was not going to be treating Mr. Rivett anymore?

A No, that wasn't the message that either of us got. I think -- I think he -- I think, bottom line, he just was really frustrated because Jim -- and I think this could have been the conversation where, you know, he just was exasperated with Jim not, you know -- not living in reality and accepting the fact that, you know, he didn't have to take responsibility for everything that had happened, you know, with Arketype and the business.

Q So in Dr. Christeson's note for August 16th, she says that you had mentioned that he had been making suicidal gestures more frequently or more so lately, and then she mentions, "told his sister may be the last time she sees him."

When did that conversation occur and which sister, or both sisters?

A I don't remember specifically. I know that there

www.phippsreporting.com
(888) 811-3408

was one time when Julie, who lives in Illinois, was visiting, and they both were -- both Julie and Jean, the sisters, were there in the house and were kind of, you know, pushing him a little bit more saying, you know, basically encouraging to keep getting help. And then he said something to that effect like he wasn't -- he didn't think he was going to make it or he didn't think he was going to, and they both started crying. And his two sisters are very different. One is a coach, and so she was very forceful, and the other sister Julie is much more nurturing. And so that could be where the comment came from, that he might have said that to them then.

Q And then you also shared that he had told you that if a specific employee resigns, he plans to go to the roof and jump off. When was that?

A I don't remember who the specific person was, but I do remember that there was someone who had made some conversations with another employee that said that she was -- I think it was a woman, I'm not even sure -- but said that she was maybe considering looking for other employment. And those kinds of things would really trigger Jim, like someone leaving, someone that he felt that he

had not made happy or satisfied in their work somehow. He took -- he took everything very personally. Like I said, that intensified much more so in the last year, especially in that last couple of months, he just took everything so personally. He had so much guilt about everything. Everything -- things that --

Q Okay. I'm sorry. Go ahead.

A Things that he didn't --

Q When did he say this comment about jumping off the roof? That's the question. When did that happen?

A I don't honestly remember. There were a couple of times, you know, I would say at least -- not only that time, but there was another time or two where he would call me and he was up on the roof and he was having a bad day, and he would say, similar to what he would say with the pills, you know, I could just make this easier on everybody and just jump off the roof. And it was a four-story building.

And, you know, I didn't know what to do again. I did the best I could. And I said, well, Jim, I said, what can you do right now. And he goes, I don't know. I said, you can walk down the stairs, you can go for a walk, you can go back

in and move -- go from employee to employee and engage and talk to them about what they could -- you know, what they're working on, how he could help. He was feeling really a lot towards the end that he didn't have a place there anymore, because so many people had picked up so much for him when he was struggling that he felt like, well, see, they don't even need me, you know. And I would try to tell him, of course they need you, Jim.

And, you know, I remember one time even telling him, giving him a box of thank you cards and said just, you know, sit down and write a note to everybody that's been, you know, that's been here working for you and working extra to do all of this. And he thought that was a good idea.

And those are the kinds of things that I would talk to him and then he would move on through his day. You know, I don't know if he just -- he always had to -- I remember one time my therapist said it wasn't fair for him to always tell me everything, 'cause he was putting that burden on me that I couldn't always control 'cause I wasn't always there. I mean, I mean he -- you know, I couldn't watch him 24 hours a day, you know, so I did what I thought would help him move

through his day.

Q So what I'm getting from your answer is he said that comment multiple times, but you can't remember -- you can't remember -- go ahead -- how many times do you think he said it?

A I'd say two or three.

Q Okay. And can you tell me like when he would have said that?

A I'm sorry. You cut out a little bit.

Q Sure. Can you tell me when he would have said that?

A Specific date or --

Q Or just time frames. 2016, 2017? When did he say this?

A Yeah. I mean, because it would have been when he started Khrome. So that whole first year or so at Khrome he had a purpose, he had a role. He was getting everything up and running. It wasn't until, you know, everything was up and running, so maybe 2017 is when he started to falter, you know, a little bit. And, you know, a lot of the things that we were doing didn't seem to be working. So I would say in that range of time, you know, like 2017.

And again, I don't have -- I didn't

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 42 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 162

keep a journal.  I wish at times -- I did keep a journal as far as like medications that he was taking on my calendar and when he would be off of things as best I could.  But I didn't keep track of -- of, you know, those sorts of specific things that he would say to me.

Q   So did he miss a lot of work in the fall of 2017?

A   No.  He would go every day, and he would take time off to go to appointments or to go play tennis early or something like that, but he did not miss any length of time.  He would keep his promise to try to, you know, to get there when he could.  And they knew that he might be a little late because he was told to exercise before he would come to work and that sort of thing.

Q   But there were times when he would miss work, though, correct?

A   Not my memory of full days, no.  It would be for time periods, or he would come home for lunch and stay a little longer 'cause he was tired or that sort of thing.  But, no, he was a trooper even in the midst of all of this; he was trying to do his best to be at work and to do his job.

        MS. ASHBECK:  Linda, can we take some time to get some food and maybe talk about how the

Page 163

day is going?

        MS. MEAGHER:  Sure.

             (Discussion off the record.)

        MS. MEAGHER:  Come back in 15 minutes, 1:35 type thing?

        MS. ASHBECK:  Yeah, that would be great.

             (Brief recess taken at 1:21 p.m. to 1:40 p.m.)

BY MS. MEAGHER:

Q   Okay.  So I'm going to go to this appointment with Dr. Christeson on August 16th.  So there was a report that he had a belt around his neck a couple weeks ago, and not very long after, actually, this weekend.  So that would have been the 11th -- August 11th and August 12th.

        "Spouse" said -- "stated that the patient occasionally takes a knife to his wrist in front of spouse."

        So, number one, did you know about the belt around the neck over the weekend?

A   I don't remember that specifically, no.

Q   And when did he take a knife to his wrist in front of you?

A   Well, I'm thinking because, you know, it started this kind of a snowball effect of saying like a

Page 164

number of things that he had been doing.  So the knife, I only remember the knife incident once.

Q   Okay.  And when was that?

A   I would say two thousand and six -- '17.

Q   When in 2017?

A   I don't recall.

Q   So back to that date.  "Mr. Rivett told Dr. Christeson that he had been having thoughts of suicide starting at 5:30 to 9:00 a.m. at home."

A   He was having --

Q   Did he tell you that?

A   Yeah.  He was having kind of a rough morning that day.

Q   What did he tell you in the morning that day?

A   I don't remember specifically, but I knew that he -- that's why we were going to see her, because he had been becoming more and more fragile since the last time she had seen him.  He had made significant progress, so I don't remember anything like specific or what he told me, but I know that he was, you know, pretty fragile that day.

Q   Okay.  And then on the way down, tell me about what happened when he opened the door of the vehicle.

A   Yeah.  And in her notes she says that I was

Page 165

driving or that we switched and he was driving.  I don't remember him ever driving.  I don't think I would have let him.

Q   How do you know that?  I thought you never looked at the records?  How do you know what's in her notes?

A   I looked at -- I was given by counsel Dr. Christeson's notes from that day, the --

Q   Okay.  From the timeline they gave you?

A   From the -- it's from the Center for Anxiety Disorders.  It was her -- her notes from that visit on August 16th.

Q   Okay.  Remember in the beginning of the deposition I asked if you ever reviewed any of his medical records.  So I'm trying to figure out what medical records have you reviewed prior to your deposition today?

A   That was the only one that I -- I guess I didn't think of that as a medical record.  I was thinking medical records were more doctors' appointments and that sort of thing.  But, yeah, that was the only one.  And that's -- I don't remember, you know, him driving at all.  And I don't think he would have been able to because of how fragile he was.  But we were probably most likely about

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 43 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 166

halfway down or closer -- getting closer to Milwaukee, and I was going about 70. And he opened up the passenger door and he opened it up about halfway, and I said what -- I shouted something about "What are you doing?" And I pulled -- kind of pulled him in and he closed the door and all -- and I started crying. And he apologized and said he was buckled in. And I said, "Jim, you can't do this." You know, all the way down he was ruminating again about Arketype. And it was like someone had turned a switch on and he like had forgotten like -- almost like it had just happened the day before. That's why I was like what -- what's happening here, you know.

And he pulled the door, he closed it, he apologized. I told him he can't do something like that; he would distract me from driving, whatever. And he said that he wouldn't do that. And, you know, it was just within a few seconds that it happened. It wasn't anything lengthy. He wasn't trying to, you know, jump. He just had the door opened and I pulled him back in.

Q   And we're talking Highway 41 or 43?

A   43.

Q   Are you aware of the fact that Dr. Christeson

Page 167

called 911 because she felt that you had been complicit in not getting help in the past for suicidal gestures?

A   She called 911 that day, you mean, or previous to that?

Q   Yes, that day.

A   Yes, I know that because she had -- the police came.

Q   Right. But the question is, did you know that she called 911 because she felt you had been complicit in not getting Mr. Rivett help in the past when he had had suicidal ideations, gestures?

MS. ASHBECK: I'm going to object to the form of the question. You can go ahead and answer.

A   That's -- I didn't pick up on that that day, obviously, because there was so much going on, but I did read that in her notes.

BY MS. MEAGHER:

Q   And so she was concerned that if she didn't call 911 and told you to go to another -- to an inpatient facility, you wouldn't go, because Mr. Rivett would talk you out of it.

Do you understand that as well?

A   Could you repeat that? There was someone that

Page 168

Q   Sure. He was concerned -- strike that.

She was concerned, Dr. Christeson was concerned that if she didn't call 911 and you agreed to go to inpatient hospitalization, Mr. Rivett would talk you out of it and you wouldn't really go.

Were you aware of that?

A   I read that in the records. She didn't really come right out and say that, I don't believe, to me. But I know she had said she was afraid -- well, no, I'm sorry. She did say that. She was afraid that he might talk me out of it or that he might try to open the door on the way home again, and she felt it was safer for him to remain there.

Q   And then -- hold on one second. Strike that.

You were asked why you hadn't called law enforcement in the past, and you said because you had learned de-escalation from other counselors. Is that true?

A   Pretty much what I had told you, you know, I was told -- I was told to call Bellin Psychiatric Center and go through that process. I -- I don't really know if I -- you know, I think if I would have called 911 and police showed up, I would have

Page 169

been -- would have scared him more than helped him. So I thought, you know, the procedures of going and calling Bellin and working through those steps would be safer.

Q   So then he was taken from Dr. Christeson's office by the Sheriff's Department, Waukesha County Sheriff's Department?

A   I'm not sure of the specifics. The police, I thought, but, you know.

Q   Oh, all right. The Brookfield Police Department?

A   I'm -- I'm assuming it was Brookfield. That's where we were located.

Q   Okay. And he was taken in handcuffs, correct?

A   Out of the building he was, yes. He asked the police officer if he could wait until he got to the car 'cause he was ashamed and embarrassed to have -- being handcuffed. And he said I'm not going to do anything, and they let him walk out of the building up into the car, I believe, and then he had to be handcuffed in the car.

Q   And then he went to Elmbrook to be evaluated?

A   To a hospital. I don't remember the name of the hospital.

Q   All right. And then do you know whether he had to be in handcuffs from Elmbrook or the hospital he

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 44 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

went to to Waukesha County Mental Health Complex?

A   I didn't -- I didn't see that, so I don't know for sure.

Q   So my understanding is he went to the Mental Health Complex and you went home; is that correct?

A   Yes.  I was told by the crisis worker that I could follow Jim to the Mental Health Center, because I know he was really upset and then just that I could make sure he got in and settled in.  I thought that would help him.  But then by the time he was done at the hospital, it was closer to like 11:00.  So then I wasn't allowed to get -- allowed to get in.

Q   Okay.  So you went home.  And when did you come back?

A   I would say around -- in time for the first visiting hours on that -- so on that Friday, so the 17th.  They had like an hour visiting hours after lunch, and I went down there to visit and bring some of his things with me.

Q   So did you visit every day then until the 22nd or how often did you visit?

A   I was there every day for both visitations, lunch and after dinner, up until the Tuesday that he was supposed to come home.  So that would have been

the 20 --

Q   21st, I believe.

A   Yeah, the 21st.

Q   I could be wrong about that.  Hold on.  Let me check.  The 21st was when he was told he was coming home, which was a Tuesday.  So...

A   Yeah.  So I -- so that last day I stayed -- I came back to get his things, 'cause he was supposed to be transported by the Brown County Sheriff, and then he would be home like 5:00-ish.  And so I just took his stuff and told him that I would see him at home.

Q   And so on the 21st was the last time you saw him alive?

A   Yes, yes.

Q   All right.  So when did you find out that he wasn't going to be transferred to Brown County until the 23rd?

A   Jim called me when I was almost home from leaving Waukesha, so it was like maybe 20 minutes out of Green Bay.  And he called and was upset because he had to stay there two extra days now.

Q   And did he tell you why he was staying there two extra days?

A   He was saying because they didn't have

transportation for him back home.

Q   And was it your understanding that there was a lack of transportation from Brown County or from Waukesha County?

A   I was told that he had to be transported by Brown County and there was no sheriff to pick him up, to bring -- to deliver him.

Q   Okay.  So when you met with him on a daily basis twice a day, was he -- did he ever tell you he was concerned that he wouldn't make it out of the facility, or did he ever threaten suicide to you?

A   He did not threaten suicide, but he -- he was very anxious to get out of there.  He never really said I'm going to hurt myself.  He never said I'm not going to make it out of here alive, you know, but he was, you know, anxious about being there.

Q   Okay.  So during the times you visited, he never said, I'm going to kill myself, right?

A   None that I remember, no.  I don't remember him saying that.

Q   He never said, I'll never get out of here alive.  He never said that to you?

A   I don't remember ever saying that.  He would write -- I think in one of his notes he wrote something about you have to help me, I'm not going

to get out -- I'm not going to get out of here, something like that.  He was more concerned that he -- that he was going to, you know, be -- have to stay there longer, and that intensified after he found out that he had to stay two extra days.

Q   And were you aware of the fact that the doctor at Waukesha County psychiatrist wanted to put him on antidepressants but he was resistant to doing so?  Were you aware of that?

A   I was not.

Q   Is this the first time you're learning of that?

A   Yes.

Q   All right.  So other than being anxious to get out of Waukesha County and get home to Green Bay, did you -- did he have -- did he seem upset in any way other than not liking Waukesha County?

A   In -- so what do you mean, in his behavior wise or --

Q   Yes.

A   -- or what he said to me?

Q   Yes, what he said to you during the visits or phone calls.  I would assume you had phone calls as well during this time period?

A   Yes, we had both.  He just -- you know, he would say you've got to get me out of here.  When he had

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 45 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 174

found out he had to stay longer, he asked me to try to find an attorney to see if we could, you know, find him a private facility in Green Bay rather than Brown County. Overall, his, you know, he -- he was happy to see me when I was there. He was grateful for that connection, but he always felt -- he just -- and he just wanted to get out of there. He couldn't -- didn't feel like it was a healing place, didn't feel like it was helping him.

Q Did you ever say to him, are you having any suicidal thoughts or gestures, or did you ask him those questions?

A No, no. I don't remember specifically talking about that. I would try to remind him that this was a short stay, that he would be home. The whole point of him being there is there was this plan that Dr. Christeson was communicating to the staff at the facility, and that plan would be started there and then continued when he got back home. And I felt that he was okay with that, you know, that he realized that, you know, he had kind of hit rock bottom and that he, you know, he saw around him, you know, a lot of things that distressed him, and I think he just wanted to, you

Page 175

know, start getting better.

Q Did he tell you that there were any staff members that he, you know, liked and got to know and -- did he have anything positive about Waukesha County?

A Yeah. He spoke about a nurse named Robin, that he wrote about her in his notes. And I do remember meeting her. She seemed to have the most conversations with him and the most connection with him.

I'm sorry. Could you repeat your question?

Q Sure. Any staff member -- so you said Robin. Anybody else?

A Yeah. No. I was only there for, you know, an hour and then another hour and a half, so there was always like different people going around. No one really made an attempt to like sit down. And Jim would introduce and say this is my husband or, you know, partner and then shake hands, but no one ever sat down to have like any lengthy conversations.

The only time that I would talk with a staff person would be usually, you know, if I asked about if he was being put on a medication.

Page 176

I brought some supplements for him. And then just generally, you know, how he was -- how he was doing, if he was eating. I know sleep was a big issue. And then some incidents that had happened there that he was upset about he -- I talked to a nurse about that.

Q And what were those incidents?

A Well, one day there was a new patient that was brought in, and my memory of it is that at lunchtime she had asked for potato chips with her hotdog or something like that, and she was told that there weren't potato chips. And she had like this big, you know, outburst that, you know, this is a crappy facility at a thousand dollars a day. And then she threw some chairs and she had to be like not strapped down, but held down, and then was taken away.

And then I asked the nurses, oh, that must have been hard for Jim to see. And I said, what was he doing at that time. And she said, oh, he was sitting in the corner with his head down between his knees rocking back and forth. You know, it just -- my impression was it wasn't a healing place. It wasn't a high touch place, you know. I think he -- he just, you know,

Page 177

it -- it felt like a prison to him and, actually, it felt kind of a more punitive place to me as well rather than like a healing place.

Q Did you ever participate in any of the counseling sessions that he attended?

A I was not invited to attend anything, and as far as I know, I don't believe he had any individual counseling sessions except with the psychiatrist there. I know he went to a couple of group sessions, but I was never informed or invited to any of them.

Q Did you ever get a lawyer for him to get him into a private facility?

A I went and talked to a Josh Koch, K-O-C-H, who referred by one of Jim's former counselors, Bob Johnson. And I met with him that Wednesday mainly to ask, you know, what my options were as far as private facility, you know, if we could make -- if he was going to be there in the facility longer, if it could be more outpatient where he could go in halftime and then work part of the time, 'cause that would make it feel more normal for him. And then also to ask him about the longer extended stay. I didn't know if that was legal. Like I thought, well, couldn't, you know, Waukesha County

www.phippsreporting.com
(888) 811-3408

Page 178

have transported him back and then Brown County could have paid for that or whatever. I didn't know what -- when you're entering a world like that that you never had any experience in, you're just shooting from the hip and trying your best. But, yeah, I did meet with him just briefly on that Wednesday.

Q And what did he tell you? Did he say he was going to do it or not?

A Pardon?

Q Did he say you could get him transferred to a private facility, or what did he recommend to you?

A He was going to check into that and then get back to me. But, of course, everything changed the next day. So I don't know if -- and, well, I think he was an attorney in the same place as our real estate attorney, so I think he must have heard about what happened. So I never heard back from him after our initial visit.

Q So did you meet with him? He must have heard about what happened about Arketype or --

A I'm sorry. No. He must have heard about Jim's death, because our real estate attorney was in the same firm and I had been in communication a lot with him. So I'm assuming that, you know, he

Page 179

never followed up with me because he had heard about Jim's death.

Q So you met with him when, like August 23rd?

A No.

Q I'm sorry, August 22nd?

A Yeah, the 22nd.

Q Okay. All right. And where were you staying when you were -- when Mr. Rivett was at Waukesha County Mental Health Complex?

A I was staying with some friends who live in Cedarburg. That's 45 minutes. And they were on vacation, I believe, out West, so they had someone give me their house keys so I wouldn't have to travel so far.

Q So they were not home when you were staying there; is that fair?

A Right, they weren't.

Q And then did you ever -- I know you met with Mr. Rivett in the visitor area. Did you ever go into his room?

A I wasn't allowed to go into his room.

Q So you're not able to describe his room because you weren't allowed in the room; is that fair?

A Fair.

Q Okay. So let's talk about August 22nd. Let me go

Page 180

back a little bit.

So during the time from August 16th to the 21st, how many times would you talk to Mr. Rivett via telephone?

A You know, I would say a couple times a day, at least, because I would usually check in before I would leave for the morning to see if he wanted me to stop and get him something. And -- or I'm sure I would call him before bedtime and say goodnight and all that sort of thing. So I'd say --

Q So you could call him? He didn't have to call you for conversation to happen; is that true?

A We could do either way. He would call me sometimes and I would call him. There was a public phone in the main area that anyone could use.

Q And if you called him, did you have to go through the support staff to talk to him, or would you call directly to his room?

A Yeah, it would ring to that number. And more than -- more often there was a patient that would answer it, and then I'd say, is Jim there, and then they'd say, I think he's in his room, I'll go check. And sometimes it was a staff person but more than not it was a patient.

Page 181

Q And then did you talk to support staff or talk to any staff, Dr. Chahal or any social worker or anything like that while Mr. Rivett was at Waukesha County Mental Health?

A No. My -- my point of contact was the social worker, Brenda Cooper, and I tried her at least two or three times to kind of find out more what was going on, what the plan was. And I never heard back from her. She -- I remember she called me on that Tuesday when I was back home like just a little before 5:00, before they closed and I was taking a nap. I didn't hear it, and then by the time I called her back, there was another voicemail so I never was able to talk to her.

Q So just to make sure we're clear here. You never spoke with Ms. Cooper at any time; is that fair?

A No.

Q What I said is fair? Yes? You never spoke with her at any time; is that correct?

A Yes, you're correct.

Q All right. And did you ever talk to any staff member at any time?

A On the phone?

Q Yes.

A Never on the phone. My conversations with the

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 47 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 182

staff were usually the people that were on the floor during visiting hours.

Q  And you would -- and do you remember the names of staff that you would talk to on the floor?

A  I don't remember anyone other than Robin, and that was probably because she was mentioned in Jim's notes.

Q  Do you remember talking to any male staff members?

A  I mean, there would be someone on the floor.  They would say hi or shake my hand, but I don't remember having any conversations with them or names.

Q  All right.  So when Julie went to visit, did she stay in Waukesha or did she go back and forth to her house?

A  To her house.

Q  And she went there on August 22nd for the evening visitor hours, correct?  That's your understanding?

A  She visited him twice.  The last time was the night before, so on the 22nd.  But she came -- I think it might have been either the day before or the couple days before.

Q  Right.  I'm just talking about the 22nd.

A  Oh, the 22nd.  Yeah, I think she came after dinner

Page 183

because -- yeah.

Q  Okay.  So she went in to visit him after dinner.  And then did she give you a call after she had visited Mr. Rivett?

A  On the 22nd, yes, she did.

Q  All right.  And what did she tell you when she called you?  Let's start with what time did she call you?

A  I would say after visiting hours, so 7:30, maybe, on her way home.  She called from her car on the way home.

Q  Okay.  And what did she tell you?

A  She was very upset, and I asked her why.  And she said, I don't know what to do.  Jim -- Jim and I were talking and he said something to the effect that he wasn't going to be coming home.  And I said why, and he said that I know how to hang myself.  And Julie started crying.

And then she said, Jim, she said, you can't tell me these things.  I'm going to have to talk to a nurse or someone, a staff member.  And he started crying and said, please don't tell anyone.  If you tell somebody, I'm going to be stuck here, have to stay here longer.

And I don't know if they talked for

Page 184

a little more, but then she must have -- you know, I know she -- then she left and then called me to tell me that.

Q  Okay.  Do you remember her telling you something about misappropriation of money at Arketype?

A  I don't remember her saying that, but he very well could because, you know, he -- he was -- that whole story was spinning in his head that time and intensified, you know, the closer to the 23rd.  It was -- it was like the only thing he could be thinking about.

Q  Okay.  And then did she call you again that night?

A  I only remember -- let's see.  I only remember the one conversation because then she said, what are we going to do.  And then I said I wasn't sure, and then we talked for a while.  And I said, I will call them back and I will ask them to do further -- further checks, shorter, you know, closer checks on Jim and -- because of his -- his fragile condition.  I mean, she was letting me make that decision, but we talked it -- talked it over.

Q  So did you -- strike that.

Did you talk to Mr. Rivett that night before you called the staff at Waukesha

Page 185

Mental Health?

A  Yep.  So then I called -- I can't remember if he called -- no, I think he called me like 9:30-ish, I would say.  And we talked for a bit.  And he said -- he said that he saw something on the staff -- the nurse's desk, and it was his release letter or his release papers.  And I said, well, good for you, Jim, looks like you're coming home tomorrow.  And he said, no, but you need to listen to me.  This is really serious.  And I said what.  And he said, they're coming for me, but it's not the sheriff, it's -- their FBI is coming for me.

And, you know, I was flabbergasted.  I said, Jim, what are you talking about?  And he said, you're not going to believe me.  I know you're not going to believe me.  And I said, Jim, you know, you haven't slept most of this week.  You've been, you know, stressed out, you know, you're in a place that you don't -- you're not happy.  And said why don't you ask -- I said, you might just be seeing it upside down or you might just be thinking that you see that.  Why don't you sit with a nurse and just have them read it with you.  And then he said, oh, that's a good idea.  I didn't think about that.

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 48 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

So, you know, I didn't realize how much the wheels had come off of his thinking at that point. So I assumed -- well, I'm assuming in my head all this time he's been saying he can't wait to get home, he can't wait to get home. And then, you know, to have him say something about the FBI, it was just like what's, you know, what's going on? What -- you know, kind of losing like all rational thought, the story that kept building up in his head that wasn't true.

Q Okay. How many phone calls did you have with Mr. Rivett?

A That evening --

Q Yes.

A -- or that day?

Q Yes.

A I mean, that day there were a lot during the day, too. I don't remember how many. I'd say probably four or five, because he was getting more anxious. But my memory of it is, you know, I talked to him, said goodnight, and then Julie -- no. I'm sorry. Julie called me. It's very hard to remember the details. But Julie called me. I talked to him before bed. He told me about the FBI thing. After the FBI thing, I don't remember talking to

him again after that. And then that's when I called the facility.

Q Do you think you had more than one phone call with Mr. Rivett or only one phone call after talking to Julie?

A I -- I only remember one.

Q And what time do you think you talked to Mr. Rivett?

A Around 9:30, I want to say, because the time -- by the time I got through to the facility, it was probably like 10:00 or 10:30. I remember it being hard to get through because, you know, certain switchboards or whatever weren't -- weren't hooked up or linked to it, whatever.

Q Do you remember Julie calling you again because she had spoken to Mr. Rivett and Mr. Rivett had thanked her for coming to visit and then whispered that they're listening to me, please call Peter, he knows more -- or he'll know what to tell you?

Do you remember that conversation with Julie?

A I don't really.

Q You were interviewed by the police on the day of Mr. Rivett's death, correct?

A A detective. Detective Kohl, I think.

Q Okay. But -- I'm sorry. It was the Waukesha County Sheriff's Department, right?

A Correct.

Q And was that interview done at the sheriff's department?

A Yes.

Q And have you seen your transcript from that interview?

A I -- I asked a few questions about it, but I haven't read the whole thing. I haven't read it at all, actually, but --

Q All right. So your attorney had it transcribed. So let's go to that. And this is on page -- let me get to Page 49 of the transcript.

MS. ASHBECK: Are you bringing it up or --

BY MS. MEAGHER:

Q Yes, I am going to bring it up. I'm just getting it on my page.

So you were asked by them -- this is the day of Mr. Rivett's death. And this is question -- or Line 4: "But you don't recall her saying he's going to kill himself?" And your answer was, "I don't remember her saying that."

Did I read that correctly?

A Yes, that's what it says.

Q And you'd agree that your memory was better on August 23rd, 2018 as to what happened on August 22nd than it is today, correct?

A Yes. I mean, it was a very stressful time, but yes, it, you know --

Q All right. So when you called Mr. Reilly -- strike that.

You called Waukesha Mental Health, correct?

A Um-hmm, um-hmm.

Q You have to say yes or no or verbally --

A Oh, I'm sorry. Yes, yes.

Q And what time was that phone call?

A I want to say between 10:00 and 10:30.

Q So with the sheriff's department, you told them, I believe -- let me get to the time. Hold on. Let me check that out. I think it was 9:53, but let me check.

You told them that you called the facility at 9:53 p.m.?

A Okay.

Q Any idea how you would have gotten that time period?

A Why I would have mentioned the time period or --

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 49 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Q How would you know it was 9:53 as opposed to 9:30, 10:00? How did you come up with the 9:53?

A I don't know. It was in between -- I know sometime in between there.

Q Okay. So you called the facility and tell me what exactly occurred when you called. What number did you call? The pay phone or some other number?

A No. I went -- because it was -- the building was closed, I had to try a number of numbers and then eventually I got to the nurse's station. And then, you know, I don't know if -- if, you know, Kevin Reilly identified himself or said his name or if I got his name from after.

But I -- I said I was calling about Jim's condition and that I was really concerned about his condition. And I asked that they could, if they would do further checks on him that night because he seemed to be almost like moving into like a paranoid state or a little almost like paranoid or something. And then he seemed surprised and said that Jim -- he goes something about Jim being, you know, one of their better clients, that he was pretty friendly and that he would talk to everybody. And they exchanged conversations about the Packers, 'cause he had

lived in Green Bay for a while. And then he just said that he heard my concerns. He said that he would -- they would do further checks but he was leaving for -- his shift that night and that he would pass the message on to the night nurse.

Q Why didn't Julie tell the people at the facility when she was there?

MS. ASHBECK: Objection. Foundation. Calls for speculation.

BY MS. MEAGHER:

Q What's your understanding from talking to Julie why she didn't tell the people at the facility while she was visiting Mr. Rivett?

A Well, you know, when someone you love tells -- that you love and you don't have any idea that this is the realm of their possibility, that they would hurt themselves, tells you something like that but then they apologize and cry and say they would never do it, she -- I'm sure she was thinking -- I mean, I can't speculate, but I mean she was probably concerned the same that I was, that was our conversation, was we were afraid that he would have to stay there longer. And he already seemed to be doing poorly there, so we -- you know, we discussed it, but I made the decision

to not say specifically what he said to Kevin Reilly. I thought -- I thought that that would be enough, you know, for them to do further bed checks on him.

Q Julie and your concern was that if you told Kevin Reilly what was actually said, that would lead to Mr. Rivett being at the facility longer; is that correct?

A That was our -- that was our thought, yes.

Q So you would agree that you did not tell Kevin Reilly that Mr. Rivett had threatened to kill himself; is that true?

A True, yes.

Q And you did not tell Mr. Reilly that Mr. Rivett was concerned that he was being transported not to Brown County Mental Health facility but that he was actually going to be transported by the FBI to the jail, correct?

A Yes.

Q When you talked to the sheriff's department on August 23rd, it appears that you said that you asked Kevin to check in on him more often and that he said he was doing well that night.

Do you remember that conversation?

A I don't remember him saying he was doing well, but

said more in general that he seemed to be, you know, one of their better clients as far as his, you know, adapting to things there, and they had good conversations, that sort of thing. I don't know how often Kevin, you know, was there on his shift or anything like that.

Q You did not -- you did not tell Kevin that Mr. Rivett was acting -- hold on -- let me get back to this. One second.

You did not tell Mr. Reilly that Mr. Rivett was acting highly anxious and paranoid; is that true?

A I thought I did say that to him.

Q If you did not tell the sheriff's department on August 23rd, you'd agree that you did not tell Mr. Reilly that. True?

MS. ASHBECK: I'm just going to object to the form of the question. Go ahead.

A Could you repeat that again, Linda, please?

BY MS. MEAGHER:

Q Sure. If you did not tell the Waukesha County Sheriff's Department on August 23rd about saying something like that when they asked you what you had said, you would agree that you probably didn't say it that night; is that true?

www.phippsreporting.com
(888) 811-3408

Page 194

MS. ASHBECK: I'm going to object to the form of the question. I believe it misstates his statement on that date.

A   I thought I had -- I thought I had said that to them, to the detective. There were two things I remember asking for, because of his fragile condition, it seemed like he was more paranoid or that, you know, that he -- asked for further checks on him, more frequent checks on him, actually.

BY MS. MEAGHER:

Q   Right. You said, and this is what I'm reading from the transcript. You asked to check on him more often and -- but there was no comment about you telling Kevin that -- or Mr. Reilly that Mr. Rivett was highly anxious and paranoid?

MS. ASHBECK: I'm going to again object to the form of the question and the fact that it misstates the statement in this transcription.

BY MS. MEAGHER:

Q   Okay. But my question for you is: Assuming that that's the case, that the transcript doesn't say that you told Mr. Reilly that, you would agree that you probably didn't tell him that otherwise you would have told the sheriff's department that.

Page 195

True?

MS. ASHBECK: Objection. Asked and answered. You can go ahead.

A   I don't remember not -- I don't remember not telling the detective that I told Kevin -- my memory is that I told Kevin that he seemed in a much more fragile state, a little more -- I don't know if I used the word paranoid or something to that effect, and that they could do more frequent bed checks on him. And, you know, what I told the detective is what I told the detective, I guess. I might have not stated all of that, but --

BY MS. MEAGHER:

Q   Well, when the detective asked you what you told Mr. Reilly, you were trying to tell the truth and give a complete statement of what you remembered at that point; is that fair?

A   Yes.

Q   When you spoke to the sheriff's department you said that Mr. Rivett had said that people will come in his room and just kind of flash a light -- a flash -- strike that.

Mr. Rivett said that people will come in his room at Waukesha County Mental Health and people would flash -- use a flashlight, kind

Page 196

of flash in and leave or whatever. And he said that people were talking in his room saying something about he was going to jail.

Do you remember that type of conversation with Mr. Rivett?

A   I don't remember the jail part, but I remember he said that when he was trying to rest at nighttime, people would just kind of come in with a flashlight, scan it quickly. And I don't remember a conversation about that -- the jail part.

Q   If you told the sheriff's department about that on August 23, you wouldn't dispute that, right?

A   I guess not, but I don't have a memory of that right now.

Q   Okay. And did you tell Mr. Reilly about that, about people saying that he was going to jail?

A   No.

Q   Did you ever ask anybody at Waukesha County Mental Health what the transportation sheet said?

A   I didn't, no.

Q   Did somebody else?

A   Well, no, I asked -- I told Jim that maybe he could ask a nurse to sit with him and read that over together, because I figured if he heard that from someone, he didn't have access to it, is the

Page 197

way that it sounded. So I just said, you know, why don't you sit down with someone and they can sit and read that over with you. I didn't realize how much, you know, how far this had crossed, you know, to this more -- the story just kept getting more and more, you know, in his head that he just couldn't shake.

Q   Did you tell -- when Julie called you to tell you what was going on and what Mr. Rivett had said to her, did you tell her that's pretty much what he's told me all along and it was more of the same of what you've heard in the past?

MS. ASHBECK: I'm going to object to the form of the question. Overly broad. Go ahead and answer.

A   Could you repeat that again, please?

MS. MEAGHER: I'll have Ms. Pezze re-read it.

(Question read.)

MS. ASHBECK: Same objection. You can go ahead and answer.

A   Well, we talked about the jail thing because, yes, that was something he had been ruminating for, and I know Julie and I had conversations during that week and even previous to that week that he was --

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 51 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 198

just couldn't get past this guilt that he had about -- and story he had in his head that he was going to go to jail for something he did at Arketype. And that seemed -- the switch, like I had said, had just like turned on after this all started happening with the business closing and that sort of thing. He just started replaying everything. So I know that we had -- I'm sure we had a conversation about that.

BY MS. MEAGHER:

Q But that particular night, August 22nd, do you remember telling Julie that this was more of the same, you'd heard this in the past about what she was saying about him wanting to kill himself, about Arketype, about the FBI?

A Well, the FBI, no, because that would have been something that I don't -- I didn't talk to Julie, I don't think, after Jim had told me about the FBI thing. You know, I think -- I think we were just kind of talking about what his fears were and where that paranoia, where that was all kind of stemming from. And it seemed to be a replay of all the things that he kept imagining that weren't true. And we kept trying to tell him if there was something that they were going to do, they would

Page 199

have done it two, three, four years ago.

Q But do you remember telling Julie or having a discussion with Julie about the concept that he was being transported to the jail and that that was more of the same of what you had heard before?

A I -- I know -- I'm almost positive we talked about that at some point, you know, when she -- either when she called me or in our conversations during that, you know, that week, like, you know, why -- you know, what he was -- because she had been there one other time before. I don't know, you know, what their conversation was, if he brought that up, you know, at that time again. And so, you know, we might have been talking about that. I don't really recall.

Q Do you remember during the first phone call her talking about that he had said that he thinks he's going to jail instead of Brown County Mental Health?

A That evening you mean?

Q Yes.

A The 22nd?

Q Correct.

A I don't remember that now, but she very well could have, because that's kind of what we were -- had

Page 200

been talking about previous to that like in the day or two before.

Q Okay. And as you sit here today, you don't recall the second phone call with Julie; is that fair?

A I -- I remember one phone call at this point.

Q Okay. Okay.

A Or, you know, maybe I might have called her back to tell her that I spoke with the -- you know, the nurses and told her that, you know, that I had gone ahead and did that, but I don't recall necessarily that second phone call.

Q But do you remember a call that Julie made to you after her initial call saying that she had gotten a second call -- or she had gotten a call from Mr. Rivett?

A I don't remember that.

Q So what's the next thing that you heard from anyone at Waukesha County Mental Health?

A I had received a call about 7:30 in the morning on that Thursday saying that he was found unresponsive and that I needed to go to the Waukesha Memorial Hospital as soon as I could. So I packed up some stuff, found someone to watch my cat, got gassed up and went down there. And I -- on my first leg of the

Page 201

journey I was calling back and forth, I was calling the hospital, and they said they had no one there by the name of Jim. So then I would call back the mental health facility and ask what was going on. And then they said, well, you have to call the hospital. They said there's no one by that name. And they said we can't give you any information. There was this back and forth. And then at some point -- I'm trying to remember the order of things. I finally did get ahold of someone from the mental health facility, and I asked what was going on, 'cause I told them again that he wasn't at the hospital. And there always seemed -- like they were trying to figure out some communication, and like they had -- they put me on hold and then they were talking and put me back on hold. And then they said something to the effect, are you driving, and I said, yes, I am driving. And they said we can't give you any information if you're driving. I said I can pull off. And they said, are you by yourself. And I said yes, and they said we can't give you that information then. And I think I talked to them at least a couple of times.

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 52 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 202

And then I probably got a little agitated and they said, I'm sorry, sir, but we're going to have to hang up on you. And they hung up on me. And then Julie called me back because I had called on the way down. I called a few people including Julie and asked, because she was the closest one to Jim, so asked her if she, you know, she was coming. She called me and said she had gotten to the mental health facility and there seemed to be a lot of commotion going on. No one seemed to really be able to help her, answer her question.

And then someone came and sat -- came and told her that she would have to go to the sheriff's department to get the information. And she called me back and told me that and then we both, you know, had this sinking feeling that something else had happened that we were afraid of.

And then I had also called -- another person I called was Dr. Koster because I thought maybe he could get some information for me. And probably about 10 or 15 minutes before I got there, he called me back and said, you know, Pete, do you want to pull off. And I said, no,

Page 203

just tell me. He goes, I'd rather it came from me rather than a stranger, he said, but Jim hung himself in his room. And then by the time I got there, you know, I went to the sheriff's department and very confusing. And then went in and Julie was there and Julie's husband was there, and they had already told Julie, you know, confirmed what had happened.

Q Okay. So I'm looking at your transcript again. And you did tell the sheriff's department that Mr. Rivett had been talking about arrest warrants for the last couple of days while he was at Waukesha County Mental Health.

Does that refresh your memory at all?

A I'm sure I -- I'm sure I did, yeah.

Q So when I asked you about the things he was concerned about or upset about, you didn't mention that. So when did this start, this concern about the arrest warrant?

A It all started when the -- Jim was kind of replaying some of this even before the business closed. You know, he kept talking about, you know, how he might have used the credit card wrongly. He just blamed himself. And then it

Page 204

intensified after the business closed.

He just couldn't seem to shake that, you know. I think that's why Dr. Koster was pushing, you know, like who's -- who caused this to happen. I know that Kurt Voss was having conversations with him. I even sat with him and I said, Jim, you know, when he was at home, I said, would you feel better if we just made a list of everything you felt you might have misappropriately used the credit card for.

And he came up with like I bought a shirt for $40. And I think when we totaled it, it was like $4,000. I said we'll just write a check. Will that make you feel better? And he said maybe it would. And I said let's just do that. And then it just seemed to intensify on that day when we were heading down to Dr. Christeson's. He was replaying that he did something wrong, that he was going to go to jail.

And then it just -- you know, I often wonder, you know, if the place that he was in felt, and he stated it, more punitive. I felt it felt more punitive. And if in his head he was thinking he was going to jail and this place that he was in felt like a jail, you know, did it --

Page 205

did all of that feed off of this story.

You know, it wasn't -- you know, there was no one really like trying to connect with him or sit with him and just talk with him. So I don't know if I answered your question. I'm sorry. I'm --

Q Well, the question is a little bit more specific, which is --

A I'm sorry.

Q -- when did he start talking about arrest warrants and concern about that?

A That would have been, yeah, previous to the business closing, a couple of weeks -- it became more, you know, intense, and so -- yeah, through that time. I may -- he did probably mention it, you know, when all this initially happened and he started Khrome, but he let go of that. We just started to revisit all of that.

Q You told the sheriff's department that it happened over the last couple of days of his stay at Waukesha County Mental Health?

A Yes. That's when it definitely intensified.

Q And that he was adding more and more to the story --

A Yes.

www.phippsreporting.com
(888) 811-3408

Q  -- as it went on?

A  Yeah.

Q  And kept getting bigger and bigger?

A  Yes, I would agree with that.  I think the longer his stay was, the more it gave him possibly a feeling that he wasn't going to be coming home.  You know, that he might -- they might say that he's going to come home, but then they might hold him another two days or four days.  He never said that to me, but I'm just thinking that could be one possible reason.

Q  But you didn't tell that -- those -- the fact of the arrest warrant concern to Mr. Reilly.  True?

A  No, I did not.

Q  And you didn't tell anybody else at Waukesha County Mental Health; is that fair?

A  Right.  Because, you know, we had been trying to tell -- you know, when you're trying to talk reason into someone that's just ruminating, you know, all you can do is just try to present the facts.  I don't think it personally would have really mattered if I would have told someone at the department.  I mean, he was only there supposedly for that short amount of time and then it was two more days.  Then all the messages I was

getting from Jim is he couldn't wait to get home, so I'm in the let's get you home, let's get you to a place where it's going to be -- you know, you'll feel comfortable because you'll be at home.  We can do some outpatient possibly or you'll be in a place where you -- your friends can stop by more often and visit you, that sort of thing.

Q  So earlier you testified that Julie told you that Mr. Rivett had said he's going to hang himself, he knows how to do that.  Is that your memory?  Is that your memory of the call with Julie?

MS. ASHBECK:  I'm going to object.  I'm just going to object to the characterization of his testimony, but you can go ahead and answer it.

A  My memory of that, that call was that she said that I'm not going to be going home, I know how to hang myself.  Those were, you know, if you -- right now if I was asked to not go back in anything, that's my memory of it.

BY MS. MEAGHER:

Q  And you agree that you did not tell Mr. Reilly that he had said, "I'm not going to go home, I know how to hang myself."

You didn't tell Mr. Reilly that, did you?

A  I did not.

Q  Did you ask Mr. Rivett about that when you spoke to him, about the "I know how to hang myself"?

A  Actually, I don't remember.

Q  And you had mentioned to the sheriff's department on August 23rd that you often felt that Mr. Rivett used the word "suicide" like a little boy crying wolf or crying like a wolf?

A  There was a range of his behaviors.  And like I had mentioned earlier, you know, he would sometimes say, I can't do it today because it's my sister's birthday, up into more things that I took more serious, like the time that he had told me with the belt around his neck.  And he did admit to me several times, he said sometimes I think I'm looking for attention, sometimes I'm trying to see how much you love me, you care about me, you know.  So it's hard.  You know, and I -- I would talk to my therapist about how and when to know to take those comments seriously or not and how to help.  So I did the best I could, I guess.

Q  And you never told Mr. Reilly that Mr. Rivett should be put on the suicide watch; is that fair?

A  I asked for frequent -- more frequent bed checks.

MS. MEAGHER:  Can you -- Ms. Pezze, can

you re-read the question?

(Question read.)

A  Fair, but I -- but, you know, I thought that's what he was there for was a suicide watch.  So I am assuming, you know, the protocol was being followed with the 10- or 15-minute bed checks.  So I thought by saying that that they would go in more often or have less time in between, or spend more time, you know, with him.

BY MS. MEAGHER:

Q  But you never told Mr. Reilly that Mr. Rivett had threatened to commit suicide; is that fair?

A  Yes, that's true.

Q  Now, in answer to Interrogatory No. 20, you mentioned that there was a time when you were visiting Jim and Jim asked for more sheets, and whoever he spoke with just pointed to an open rack cart to grab sheets from.  This cart with sheets on it was freely available to take sheets from.

Do you remember writing that in answer to interrogatories?

A  Yes, I do.

Q  And when did that happen?

A  It was more towards maybe the middle of his stay, because he was asking where would he get his

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 54 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

clothes washed. It was pretty humid and hot that week, and he said his bed sheets were damp, his clothes were dirty. And I don't remember if it was a nurse or an aide said, you put your dirty clothes over there with the label in that bag, and then if you want some sheets, you can help yourself to what you need here on the cart. And he -- and he took some.

Q And where was the cart?

A The cart was in the main, you know, part of the room. It was like parked, you know, off to the side somewhere.

Q So where would it be in relation to the nurse's desk?

A The nurse's station? Within, you know, 15 -- 15 feet, roughly.

Q And what shift was this on?

A It was one of my visits, so I'm assuming it was probably an afternoon visit. So I think it was like after lunchtime. I don't remember specifically, but --

Q So it would probably, regardless, it would have to be the second shift because you only visited after lunch or after dinner, right? So sometime between, you know, around -- after lunch or

between 5:45 and 7:00 p.m., right?

A Yes.

Q Okay. And do you remember, was it a man or a woman that this conversation was with?

A I believe it was a woman.

Q And where was this woman? Was this woman behind the nurse's station or somewhere else?

A No. She was someplace close by, because I remember Jim coming out with his stuff and just asking, you know, about that.

Q And did he bring sheets back in to turn in to get washed?

A I'm -- I don't know. He took the sheets, and then as far as I know he went back into his room. I don't know if he changed them then or later.

Q Are you -- has anyone told you that he somehow had extra sheets?

A I've -- I read some -- that he had taken extra sheets.

Q Where did you read that?

A I can't remember where I read that, but that he used the extra sheets and then he -- to hang himself.

Q So you read that somewhere; it's not that someone told you that? Is that fair?

A I -- I read that, I believe. Or --

Q And remember in the beginning I asked you what you reviewed, so I'm trying to find out; was it a medical record, was it a police record? What was it that you read that told you that?

A I'm trying to remember now. I remember -- my memory of this whole thing with the sheets was that that memory stuck with me, because when I was driving down on that day that it happened, that morning that it happened, I was replaying everything that I could have done differently the night before, and including, you know, why didn't I just drive down that night before and I would have -- you know, I could have went around and knocked on the windows and told Jim or called Jim and said, I'm going to be in the car and just stay in the car and then I'll follow you all the way home.

And I remember when -- I think the sheet thing I remember when Dr. Koster said he had hung himself, I remember thinking, you know, was this with the sheets or was this with the extra sheets that he might have taken, you know, off that cart. And had he done that more than once; I don't know. I only remember him doing that once

when I was there.

Q Back to Dr. Koster. It looks like he has a whole services list where he got paid a certain amount for a person's age, 3,600 a year for an individual over the age of 61; 3,200 for an individual under the age of 60.

Was Mr. Rivett paying that, or was he getting it free because he had done work for -- Khrome had done work for Mr. Koster?

A He did get -- he did get bills from Dr. Koster that were being, you know, paid. I don't think he charged him what he normally would charge other patients because he knew that he probably couldn't afford that.

Q And then Dr. Koster advertises 24/7 access e-mail, work cell phone, home phones. Is that your understanding?

A I didn't know that, but that's -- you know, that's kind of how he let Jim have access to him. You know, he would -- more than a regular doctor would.

Q And he would visit home or office?

A He came to our house maybe once or twice. Mostly there was his meetings at the office. And then like I had mentioned, he went for dinner or lunch

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 55 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 214

with him sometimes.

Q  So he did come to your home a couple times?

A  I want to say at least once or twice, um-hmm.

Q  Have you spoken to anyone at Waukesha County Mental Health since Mr. Rivett's death?

A  No.

Q  And I understand that you and Julie spoke with the medical examiner. Was that in person or by telephone?

A  I feel like there was another woman that we met that day that spoke with us. I'm assuming that was her. I really can't -- can't say. That day's kind of a blur.

Q  Do you remember anything about what was said to you during that call -- I'm sorry, during that meeting, during that meeting?

A  I don't really. My main memory was with the detective.

Q  So you really have no memory of the meeting with the medical examiner; is that fair?

A  I remember there was another woman there that we spoke to or that spoke to us, you know, and then I had my -- and then I had the meeting with the detective. And then at some point I was outside when, you know, Dr. Christeson called. But I

Page 215

don't remember anything specific related to the meeting with the woman. I don't even --

Q  Go ahead. I'm sorry.

A  I don't even remember what her title was, really.

Q  What about, did the Waukesha County Sheriff's Department tell you what they thought had happened? Did you have any conversations with them about it?

A  They just told me that it was considered a crime scene because it hadn't been determined yet if someone had assisted Jim or -- so, yeah, they couldn't tell me much, much details.

Q  Did you have any conversations with the Waukesha County Sheriff's Department later at any time since August 23rd about events?

A  No. Other -- you know, some of the different -- you know, I guess it was the medical examiner's report or things that have come in later through counsel that would have shared some of those things with me.

Q  No. I'm talking about conversations. I'm trying to find out about all conversations you had. So you met with the sheriff's department on August 23rd. You were interviewed --

A  Yes.

Page 216

Q  -- and that was recorded.

Did you have any conversations with the sheriff's department about what they thought happened?

A  Not that I remember, no, after.

Q  Did you have any conversations with the medical examiner's office about what they thought happened?

A  I mean, I'm sure at some point I received some notification that said, you know, that it wasn't considered a crime scene and that Jim had taken his life, but I don't like remember like personal face-to-face conversations with anyone.

Q  Any telephone calls -- I just want to make sure I'm not missing any phone calls you had with anybody from Waukesha County about what happened.

A  Nothing that I can -- nothing that I can remember.

Q  Other than speaking with your lawyer, did you talk to anyone about the events, about what happened in terms of staff members, anybody? I just want to make sure I'm not missing anybody that would have talked to you about what they think happened. And I'm not including your lawyer in this.

A  No, hm-mmm.

Q  Have you been interviewed by any of the lawyers --

Page 217

strike that.

Have you been interviewed by any of the experts that your lawyer retained?

A  No.

Q  Okay. Let's switch over to those letters that I'm calling the good-bye letters, and that's going to be marked as Exhibit 2.

A  Maybe I called them good-bye letters because they were found after his death. So...

Q  Well, we'll go through them. I think some of them were found -- you knew about before the death, right? Just going to make sure that's clear.

A  I didn't find any -- other than the ones that were in that book, we didn't find any letters until after his death --

Q  All right. Well, let's --

A  -- that I remember.

Q  Okay. Let's go through these and figure out when you found these. There's one dated -- and this is Exhibit 2, this is page Plaintiff 03767. We Bates stamped these. All right. That's the beginning of the letter.

When did you find this letter?

A  After -- after he died. It was one of the letters that we found in his leather briefcase that the

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 56 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

employer -- employee brought to our house.

Q So now we're going to these handwritten notes that look like they're photographed, Plaintiff 03770, as part of Exhibit 2.

What are these?

A Those are the ones that were found in the book at -- that John found in the book at the cottage.

Q All right. So Jean, Julie -- who's Evan?

A Evan is his nephew who -- he moved to Green Bay because Jim was kind of like a father figure to him.

Q All right. So you knew about this when John was visiting in July of 2018, correct?

A Again, it's unclear to me because John thinks it was 2018 when he came.

Q I'm sorry. I misspoke.

A Okay.

Q I'm glad you said that. All right.

You knew about these in July of 2018 when John was visiting; is that correct?

A That's what my memory -- he thought -- he thought we went to the cottage as a first-year anniversary of his mother's death. For some reason my memory is that we went to the cottage in 2017 while his mom -- while his mom wasn't doing well because we

wanted to be closer to Green Bay so that we could get home if something were to happen. But I really -- I don't know -- I mean, I have photos from that time. So I can look at the photos to tell you for sure what year that was that we were at the cottage. But John's memory of it, he told me, was that he found those in a book.

Q Yeah. If you can look at the photos, that would be good.

A Okay.

Q Let us know.

A Okay.

Q And then you had mentioned that in the briefcase there was some photos that were special to Mr. Rivett with you?

A On his computer -- he had a file folder on his computer that had a letter that was typed, which I believe you have a copy now, and about eight or nine photos of important times in our life together, like a photo of our wedding, a photo of some of our pets, things like that.

Q Okay. Well, I'd request those photos. Okay.

Going to Page 3771 of Exhibit 2, what are these?

A Those were the same ones found in the book.

Q So these are different ones but also in the book?

A Yes. That's -- those are the ones that John sent --

Q Okay.

A -- just recently. I had a conversation --

Q Those were in the book when John visited and you went to the cottage, right?

A Right, um-hmm.

Q Is the fact that he didn't write -- oh, he did write a letter to mom.

A Um-hmm. That's why I'm confused. I was thinking he wrote these while his mom was still alive, but I'm wondering if I have the date wrong. Maybe he was writing that to his mom just to ask forgiveness for something, you know.

Q And in a letter -- the first letter to the left, upper left, who is that to?

A Well, he's writing it to himself, but then he kind of -- continues it to me. 'Cause it says, "Jim, work through these feelings before they consume me."

So he's telling -- he's trying to encourage himself to do what he needs to do and then he kind of moves the letter into talking about me and never -- I can't read from here. I

never meant --

Q Let me make it bigger and then maybe you can see if you can read it. Why don't you just read the letter so we know what it says.

A Yes, I can read that.

MS. ASHBECK: Can you read it?

A So it looks like he started writing it to himself to tell him, you know, he's got to get a handle on this before the feelings consume him, and then he moves into writing more to me.

BY MS. MEAGHER:

Q But what does it say? Could you read it to us so we know what it says?

A Sure. You want me to read the whole letter?

Q Just this letter on the upper left, yes.

A "Jim, Work through these feelings before they consume me. I cannot seem to get a grip on things lately and see no reason for me to stick around. I just need -- I just need to plan how I can do it. I know it will hurt many, but life will go on. It has been so unfair to Pete. I love you, Pete. Love you enough to do this. I pray you will forgive me. I never intended to harm or hurt you -- your beautiful heart. It is just that mine is so broke -- damaged. Repair is not possible

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 57 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 222

anymore.  I love you all.  Jim."

Q  Thank you.  Sorry about that.  Thank you.  I'm sorry I had to have you read that.  I just want to make sure I'm not missing what it says.

A  Um-hmm.

Q  So you would have seen that prior to his death, though, correct?

A  I believe so, yeah.  Yeah.  These letters are -- yeah.

Q  And --

A  These are the ones that John had sent me, and he said he found those inside the book.  So...

Q  All right.  So you would have talked to Mr. Rivett about this?

A  Yes.

Q  All right.  Then we've got Page 3772.

A  Um-hmm.

Q  And this is dated August 24th, 2018.  Where did you find this?

A  This was also -- this was not the letter that was on his computer.

Q  Well, it looks like it was e-mailed to you?

A  I never got -- I never got the e-mail.

Q  Is that your correct e-mail address?

MS. ASHBECK:  We may need to make it

Page 223

bigger, Linda.  It's smaller.

MS. MEAGHER:  Yeah, let me do that.

A  Yes, that's my correct e-mail address.

BY MS. MEAGHER:

Q  And did you ever look at that e-mail address to see if you got that e-mail on August 24th, 2018?

A  No.  I'm assuming that he might have typed it and then saved it to send maybe at a later date or something like that.  I mean sometime -- again, you know, I think he was just trying to -- to tell me what he needed to say in case he couldn't -- wasn't able to make it out.  And the second, third paragraph is the paragraph, I believe, that talks about --

MS. ASHBECK:  You won't be able to move it.

A  Yeah.  Well, part of that letter is the part of the letter that I had read at his funeral, because I thought it would be helpful to people because so many people were shocked.

BY MS. MEAGHER:

Q  When was his funeral?

A  His funeral was a week after he died, so it would have been August 30th.

Q  And when did you find this letter?  Or you went on

Page 224

his computer or did somebody else go on his computer?

A  Someone went off -- on his computer.  I'm assuming it was Bobbie, whoever delivered it, and printed that off for us.  And then it was the week sometime in between his death and the funeral, because I remember all of us were together eating dinner when she came, Jim's siblings and my niece was there, and maybe somebody else, but I think that might have been it.  But we just thought that there were parts of this letter that were important for everyone to hear.  So I'm assuming he like somehow had it up or had saved it to maybe send at some point, or, you know.

Q  Do you know whether it was in his "sent" box or don't you know?

A  I don't know.

Q  Did you ever ask how it's dated August 24th?

A  Jenna and I have had conversations about that.  I don't -- you know, I don't really know for sure, you know.  I don't know if he was confused at the date, because it says the 24th, you know.  It could have been the 14th he meant, or I don't know.  I don't know.  There's --

Q  Well, there's programs where you can send things

Page 225

on a certain date.  Did you ever have a conversation with Bobbie or Carol or somebody else about was this in his sent e-mail, was this in his draft e-mail, where was this?

A  I never had a conversation with anyone regarding, you know, when that might have -- I don't even know if I noticed the date until, you know, after the fact, after we were given it.  And --

Q  All right.  And then you've got this -- there's all this allegation about Paul saying he wanted to have sex with him and saying that there was sexual tension.  Was that part of the toxic behavior that was going on?

A  Yes.

Q  And sending him pornographic images -- and I assume through e-mail, right?

A  Yes.

Q  I'm sorry?

A  Well, yeah.  You know, you can read in this -- in this text that he was going back to a lot of different things that brought up a lot of different feelings.

Q  Okay.  And then do you have any idea when he wrote this?

A  I don't.  Obviously, it couldn't have been

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 58 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 226

August 24th. So...

Q Right. So there's also comments about Kurt never giving him statements to show, you know, what he owed.

So from reading this, it sounds like Kurt did say to him that he did owe some money.

Are you aware of Kurt ever saying that to him that, you know, you owe us money in backpay for some credit card use? Do you remember --

A No, I don't. But I mean that makes -- you know, if we're looking at a possible date when that was written, I mean, again, the last two weeks after, you know, when Arketype closed until his death, that's when he was revisiting and ruminating about all of this. So it could well have been.

Q All right. And then this is Page 3773.

A That was a letter to his brother. And to my memory that was -- those handwritten letters were found in that -- his briefcase. That was brought to our house along with that other one, another one, I think, that you're going to be seeing soon.

Q So this was found after his death as well?

A Yes.

Page 227

Q And then we've got 3774.

A Um-hmm.

Q Was this also found after his death?

A In the same bag.

Q You would agree that these notes that he wrote at work had -- or that were in his briefcase had to be written sometime prior to August 16th?

A Prior to August 16th, yes. Yeah, 'cause he wouldn't -- his briefcase was left at work. He didn't have it with him at home, and so we went from -- yeah, to Brookfield. So he wouldn't have had this with him. I don't know if he wrote the letters at home or at work, but they were found in his briefcase that was delivered from work.

Q Right. But my point is that he couldn't have written it then -- I'm sorry. He couldn't have written them at Waukesha County Mental Health. He had to have written them prior to going to Waukesha Mental Health, right?

A Correct, correct.

Q But you don't know exactly when he wrote them. True?

A True, I do not.

Q And on this page he's basically giving certain items of his property away?

Page 228

A Some things that were special to him, yeah.

Q And then he wanted you to get a -- he wanted you to get a puppy named Jimmy. I'm sorry for you to go through this. I know.

If you want to take a break, we can.

A No. I did get a puppy and named him Jim. I did what he wanted me to. I was bugging him to get a dog, because when he had anxiety in his 20s, we got a couple of cats because we could only have cats at our apartment. And I reminded him of how much it helped him to have something else to keep his -- you know, to give his attention to. So I was bugging him for a while about getting a dog, and he said it wasn't the right time.

Q Did you give the things away that he asked you to?

A Yes.

Q Did Julie get the cupboard?

A Well, it's when I was done using it, so I still have it. Most of the things -- I mean, I could go over this list if you'd like. But I know the computer was not -- the computer belonged to work, so they kept the computer. I don't know if they sold that or what they did with it.

Q And then the Aaron Rogers cutout to Ryan. Who's

Page 229

Ryan?

A His nephew.

Q Okay. And then if you want to take a break -- are you okay?

A I'm okay.

Q All right. Page 3755. When did you -- when did you see this for the first time?

A Those were in the bag as well, the leather bag, B-A-G.

Q And also 3776, that was in the bag too?

A Yes, I believe. That one I'm not sure, but I think that one was in the bag.

Q So that one might have actually been in the -- that might have been in the items that John found in the book, that one?

A It might have been. I'm not sure exactly about that one, because the other ones appeared to be in the same color and -- and that one -- that one looked a little different. I don't really remember where that was -- that one was found.

Q All right. I'm just going to mark this group of things that your attorney gave you to review. I'm going to mark them after we're done here as exhibit -- let me look where I am.

MS. ASHBECK: Exhibit 3, I think, Linda.

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 59 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 230

MS. MEAGHER: I know, but I might have marked something in between there, so let me check -- that I just haven't talked about yet. So one second.

Exhibit 3 is actually -- wait. I can't open that one. I marked his resume as Exhibit 3. Let's see if I have it up. No, I don't. Well, we can go over -- let me go over that next just because I can't open it at the moment.

All right. Let's start with this letter in purple. And this is going to be Exhibit 4.

BY MS. MEAGHER:

Q All right. So when did he write these?

A This was, I believe, a group of the letters he wrote in the facility, because he wasn't able to have access to pens or a pencil, so I brought him some markers and paper, a drawing pad and stuff with him -- to him when he was in the facility.

Q Were you aware of these notes or this particular note prior to his death, or did you find out about this after his death?

A There were some that he gave to me and there were some that were after. But most of these he gave

Page 231

to me when he was there.

Q Is this one of the ones he gave to you?

A I don't remember which -- when it was -- there were some that he had like in a -- there was a drawing pad and he had a couple in there. And then a few he said, you know, I've been writing to you or, you know, there were exercises because they were encouraged to journal there, so he was doing some journaling, too.

Q All right. Just so I don't lose track of where I am. I'm going to call that Exhibit 4. Going to go back now. All right. Then there's -- hold on. I got to close out some of these things.

Then there's one in blue crayon, which is a little difficult to read, and I got to rotate it as well. Hold on. We'll call this Exhibit 5. Having a heck of a time. So this is Exhibit 5. This is the blue crayon. And let's just start at the bottom where it's right-sided up.

Is this something that you saw before his death or after his death?

A Honestly, I don't -- I couldn't tell you which ones were when. He gave me some and some were in his -- his drawing book that I gave him.

Page 232

Q Okay. So you don't know either way on this one?

A No.

Q Trying to figure out how to make the top part -- I'm having a heck of a time here.

So after his death you got the notebook back?

A Correct.

Q But you don't know which one it was, whether it was before or afterwards?

A I couldn't tell you with any certainty, no.

Q All right. Then there's one in green. I believe I'm on -- am I on Exhibit --

MS. ASHBECK: Six.

MS. MEAGHER: -- 6, okay. Just making sure.

MS. ASHBECK: Yes.

BY MS. MEAGHER:

Q All right. On this one, did you see this before he died or after he died?

A Again, I don't -- I couldn't tell you with any certainty.

That one, I think maybe possibly before, because he asked to get him out of the place, and we had been talking about that, you know, can you find another attorney or someone

Page 233

that can get me to a private facility or something like that. But honestly, Linda, I can't with any certainty know if they were before or after.

Q All right. So we're going to call that Exhibit 6. I don't know why it didn't -- okay. Then there's one in orange [Exh. 7].

It's the same thing with that; you don't know whether he did that before or after, same thing?

A I can't see it, but -- yeah.

Q Can you see it now, or not?

A Yes, I can.

Q Okay. And do you know whether you got this before or after?

A I don't remember. You know, some of them, if I -- I would just be guessing. You know, I mean the ones that I did get before definitely made me concerned that, you know, that he wasn't having the best experience, you know, there. So -- I loved the man, so I'm just trying to do what we all thought might be better, you know.

Q All right. Then there's one in purple. And is that the same thing, you don't know when this was done?

A Yeah, that looks more like a marker. And I don't

www.phippsreporting.com
(888) 811-3408

Page 234

remember getting anything that was like in the thicker marker like that, so I would think that was one that he wrote at the facility, too. It seemed like either there were the ones that were kind of torn apart, like the ones found in the book. They are the ones that had -- that were on the Khrome stationery that were kind of in the book bag, and then there are these that are more colorful and heavier text. So I'm assuming those were the ones he did in the facility.

Q So this one, which -- I believe we're on Exhibit 8, right?

MS. ASHBECK: Yes.

BY MS. MEAGHER:

Q Exhibit 8, which is the purple marker, this was done at the facility, you believe?

A I believe so, um-hmm. Just based on the color and the kind of instrument used to write with.

Q And then this is Exhibit 9, which you wrote in the column that this is a letter Jim would leave out on his desk in his room because he thought staff read his writings?

A Yes.

Q You wrote that after -- you wrote this note on Exhibit 9 after Mr. Rivett's death, correct?

Page 235

A Yes.

Q And how do you know that he left this on his desk so that people --

A I can't remember if he showed it to me or he told me about it, but he said he wrote one letter that wasn't entirely negative but had some positives on it so that he -- that would show that he was making some progress so that he could go home. You know, that's what he told me.

Q Okay. So he basically was trying to tell them I'm making progress, I definitely can be transferred home? That's why he wrote this?

A That was my understanding. It's not necessarily all positive, but, you know, it's more positive than some of the other letters. He still makes some comments about something, but, you know, he -- he said he left that on the desk so that people, if staff read his things, they would think that he was progressing.

Q And he told you he would leave this one out of the journal and just sitting on the desk so the staff could read it. That was your understanding?

A If -- if -- yeah. That if staff happened to be cleaning or seeing or looking in or checking in, they would see that letter.

Page 236

Q Was Mr. Rivett ever on disability insurance?

A No.

Q Was he ever on social security disability?

A No.

Q Did he ever apply for either one of those?

A No.

Q There was also a note on his desk with the name of Josh Koch. Was that the lawyer that you were talking to?

A Yes.

Q All right. And it gave his number, his e-mail. Did you give him Josh Koch's information, or how would he have that written down?

A He -- he had that written down?

Q Yes. It was on his desk. I believe maybe it's your document. I don't know. Was that something you wrote down? There's an orange paper somewhere that has Josh Koch. It has his number.

A I mean, I told Jim that I had an appointment with him. I might have given him -- either I might have either given him that number, he wanted to talk to him directly, or perhaps Bob Johnson who knew him gave Jim his name and number and then Jim gave me that name and number to call. I'm not exactly sure how that actually went, but --

Page 237

Q Okay. Let me look back at something real quick. Hold on. So I'll mark this as Exhibit 10. This is a picture of items on his desk and there's this phone with all the different numbers.

Is this something you would have written out for him or he would have written it?

MS. ASHBECK: Can you make it bigger, Linda?

MS. MEAGHER: Sure. Sorry.

MS. ASHBECK: That's all right.

MS. MEAGHER: Now it's probably too big.

MS. ASHBECK: That's all right. Just on the edge.

A That's my handwriting. My handwriting is from "Jean" down. And then if you scroll up a bit, and that is Julie's handwriting with her cell number. So possibly she just added that, her number, because maybe I didn't have it or have it on the top of my head or something.

BY MS. MEAGHER:

Q Did you say Evan is his nephew?

A Correct.

Q And whose child is that?

A Julie's.

Q So she was married before her current husband?

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 61 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

A   Yes, yes.

Q   And then did you write Bob Johnson as well?

A   Where is that?

Q   At the very bottom in green.  Do you see the green on the bottom here?

A   It kind of looks more like Jim's handwriting.

Q   Okay.  And then underneath that sheet was this document -- was this.  Is that Jim's handwriting or your handwriting?  And I'm going to mark this as Exhibit 11.

A   That looks more like his.  Yeah, I think that's his handwriting.

Q   Did you -- strike that.

Do you know whether he talked to Bob Johnson?

A   Who's he?

Q   I'm sorry, Mr. Rivett.

A   Oh.  He talked to Bob Johnson a few times when he was there, yeah.  Bob and he were pretty close.  So Bob -- I know Bob called him a couple of times to see how he was doing, and Bob was, you know, one of Jim's people that he could call if there was, you know, an issue or something.  Even though he was no longer working for the counseling agency, he had another job that he said -- we felt

like we could call him and talk to him.

Q   And where did Bob Johnson move to after he left?  Did he leave Bellin or --

A   Bob Johnson worked for American Foundation of Counseling, and he became a foundation director of -- I think it's a samaritarian [ph] group or something.  It's not based in Green Bay, but he still has a home address in Green Bay.  His wife lives in Green Bay still.  So he's -- he works more so remotely, I think.

Q   Did you ever talk to Mr. Johnson about the conversations he was having with Mr. Rivett while Mr. Rivett was at Waukesha County Mental Health?

A   No, hm-mmm.  I just knew that --

Q   How do you know that they had a conversation or had conversations?

A   Jim would tell me that Bob -- he either talked to Bob or Bob would call him.  Same with Dr. Koster.  That was, you know -- I would -- Jim would tell me if he called or if he called him.

Q   So he was having conversations with Dr. Koster as well?

A   Yes.

Q   Let me make sure the question comes out straight.

A   Sure.

Q   While Mr. Rivett was at Waukesha County Mental Health, he had conversations with Mr. Koster -- or Dr. Koster?

A   Yes, I do remember.

Q   And you know that from talking to Mr. Rivett, correct?

A   Yes.

Q   Had you ever talked to Dr. Koster about what was discussed during that time?

A   No, hm-mmm.

Q   All right.  And then he had conversations, Mr. Rivett had conversations with Bob Johnson while he was at Waukesha County Mental Health, and you know that from talking to Mr. Rivett?

A   Right.

Q   But you never talked to Mr. Johnson about that; is that fair?

A   That would be fair.

Q   And did Mr. Rivett speak to any other siblings other than Julie while he was at Waukesha County Mental Health?

A   I'm assuming he talked to both of them.  I mean John, I'm pretty sure they communicated.  Jean, I'm assuming.  You know, there were a couple -- you know, Milda and Jason might have called him.

But there were a few people checking in on him.  I don't know all of them.

Q   When Arketype sold the building -- strike that.

The bank sold the building.  Is that how it worked out?

A   The bank, U.S. Bank sold the loan to Amos Financial at some point, and then the whole -- the building was -- the sale of the building was settled through a deed in lieu of foreclosure in like '20 -- December of 2020, I want to say.  So yeah, so it was eventually settled.

Q   And there was a lawsuit brought by Amos against you, Kurt and Paul, right?

A   Yes.

Q   And there was a judgment against the three of you for 800,000 -- $863,998.17; is that right?

A   Yes.

Q   And it looks like they sold the property for 675?

A   I think that was about what it was.  And I had to pay in as part of the deed in lieu of foreclosure.  I paid in -- we had to pay in 180,000 on top of that, and I -- I paid 160,000 and Paul and Kurt contributed 20,000 'cause that's all they said they had.  So most of that came from the sale of the -- of Khrome.  All that came from the sale of

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 62 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Khrome.

Q How did it get decided that you owed 160,000 when the difference is -- (inaudible).

THE STENOGRAPHER: "When the difference is" -- I didn't hear the end of the question.

BY MS. MEAGHER:

Q Sure. The difference was 188,000, how was it decided that you would pay 160?

A Because Paul and Kurt paid 20,000 of that, and then I paid the hundred and -- the balance, whatever that was, like 160,000, something like that.

Q Oh, I see. Okay. They jointly -- I thought they each paid 20.

A No, no.

Q So jointly they paid 20,000?

A You're correct.

Q And then whatever was left over after 20,000 was paid, you paid the rest, so you would have paid like $168,998.17?

A Correct.

Q And did you do anything to dispute that they only had 20,000, or how did you --

A My attorney, real estate attorney, said it would be basically putting good money after bad to have

to prove that they, you know, that they didn't have the money would have cost me. And by that time, you know, my coffers were getting pretty slim, so yeah.

They -- we had a potential buyer and her deal fell through at the last minute, but we had signed all the paperwork for the deed in lieu of foreclosure, so we only had to pay what we had agreed to and then we were off the hook. But the building was then later sold after we were off the hook for that.

Q Do you have some documentation that shows what you paid in versus what Paul and Kurt paid in?

A Yes.

Q All right. I'd request copies of that.

You're saying you paid that in prior to the sale?

A Yes, 'cause her -- the person that was going to buy it, that fell through. But then the same realtor sold the building later to St. John's Ministries that turned it into a day shelter for homeless people.

Q So they just paid the same price?

A I'm not exactly sure what it was sold for. I know they came out -- Amos Financial came out ahead

because they received 180-some thousand from us, and I don't know, the 6- or 700,000. I could find that out, but --

Q So before I forget, I want to talk about Exhibit 2, which is his resume that you put together.

MS. ASHBECK: I think that might be Exhibit 3, Linda.

MS. MEAGHER: Oh, yes, you're right. Thank you.

MS. ASHBECK: I just want to make sure I have it right.

MS. MEAGHER: Yep, that is correct.

BY MS. MEAGHER:

Q All right. So this is the document that you put together, or this was something Mr. Rivett put together?

A I put -- I put -- I gave the information, yep, um-hmm.

Q But it's like --

A This wasn't from Jim. I had to construct this because he hadn't had a resume, you know, for years because he had, you know, the same job for a long time. So I just did an account of what he --

Q All right. So just to be clear. You drafted this Exhibit 3, correct?

A Yes.

Q And it was done for your lawyers. They asked you to do this, right?

A Yes, um-hmm.

Q And if you look at -- you have President/Creative Director of Khrome, and then you have President/Creative Director of Arketype.

He was not president, though, until 2009, right?

A Correct, um-hmm.

Q And what was the reason that they gave for firing him in December of 2014?

A Well, they really didn't give any reason. They just -- Jim showed up -- Paul had told him he wanted to discuss Jim's offer to buy him out, and Jim showed up at Paul's house. And when he got there, there was a security guard in the home and then Paul said -- and I expected Jim to be gone for an hour or two, and Jim was back at home within 15, 20 minutes. And he said I just got fired. And it's like what, what are you talking about. And he said, you know, there was a security guard there. I was told that I was no longer needed -- he said Paul suggested I resign, and I said -- because all I did was offer to buy

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 63 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Page 246

you out, can we talk about this. And Paul said, absolutely not.

And at that point they -- the Arketype business, they had letters already ready to be mailed out that day that said Jim had resigned to work at Mayflower Greenhouse because he wanted to do more creative work. And so they sent that to all the clients. They told all the employees that same thing.

And all of a sudden I remember the employees saying Paul showed up at work and, you know, they had a security guard, they thought something had happened to Jim, and they said, no, Jim quit to go work for Mayflower Greenhouse. And they're like, you know, a president of a company would not just up and do that without like letting somebody know, and especially that had been there that long.

And so it was just this thing that they had set up to lie to everyone about what they had done. And a lot of clients found out about that and employees found out about that. And anyway, that's bottom line. I don't know if I answered your question. But...

Q   Yeah, thank you. So Dos Espiritu, did that only

Page 247

own the Arketype building or did that company own anything else?

A   No, it was just for the purchase of that building.

Q   All right. For the sale of Khrome, it looks like you sold it on December 21st, 2018.

Does that seem right?

A   Yes, um-hmm.

Q   Like you said, you first went to the current employees, asked if they wanted to buy it and that didn't work out, correct?

A   Yes. There were two women there that had considered it, but after one backed out, then the other one wasn't able to do that.

Q   And then what did you sell it for?

A   300,000.

Q   But then your taxes make it look like it was sold at a loss -- the sale price was $313,871, cost of $599,371 for a loss of $285,500.

Any idea what those numbers mean, or why was there a loss in the sale price?

A   I can find out. I never -- you know, I don't ever -- I remember getting that information. I'm sure it was in my taxes and my accountant, but, you know, at that point -- yeah.

Q   Did you actually get 300,000 in your pocket, or

Page 248

did you write off things, or what exactly happened?

A   Well, there were -- I'm trying to remember now. There was all the attorney fees that came out of that 300,000, the attorney that helped do the sale. I gave the employees all a larger bonus that year because I wanted to do that for Jim, because I didn't know if they would get something from him. I don't -- I mean, I could -- I could find out like what the rest of that was from, but no, I did not pocket the full 300,000, I know that.

Q   What do you think you did pocket?

A   I could -- I can find out. I don't remember off the top of my head. I had about --

Q   Go ahead.

A   I mean, I had -- I mean, I had the 160,000. That all came, you know, from that amount. I put about 50,000 in some projects at my house, you know. Some of the money went to pay for everything at Arketype, because I was paying for the utility -- the water and snow removal and all those things. But I can -- I could find out from my accountant where all that went, if you would like me to.

Q   Well, let me just go back a little bit. Here's --

Page 249

I am going to call this Exhibit 12. This is an Informal Administration from Mr. Rivett's estate and it's got this itemization here.

This is really what you received, is that correct, from the estate?

A   From the estate, yes.

Q   Okay. So you got one half -- you got his share plus you got your own share, but this is just itemizing what you got from him, right?

A   From him, yes, um-hmm.

Q   And then you inherited money from his mother's estate?

A   Yes.

MS. MEAGHER: Let me look back at -- I'm almost done, by the way, so if you want to tell Julie to come back.

MS. ASHBECK: I think she might be back, but -- I think I can see your car out there. So she must be here.

MS. MEAGHER: Okay. I just want to make sure I didn't need to give the half hour warning or something.

MS. ASHBECK: I think she's here.

BY MS. MEAGHER:

Q   So I'm sorry. What do you think you got from

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 64 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Khrome in terms of actual assets?

A I can -- I can find out for you exactly.

Q You just don't remember?

A Not off the top of my head, no.

Q All right. Hold on.

A I would have come more prepared for that.

Q In terms of Mr. Rivett's income, what was he earning per year as an employee of Khrome?

A He -- at Khrome, I'm guessing around 80,000, 90,000 possibly. I mean, I do have his tax records.

Q Yeah. And then he also earned money as the owner of Khrome?

A Yeah, I think that was just his salary.

MS. MEAGHER: Okay. Let me think. I think I have asked you -- let me go through my notes real quick. Let's take a little break here.

MS. ASHBECK: Yeah, we'll just let Julie know she's up next.

MS. MEAGHER: Let's take a five-minute break while I go through my notes. Okay?

MS. ASHBECK: Sound good.

THE WITNESS: Thank you.

(Brief recess taken from 3:52 p.m. to 3:58 p.m.)

BY MS. MEAGHER:

Q This is Exhibit 13. This is a page from your 2018 taxes that I was talking about. So it gives sales proceeds, costs or other basis, and then the gains or loss.

Do you have any idea what the costs or other basis is for?

A The 599?

Q Yes, those.

A I can find out. You know, I do not follow financial stuff, and at that time I just trusted the experts to do the magic that they do, but I can certainly find out for you.

Q So the questions I have for you that I would request that you get from your accountant is, number one, what did you get net in terms of the sale of Khrome.

A Okay.

Q And then number two, what was the costs or other basis. So I don't know if that's like the amount that Mr. Rivett had invested in the company.

A Okay.

Q It may be. I don't know. So that's what I'm trying to find out. Okay. There was -- let me make sure there wasn't something else I wanted to

ask you.

Have you told me about all the -- anything you earned or received as a result of Mr. Rivett's death? Did you get anything else like social security death benefit?

A I do receive social security death benefits.

Q And how much do you get per month?

A Like around -- around 2,000, 2,100, about, I want to say. I know that amount went up just recently.

Q And is that his -- is that what he was supposed to receive in social security earnings after his retirement, or is that a death benefit?

A I'm not sure. I know I'm -- my financial planner is having me use those benefits up until age 70 and then I will take my own.

Q Oh, I see. So you're taking his -- what his social security death benefit would be -- strike that -- his social security earnings would have been? You're taking that and then you start taking your own at 70?

A Correct.

Q Did you get any sort of death benefit, though?

A No, just the monthly benefit.

Q Okay. Is there anything else that you received as a result of Mr. Rivett's death?

A Nothing else.

Q Anything else that we haven't talked about?

A Nothing else that I can think of.

MS. MEAGHER: Okay. All right. I think that's all I had. Thank you.

MS. ASHBECK: All right.

THE WITNESS: Okay. Thank you.

(Deposition concluded at 4:01 p.m.)

(Deposition Exhibit Nos. 1 through 13 electronically marked for identification.)

(Original exhibits attached to Original transcript; copies of exhibits are attached.)

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 65 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

Page 254

STATE OF WISCONSIN )
                  ) SS:
MILWAUKEE COUNTY   )

            I, Rosanne E. Pezze, RPR/CSR/CRR
and Notary Public in and for the State of
Wisconsin, do hereby certify that the deposition
of PETER ANGILELLO was recorded remotely by me and
reduced to writing under my personal direction.
            I further certify that said
deposition was taken at Montello, Wisconsin, on
the 13th day of July, 2022, commencing at 9:06
a.m.
            I further certify that I am not a
relative or employee or attorney or counsel of any
of the parties, or a relative or employee of such
attorney or counsel, or financially interested
directly or indirectly in this action.
            In witness whereof, I have hereunto
set my hand and affixed my seal of office on this
22nd day of July, 2022.

            _____
            ROSANNE E. PEZZE, RPR/CSR/CRR
                   Notary Public
         My commission expires January 10, 2026

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 66 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

### $

**$15,000**
12:13

**$168,998.17**
242:20

**$25,000**
128:11

**$285,500**
247:18

**$313,871**
247:17

**$4,000**
204:13

**$40**
204:12

**$599,371**
247:18

**$600,000**
30:6

**$863,998.17**
241:16

**$920**
13:14

### -

**-125**
149:10

**-574**
107:4

**-79**
108:24

### 0

**03767**
217:20

**03770**
218:3

### 1

**1**
140:18 253:9

**10**
125:25 130:23
146:12 202:23
237:2

**10-**
209:6

**100**
7:14

**10036**
69:9

**10:00**
187:11 189:15
190:2

**10:30**
187:11 189:15

**10:31**
60:18

**10:37**
60:19

**10th**
89:25 91:16
94:8 98:4 99:6
100:9 142:19,
23

**11**
238:10

**11:00**
170:12

**11:19**
89:19

**11:33**
89:20

**11th**
44:1 151:7,10,
11 152:22
163:14,15

**12**
146:12 249:1

**12,000**
11:6,8

**12-**
12:13

**12th**
57:13 151:7,11
163:15

**13**
62:6 154:20
251:2 253:9

**13th**
45:1 152:25
156:20

**14**
8:17

**146**
4:10

**14th**
224:23

**15**
8:17,19 27:22
51:2 125:25
163:4 202:23
210:15,16
245:20

**15-minute**
209:6

**15th**
72:11

**16**
74:12 106:20

**160**
242:8

**160,000**
241:22 242:2,
11 248:17

**16th**
78:23 79:14

**12**
80:19 81:5
118:14 135:2
149:2 152:20
157:18 163:11
165:12 180:2
227:7,8

**17**
14:13 38:15
99:6 119:8
164:4

**17-**
38:22

**17th**
170:18

**18**
38:15

**18-year-old's**
38:22

**180,000**
241:21

**180-some**
244:1

**188,000**
242:7

**1980**
37:18 39:16

**1983**
39:8

**1996**
50:4

**1997**
50:3,13

**1998**
50:13

**19th**
47:23 105:22

**1:21**
163:7

**1:30**
111:10

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 67 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**1:35**
163:5

**1:40**
163:7

**1st**
56:22

---

**2**

---

**2**
217:7,20 218:4
219:23 244:5

**2,000**
252:8

**2,100**
252:8

**20**
171:1,20
209:14 241:10
242:14 245:20

**20,000**
241:23 242:9,
16,18,23

**200,000**
49:1

**2007**
25:21,24 26:2

**2008**
25:24 42:17,20
43:16,22

**2009**
23:4 24:17
25:10 26:1,2
27:11,17 28:15
36:3 43:5
44:1,18 54:13
245:9

**2011**
14:9,10 99:6

**2012**
45:1

**2014**
13:22 24:19,24
25:10 27:17
28:16 36:3
47:23 48:15,24
51:2 245:12

**2015**
10:9,10,20
49:11 52:9,15
127:3 128:23
145:25 146:1,7

**2016**
9:25 10:1
11:18,23 13:18
14:4 53:2
55:14,22 56:22
102:10,15
103:13 152:20
154:6 161:13

**2017**
12:11 14:13
54:13 57:13
60:23 61:1,23
62:7 63:9 65:1
68:14 69:9,19
71:21 72:23
74:3,4,8 76:20
77:11 78:5
89:23 90:1
91:16 98:5
100:9 101:6,
18,22 102:11
105:18,22
106:1,20 107:3
108:23 109:10
110:24 111:12
119:22 120:2,8
129:2 147:8
152:16 161:13,
20,24 162:7
164:5 218:24

**2018**
9:15 12:14,20

18:21,22 22:12
27:12 74:2
77:14,22 78:8
80:19 81:5
136:9 147:9,11
151:7 152:15
154:7,20
156:20 189:3
218:13,15,20
222:18 223:6
247:5 251:2

**2019**
6:3,10 12:22
85:10 138:8

**2020**
6:5,9,10
241:10

**20s**
15:7 17:23
41:2 228:9

**21**
20:2 62:5

**21st**
72:22 140:16
171:2,3,5,13
180:3 247:5

**22**
18:21,22
37:18,21 119:8

**22nd**
107:3 170:21
179:5,6,25
182:17,21,24,
25 183:5 189:4
198:11 199:22

**23**
37:20 196:12

**23andme**
116:13

**23rd**
171:18 179:3
184:9 189:3

192:21 193:15,
22 208:6
215:15,24

**24**
160:24

**24/7**
213:15

**24th**
9:25 84:23
222:18 223:6
224:18,22
226:1

**27th**
69:9,16

**28**
43:5 55:22

**28th**
43:25

**29th**
44:18

**2nd**
71:21 108:23

---

**3**

---

**3**
61:23 229:25
230:5,7 244:7,
25

**3,200**
213:5

**3,600**
213:4

**30**
8:16 32:24
64:18 127:24
146:12

**300,000**
9:6 247:15,25
248:5,11

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 68 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**30s**
  38:11 41:2

**30th**
  101:6 223:24

**31st**
  74:2,7 76:20

**344**
  109:14

**35**
  40:11

**3755**
  229:6

**3771**
  219:23

**3772**
  222:16

**3773**
  226:18

**3774**
  227:1

**3776**
  229:10

**3:52**
  250:24

**3:58**
  250:25

**3rd**
  55:14 60:23,25
  150:3

---
**4**
---

**4**
  188:22 230:13
  231:11

**40**
  32:7

**401(k)**
  7:10,17 8:6

**41**

166:23

**43**
  166:23,24

**44**
  17:22

**45**
  11:22 17:22
  179:11

**47**
  17:22

**49**
  188:14

**4:01**
  253:8

**4th**
  14:14

---
**5**
---

**5**
  231:17,18

**50**
  27:7

**50,000**
  248:19

**54301**
  4:11

**599**
  251:8

**5:00**
  181:11

**5:00-ish**
  171:10

**5:30**
  164:9

**5:45**
  211:1

**5th**
  70:16

---
**6**
---

**6**
  232:14 233:4

**6-**
  244:2

**60**
  7:15,16,17
  32:7 213:6

**60,000**
  7:5

**600,000**
  29:20

**61**
  213:5

**62**
  130:20 131:23
  134:24

**62-ish**
  134:22

**64**
  126:24

**65**
  127:7 130:19

**65,000**
  7:16

**675**
  241:18

**6th**
  9:22 109:10
  139:12 142:15
  149:2

---
**7**
---

**7**
  233:6

**70**
  166:2 252:14,
  20

**700,000**
  244:2

**75**
  7:15 12:5

**7:00**
  211:1

**7:30**
  183:9 200:19

**7th**
  49:11 52:9,15
  89:23

---
**8**
---

**8**
  234:12,15

**80,000**
  250:9

**800,000**
  241:16

**84**
  39:8

**85**
  27:24

**8th**
  53:2 110:24
  111:12 139:13
  140:23 141:17
  142:16 144:15

---
**9**
---

**9**
  234:19,25

**90,000**
  250:10

**911**
  59:25 60:4,7
  63:4,18 64:22
  81:14 113:7,9,
  16 167:1,4,10,
  21 168:4,25

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 69 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**9:00**
164:9

**9:30**
187:9 190:1

**9:30-ish**
185:3

**9:53**
189:18,21
190:1,2

— A —

**A-N-D-E-R-S-O-N**
24:15

**a.m.**
60:18,19
89:19,20 164:9

**Aaron**
228:25

**abrupt**
78:24

**absolutely**
115:23 246:2

**absorb**
116:17,18

**absorbing**
110:18 116:20
117:4 118:7,9

**abuse**
38:10 41:5
42:3

**accepting**
157:14

**access**
44:23 69:3
196:25 213:15,
19 230:18

**accomplish**
151:3

**account**
244:23

**accountant**
132:25 133:12
247:23 248:23
251:15

**accurately**
99:9

**act**
137:21

**acting**
121:16 193:8,
11

**action**
142:19 149:11

**activities**
25:18

**actual**
100:6 250:1

**adapting**
193:3

**ADC**
156:24

**add**
14:7 21:25

**added**
21:9,20,23
22:2,3,6 31:8
237:17

**addicted**
23:25

**addiction**
23:3

**adding**
205:23

**addition**
121:19

**address**
4:9 222:24
223:3,5 239:8

**adjusting**
58:14

**adjustment**
55:13

**Administration**
249:2

**admission**
73:17

**admit**
98:23 208:14

**admits**
53:12,15

**admitted**
73:13 111:5,19
155:1

**adopted**
14:25 15:3,5

**advertises**
213:15

**advice**
149:13

**advised**
61:6

**affect**
78:24 138:22

**affected**
50:22 142:8

**afford**
37:9 129:22
213:14

**afraid**
27:20 28:2
48:1,10 66:12
86:18 168:11,
13 191:22
202:18

**afternoon**
136:25 210:19

**age**
7:17 127:1,6
213:4,5,6
252:14

**agency**
238:25

**agitated**
202:2

**agree**
23:12 27:10,15
40:7,9 45:19
46:12 47:12
66:8,10 79:11
80:16 81:3,9
82:20 100:18
111:20 119:22
189:2 192:10
193:15,24
194:23 206:4
207:21 227:5

**agreed**
21:5,12 24:6
66:16 168:5
243:9

**agreement**
32:2,3,5,17
47:14

**ahead**
10:12,17 20:12
23:1 34:9
45:23 46:3
48:23 51:11
80:24 81:8
99:11 112:21
124:18 144:7
159:8 161:4
167:14 193:18
195:3 197:14,
21 200:10
207:14 215:3
243:25 248:16

**ahold**
17:6 201:11

**aide**
210:4

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 70 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

aisle
  15:11

alcohol
  23:25 24:1

alive
  64:8 75:8
  171:14 172:15,
  21 220:12

allegation
  225:10

allowed
  170:12 179:21,
  23

ALS
  102:1,17 103:4
  105:16,18

American
  56:4 239:4

Amos
  241:6,12
  243:25

amount
  7:4,18,20
  29:19 115:17
  119:5 206:24
  213:3 248:18
  251:20 252:9

Anderson
  24:14 26:9
  36:14,18,24
  37:1,3

Angilello
  4:2,8

animated
  155:17

anniversary
  74:22 77:18
  117:11 150:10,
  16 218:22

announced
  142:15

answering
  81:1

answers
  22:7 32:11
  62:6

anti-anxiety
  125:12

antidepressant
  118:16 125:11

antidepressants
  173:8

anxiety
  6:18 27:16
  28:17 33:18
  40:4,12,18,25
  58:16 65:7
  79:19 102:22
  103:1 107:19
  108:17 109:11
  135:25 136:3
  150:5 165:10
  228:9

anxious
  28:8 107:7
  136:21 172:13,
  16 173:13
  186:19 193:11
  194:16

anymore
  87:24 125:20,
  21 133:24
  137:25 157:8
  160:5 222:1

apartment
  15:6,21 38:18,
  20,23 228:11

apologize
  137:10 191:18

apologized
  39:25 137:15
  166:8,16

apparently
  57:1

appeared
  79:16 229:17

appears
  192:21

apply
  125:15 129:8
  236:5

appointment
  52:19,21 56:23
  57:19 60:23
  107:13 110:23
  111:16 149:25
  152:24 153:6
  155:12 163:10
  236:19

appointments
  43:8,13 45:15
  54:20 56:7
  66:3 70:4 72:9
  162:9 165:20

approach
  75:11

approached
  50:7

approved
  119:11

April
  42:17 49:11
  52:9,15 57:13
  94:16 110:4,8

area
  179:19 180:15

Arketype
  13:22 16:20,23
  22:22 27:12,
  18,19,23,24
  28:4,6,15 29:4
  43:10 44:12
  49:20 50:8,12,

13 115:8 121:2
122:10 126:22
134:3 139:13
140:2,25
141:4,14
142:12,21
143:10,12
144:15 145:3,
10 146:11,19
147:16,22,24
148:2,3,6,8,
11,15 149:12,
23 150:4
154:13 155:16,
19,21 157:17
166:10 178:21
184:5 198:4,15
226:15 241:3
245:7 246:4
247:1 248:21

arranged
  111:9

arrest
  203:11,20
  205:10 206:13

art
  128:19

article
  139:22,23,24
  140:14

artistic
  40:19

ashamed
  169:16

ASHBECK
  17:12 20:11,
  14,20 34:8
  36:12 45:22
  46:3 60:11,15
  80:23 81:8
  88:20,25 89:4
  90:21 98:2

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 71 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

99:7 112:18 113:1 115:19,24 162:24 163:6 167:13 188:15 191:8 193:17 194:1,17 195:2 197:13,20 207:12 221:6 222:25 223:15 229:25 232:13,16 234:13 237:7,10,12 244:6,10 249:17,23 250:18,22 253:6

**Asheville**
5:22

**Ashland**
5:22

**assertive**
53:13,16

**assessment**
73:17

**assets**
250:1

**assistance**
20:16

**assisted**
215:11

**Associates**
16:24 17:2,4

**association**
69:1

**assume**
4:17 5:4 39:2 49:7 110:7 173:22 225:16

**assumed**
80:13 82:15

146:22 186:3

**assuming**
43:3 65:15 68:21 108:16 114:18 142:2 148:17 169:11 178:25 186:3 194:21 209:5 210:18 214:11 223:7 224:3,12 234:9 240:22,24

**attached**
253:11,12

**attack**
107:21

**attempt**
26:22 49:13 175:18

**attend**
43:8,12 45:6 121:13 177:6

**attended**
53:5 54:18,19 177:5

**attending**
52:17

**attention**
208:16 228:13

**attorney**
28:10 174:2 178:16,17,23 188:12 229:22 232:25 242:24 248:4,5

**August**
9:22 18:21,22 27:12 43:5,25 47:23 71:21 74:12 78:23 79:14 80:19 81:5 84:23

118:14 135:2 140:16,23 142:15,16,19,23 143:21 144:15 147:11 150:3 151:6,7,10,11 152:20,22,25 154:20 156:20 157:18 163:11,15 165:12 179:3,5,25 180:2 182:17 189:3,4 192:21 193:15,22 196:12 198:11 208:6 215:15,24 222:18 223:6,24 224:18 226:1 227:7,8

**aware**
6:18 42:8,19,20 43:7,16,21 44:4,24 45:5 48:3,8,15,18 52:13 55:5,16 56:19 57:16 67:4 81:13 95:7 119:15 166:25 168:8 173:6,9 226:8 230:21

---

**B**

---

**B-A-G**
229:9

**B-L-A-K-E**
69:7

**B-O-B-B-I-E**
93:13

**back**
6:11 9:3

16:12,14,19 25:2 29:22,23 31:18 35:12 42:16 43:2 47:22 49:24 50:5 52:8 60:20 67:16 68:19 84:11 86:2 89:8,22 90:21 91:11 92:17 94:3,25 95:4 98:17 99:3,20 104:17 105:14 109:9 114:12 117:22,24 128:12 135:1,2 136:22 137:23 140:5,24 143:15 150:3 152:2,23 153:16 154:9 159:25 163:4 164:7 166:22 170:15 171:8 172:1 174:20 176:22 178:1,13,18 180:1 181:9,10,13 182:14 184:17 193:8 200:7 201:1,4,8,17 202:4,16,24 207:18 211:11,14 213:2 225:20 231:12 232:6 237:1 245:19 248:25 249:14,16,17

**backed**
157:2 247:12

**background**
8:9 115:12 118:21

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 72 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

**backpay**
226:10

**backwards**
61:20 62:12
115:4

**bad**
55:9 57:11
94:23 103:1,4
106:24 134:10
139:18 159:16
242:25

**bag**
55:15 74:9
84:4,12 85:1,
8,10,14 210:5
227:4 229:8,
10,12 234:8

**balance**
242:10

**ball**
140:12

**bank**
28:10 142:19
143:2,12,22
144:4,13
146:21 147:3,
16,20,23
149:7,11
241:4,6

**bankrupt**
28:7 134:5
139:13 143:18
147:10,17,25

**barber**
5:16,20,25

**based**
20:6,19,20
21:3 22:16
90:23 128:10
138:13 151:12
234:17 239:7

**basically**
7:23 8:1 15:7
21:6 25:17
26:8,10 32:8
65:4 102:19
114:8 158:5
227:24 235:10
242:25

**basis**
19:3 36:20
172:8 251:4,7,
20

**Bates**
91:1 217:20

**bathroom**
5:9

**Bay**
4:10 8:12
10:19 16:1,11
18:1,13,16
47:16 138:6,13
150:24 152:5
153:7 171:21
173:14 174:3
191:1 218:9
219:1 239:7,8,
9

**beautiful**
143:6 221:24

**Becker**
70:17

**bed**
119:25 137:1
138:20 186:24
192:3 195:10
208:24 209:6
210:2

**bedtime**
180:9

**began**
53:18

**begin**
117:5

**beginning**
116:22 165:13
212:2 217:21

**behavior**
92:24 105:24
106:21 173:17
225:12

**behavioral**
79:20 105:4

**behaviors**
208:9

**Bellin**
54:23,25 59:9
81:11 98:15
107:4 111:6
113:24 115:14
139:8,9
154:17,18,19,
22 168:22
169:3 239:3

**belonged**
228:22

**belt**
61:18,20 62:4,
9,11,25 63:19,
20 65:18 67:3
68:6,12 69:13,
23 70:2 71:18
151:8,22
163:12,20
208:14

**benefit**
124:9 252:5,
12,17,22,23

**benefits**
252:6,14

**betrayal**
140:10

**big**

44:11 48:24
67:13 146:13
176:3,13
237:11

**bigger**
206:3 221:2
223:1 237:7

**bills**
37:8 213:10

**biopsy**
9:18 117:13
138:2,3

**bipolar**
95:6

**birth**
16:4

**birthday**
58:25 59:6
208:12

**Bishop**
42:10

**bit**
5:8 6:24 19:6
28:13 33:7
35:24 50:20
110:9 122:2
123:5 132:9
152:2 153:4,17
158:4 161:9,21
180:1 185:4
205:7 237:15
248:25

**Blake**
69:6

**blamed**
203:25

**blaming**
141:6

**blanking**
146:2

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 73 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

block
122:15

blue
231:14,18

blur
214:13

boards
25:15

Bob
41:10,11 42:1,
21 43:2,9 45:7
48:16,19 49:7,
14,16,17,20,
21,25 50:9
52:17 54:18
56:4 58:6
67:17 177:15
236:22 238:2,
15,18,19,20,21
239:2,4,17,18
240:12

Bobbie
84:10 93:13,20
95:22 224:4
225:2

bonus
248:6

book
75:24 81:20
82:23 83:1,2,
8,10,11,12,14,
15 217:14
218:6,7 219:7,
25 220:1,6
222:12 229:15
231:25 234:6,8

bookmark
83:9

books
75:1,2 83:16

boosted
94:22

bothered
120:17

bottle
71:9

bottom
157:10 174:23
231:19 238:4,5
246:23

bought
35:11 204:11

bounce
95:3,4

bouts
40:15

box
160:11 224:15

boy
58:22 59:2
208:7

BP0056
55:15

BPC0050
55:4

BPC0087
57:14

BPC0098
61:2 63:9

BPC0115
71:7

BPC014
70:17

BPC0192
90:10

BPC0193
98:22 100:7

BPC171
105:23

brain
84:17

brainstorming
97:10

break
5:6,7 17:16
60:12 63:24
86:20 89:2,5,
15 115:22
228:5 229:3
250:17,21

breakdown
44:20

breakfast
133:3

Brenda
181:6

Bridgit
15:19,20,22

briefcase
93:15 217:25
219:13 226:21
227:6,9,14

briefly
178:6

bring
38:12 144:22
153:16 170:20
172:7 188:18
211:11

bringing
84:8 135:12
188:15

broad
197:14

broke
221:25

Brookfield
151:24 169:10,
11 227:11

brother
14:15,24 18:6
68:17 74:19

76:9 101:20
150:6,7 226:19

brothers
38:8

brought
24:4 66:6
83:15 84:4,11
85:10 93:17
176:1,9 199:12
218:1 225:21
226:21 230:18
241:12

Brown
171:9,17
172:3,5 174:4
178:1 192:16
199:18

buckled
166:8

buffer
144:4

bugging
228:8,14

building
15:6,21 25:23,
25 26:4,8,11,
12 28:5 37:4,5
41:14,15,25
42:24 50:20
51:1,23 52:1,6
120:14,17,20,
23,24 121:2,3
122:10,17,19
129:19 134:16
142:20,21
143:5,6
144:19,22
145:11,12,17
146:13,15,25
159:20 169:14,
19 186:9 190:8
241:3,4,8

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 74 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

243:10,20
247:1,3

**built**
128:9

**bunch**
74:3

**burden**
160:22

**burdened**
67:14

**burn**
49:9

**burning**
49:3

**business**
7:19,23 8:5
13:19,20 16:23
23:2,4 24:8,9,
11,12 25:2,6,
9,10,12,18
26:10,12,14,
15,16,25 28:4,
12 29:6,17
30:3,7,11,14,
16 31:7,19,25
33:24 34:20
35:5 36:6,7
41:20 42:24
49:18 84:11
85:24 92:19,
20,22 114:19
115:9 122:1
123:13 127:8
128:6,13
130:3,15,19,25
131:5,19,20,22
132:11,13,14,
19 133:1,19,22
134:5,14,22,23
140:6,23
141:1,2,22
142:16,25

145:19,22
146:9 157:17
198:6 203:22
204:1 205:13
246:4

**busy**
64:1 135:8
141:2

**buy**
29:4,5,10,13,
20,24 30:24
31:15 243:19
245:15,25
247:9

**buy--**
29:20

**buyer**
143:7 243:5

**buying**
42:24

**buyout**
7:21 29:8 49:4

---

**C**

---

**C-A-R-O-L**
91:25

**C-A-S-S-E-L-L**
91:25

**C-H-A-P-U-T**
54:9

**C-U-R-T**
69:6

**Cagle**
73:12 99:1
114:1

**calendar**
162:3

**California**
68:19

**call**
19:3,8,14 55:7
58:2,6 59:9,25
60:6,25 61:6,
11,12,13,15,23
62:15 63:4,6,
8,9,18 64:22
65:24 66:9,11
67:16,17 71:5
73:15,22 90:11
96:12,13 99:2
100:8,22
106:2,6,25
111:8 113:7,15
139:7,9 141:25
153:12 155:4,5
159:15 167:20
168:4,22
180:9,11,13,
14,19 183:3,8
184:12,17
187:3,4,18
189:14 190:7
199:16 200:4,
5,11,12,13,14,
19 201:4,6
207:11,15
214:15 231:11,
16 233:4
236:24 238:22
239:1,18 249:1

**called**
6:15 8:6 15:3
16:23 26:5,6,
20 40:21 55:2,
6 60:4,5,6,7
61:2 70:16
75:25 81:11,14
88:4 90:1
91:20 92:3
94:5 98:9,17
103:25 105:22
110:11 121:22
147:3 148:18

167:1,4,10
168:18,25
171:19,21
180:17 181:9,
13 183:7,10
184:2,25
185:2,3
186:22,23
187:2 189:7,9,
20 190:5,6
197:8 199:8
200:7 202:4,5,
8,16,20,21,24
212:15 214:25
217:8 238:20
239:20 240:25

**calling**
19:11,18,19
61:25 90:6
106:21 169:3
187:15 190:14
201:1,2 217:6

**calls**
143:25 173:22
186:11 191:9
216:14,15

**camp**
39:15,16

**cancer**
9:7,14 12:18
86:24 87:1,2

**capital**
26:7

**car**
68:9 120:21
122:14 169:16,
19,20 183:10
212:16,17
249:18

**card**
34:6,19 35:4,
5,8,11 36:5,

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 75 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

16,22 203:24
204:10 226:10

**cards**
160:12

**care**
32:21 49:8
56:8 208:17

**cared**
88:1

**Carol**
91:25 93:18,19
94:4 95:22
97:7 225:2

**Carolina**
5:23,24

**carrying**
35:8

**cart**
209:18 210:7,
9,10 212:24

**case**
76:23 97:21
114:5 194:22
223:11

**cash**
36:5

**Cassell**
91:25 94:4

**cat**
200:24

**Catholic**
42:13

**cats**
228:10,11

**caused**
27:16 28:17
33:17 155:21
156:2 204:4

**causing**
134:10

**Cedarburg**
179:11

**cell**
213:16 237:16

**center**
54:10 165:10
168:23 170:7

**Centers**
109:11

**ceremony**
18:6

**certainty**
232:10,21
233:3

**certification**
8:13

**Chahal**
181:2

**chains**
87:24

**chairs**
176:15

**challenging**
53:14,17 69:20
71:2 156:24

**chance**
34:22

**change**
75:17 78:24
126:18 156:4

**changed**
178:14 211:15

**channel**
40:18,24

**Chaput**
54:6

**characterization**
207:13

**charge**
115:18 120:15

213:12

**charged**
213:12

**charges**
35:18

**charging**
115:15,16

**check**
59:10,15 93:2,
3 96:2,6,9
123:15,17
155:6 171:5
178:13 180:6,
24 189:18,19
192:22 194:13
204:13 230:3

**check-in**
72:19

**checked**
59:19 73:25
90:8 92:6

**checking**
113:10 235:24
241:1

**checklist**
73:23

**checks**
60:3 99:24
184:18,19
190:17 191:3
192:4 194:9
195:10 208:24
209:6

**chemistry**
119:1

**child**
237:23

**childhood**
126:21

**children**
5:18

**chips**
176:10,12

**chiropractor**
50:19 51:6,14,
15

**choice**
12:10

**chose**
18:12

**Christeson**
47:3,5,6,10
54:21 65:4
77:24 78:1,2,
12,19 79:7,11
80:3,11 97:14
105:10,13
109:13,14
114:7 118:13
135:3,22
152:20 153:5
163:11 164:8
166:25 168:3
174:18 214:25

**Christeson's**
68:9 80:16
81:3 118:7
155:7 156:12
157:18 165:8
169:5 204:17

**Christian**
39:20

**chronic**
69:10

**church**
25:19,21,22
27:10 37:5
87:17 120:17

**circle**
148:13

**circulation**
107:23

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 76 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

clarify
99:13

cleaning
84:12,13
235:24

clear
32:14 98:2
181:15 217:12
244:24

cleared
84:18

click
56:9

clients
27:20,24 30:18
33:5,10 94:21
115:18 136:6
141:3 190:23
193:2 246:8,21

close
26:3 62:16
68:18 91:20
140:23,24
142:20 149:12
151:23 152:5
155:19,21
211:8 231:13
238:19

closed
27:12 28:7
31:19,25
141:3,22
142:16 143:10
145:3,10,19
147:17,21,22
148:3,8 166:6,
15 181:11
190:9 203:23
204:1 226:15

closer
166:1 170:11
184:9,19 219:1

closest
202:7

closing
141:14 144:16
154:13 198:6
205:13

closure
38:12

clothes
210:1,3,5

cloud
105:6

co-vice
97:1

co-worker
91:17

coach
64:22 121:17
153:11 156:11
158:10

coffers
243:3

cognitive
79:20 105:3

colleagues
85:24

college
8:11 16:15
18:1,2

color
229:18 234:17

colorful
234:9

column
234:20

comfortable
58:7 207:4

comment
91:17 118:8
158:13 159:10

161:3 194:14

commented
78:16

comments
58:3 61:5
80:16 156:12
208:20 226:2
235:16

commit
50:14 52:2
55:15 209:12

commitment
18:6 47:25

commotion
202:10

communicated
240:23

communicating
80:14 174:18

communication
95:24 146:24
147:4 178:24
201:15

community
27:4 40:20
48:24

commuted
18:13

company
26:4 27:13,19
28:16 29:4
44:7 49:18
50:2 141:2
154:1 246:15
247:1 251:21

competitor
130:13,14

compiled
20:16

complain
92:22 124:15,

17

complaint
57:4

complaints
72:14

complete
16:15 21:17
31:22 195:16

completely
31:17

Complex
170:1,5 179:9

complicit
167:2,10

computer
84:15 219:16,
17 222:21
224:1,2,3
228:22,23

computer's
84:16

concept
199:3

concern
36:15 96:10
124:19 134:18
192:5 203:19
205:11 206:13

concerned
9:11 30:8 90:6
92:4,10 105:23
107:11 113:16
118:14 134:11,
13 149:12
167:20 168:2,
3,4 172:10
173:2 190:15
191:21 192:15
203:18 233:18

concerns
92:23 95:13

www.phippsreporting.com
(888) 811-3408

99:2 191:2

**concierge**
114:19 115:15

**concluded**
253:8

**condition**
184:20 190:15,
16 194:7

**conditions**
107:12

**condo**
62:21 68:25
69:1,2

**confidence**
94:22

**confirm**
20:24

**confirmed**
203:8

**conflicts**
130:9

**confront**
75:11 81:22
82:9 121:23
145:13

**confronted**
137:8

**confused**
115:4 220:11
224:21

**confusing**
203:5

**connect**
205:3

**connected**
41:25 61:24

**connection**
64:1 174:6
175:9

**considered**
13:13 15:11,14
16:6,8,9 33:20
98:24 215:9
216:11 247:12

**constant**
24:10

**construct**
244:20

**consultant**
128:18,19
131:21 132:24
133:1,19

**consulting**
132:20

**consume**
220:20 221:9,
17

**contact**
19:16 37:15
142:4 146:21
147:6 181:5

**contacted**
98:15 142:6
149:10

**continue**
127:19

**continued**
44:2 56:15
174:20

**continues**
220:19

**contract**
31:14,16,21
32:1,13 91:19

**contributed**
241:23

**contributing**
27:6 92:7 96:3

**control**
31:22 110:12

150:5 160:22

**controlled**
119:12

**conversation**
45:8 48:16
52:25 53:10,22
55:17 75:19
81:16 98:6
110:13 111:15
129:6 145:20
146:4 157:12,
23 180:12
184:14 187:20
191:22 192:24
196:5,10 198:9
199:12 211:4
220:5 225:2,5
239:15

**conversations**
19:13,21 29:6
42:11 72:4,15
78:19 98:11
129:13 131:25
135:12 140:3
156:6 158:20
175:9,22
181:25 182:11
190:25 193:4
197:24 199:8
204:6 215:7,
13,21,22
216:2,6,13
224:19 239:12,
16,21 240:2,
11,12

**conversion**
39:18,19 40:2

**convince**
46:20,24 47:18

**convinced**
140:5

**Cooper**

181:6,16

**copies**
76:7 86:4,7
89:10 243:15
253:12

**copy**
17:10 88:10
219:18

**copyrighter**
92:2

**corner**
176:21

**correct**
5:21 8:24 9:24
10:1,21 13:1
14:9,16 15:1,
25 19:5 20:3,
25 21:24
22:20,24
24:14,25 25:11
28:18 33:6,11
47:12 60:7,10
65:21 107:1
116:10 118:16
121:3 125:10
128:23 132:1,5
134:18 135:20
138:3,9,12
140:21 148:9
162:17 169:13
170:5 181:19,
20 182:18
187:24 188:3
189:4,10
192:8,18
199:23 218:13,
20 222:7,24
223:3 227:20
232:7 234:25
237:22 240:6
242:17,21
244:12,25
245:10 247:10

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 78 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

249:5 252:21

**correctly**
9:19 100:16
188:25

**cost**
243:2 247:17

**Costa**
50:4

**costs**
141:5 251:4,6,
19

**cottage**
74:25 83:16
150:9,11,17,19
151:3 152:2,4,
13,18 218:7,
22,24 219:6
220:7

**counsel**
17:7 20:16
21:7 22:8 76:5
88:11,12 165:7
215:19

**counseling**
41:2 45:6
54:16 177:4,8
238:24 239:5

**counselor**
39:20,21,25
41:4,8 74:12
113:24

**counselors**
168:20 177:15

**counted**
13:7

**county**
8:18 18:10,13
19:4,9 150:19,
23 169:6 170:1
171:9,17
172:3,4,6

173:7,14,16
174:4 175:5
177:25 178:1
179:8 181:4
188:2 192:16
193:21 195:24
196:18 199:18
200:18 203:13
205:21 206:16
214:4 215:5,14
216:16 227:17
239:13 240:1,
13,20

**couple**
18:5 25:14
61:15 70:23
76:5 78:15
80:1 86:9
93:11 103:15
109:15 110:7
121:6 130:4
133:22 159:5,
12 163:12
177:9 180:5
182:23 201:25
203:12 205:13,
20 214:2
228:10 231:5
238:20 240:24

**court**
4:24 5:2

**cover**
143:1

**COVID**
11:9 12:24

**coworkers**
78:15 92:25
106:4,9,11
129:3

**cramps**
107:8

**crappy**

176:14

**crayon**
231:14,18

**creative**
23:6 96:24
127:13 246:7

**credit**
34:5,19 35:4,
5,11 36:5,16,
21 203:24
204:10 226:10

**cried**
58:22 59:2
137:15

**crime**
215:9 216:11

**crisis**
74:12 157:3
170:6

**Cross**
49:2

**crossed**
197:4

**crummy**
108:1

**cry**
106:14 191:18

**crying**
106:8,10
119:23 129:2
137:9 158:9
166:7 183:18,
22 208:7,8

**cues**
112:5 113:2

**cupboard**
228:18

**cured**
9:10

**current**

4:9 141:18
148:11 237:25
247:8

**curser**
100:11

**Curt**
69:5

**cut**
6:24 33:7 83:6
141:4 146:23
161:9

**cutout**
228:25

**cutting**
19:6 48:9
136:13 142:10

**CV**
17:5

---

**D**

---

**D-O-S**
26:6

**dad**
14:8 16:9 38:7

**dads**
16:6,9

**daily**
19:3 25:18
55:23 172:8

**damaged**
221:25

**damp**
210:2

**Dancing**
48:25

**danger**
61:7

**dark**
72:12

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 79 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

**date**
9:21 52:14
53:4 61:21,23
68:22 72:7
161:12 164:7
194:3 220:13
223:8 224:22
225:1,7 226:13

**dated**
54:23 74:7
84:23 88:7
140:24 217:19
222:18 224:18

**dates**
71:15 78:5

**daughter**
15:12

**daughters**
15:3,5

**day**
19:9 25:6,7
47:13 56:20
57:23 68:21
81:7 84:24
88:7 93:9 94:5
96:17 104:17
107:7 109:16
118:8 144:9
159:16 160:18,
24 161:1 162:8
163:1 164:13,
14,21 165:8
166:13 167:4,
6,16 170:21,23
171:7 172:9
176:8,14
178:15 180:5
182:22 186:15,
17 187:23
188:21 200:2
204:16 212:9
214:11 243:21
246:5

**day's**
214:12

**day-to-day**
95:20 141:1

**days**
11:22 12:7,15
13:7 56:13,14,
15,17 59:7
72:23 76:6
98:25 104:10
133:6 162:18
171:22,24
173:5 182:23
203:12 205:20
206:9,25

**de-escalation**
168:19

**dead**
72:25 73:3

**deal**
29:14,21 41:8
135:14 143:2
243:6

**dealing**
12:18 37:6,7
118:1

**dealt**
58:18

**death**
8:3 11:17
12:21 13:24
36:19,25 37:14
69:20 70:22
74:10,15,16,23
77:18 82:18
84:2,3,5 88:8
117:11 120:13
150:11 154:7
178:23 179:2
187:24 188:21
214:5 217:9,
11,15 218:23

222:6 224:6
226:15,24
227:3 230:22,
23 231:22
232:5 234:25
252:4,5,6,12,
17,22,25

**decade**
140:25

**December**
6:3,10 24:19,
24 28:16 44:18
78:4,5 109:10
110:24 111:12
241:10 245:12
247:5

**decide**
29:3 30:17

**decided**
144:3 147:5
155:8 242:2,8

**decision**
10:5 184:21
191:25

**declared**
25:7

**deed**
241:9,20 243:7

**deep**
126:19

**deeply**
139:1 142:8

**defense**
20:1

**degree**
16:15

**deliver**
149:14 172:7

**delivered**
224:4 227:14

**demeanor**
78:24

**denied**
99:2

**Denies**
101:13

**dentist**
118:22

**department**
71:6 169:6,7,
10 188:2,5
189:16 192:20
193:14,22
194:25 195:19
196:11 202:15
203:5,10
205:19 206:23
208:5 215:6,
14,23 216:3

**depend**
127:11

**depended**
57:23

**dependent**
153:17

**depo**
88:18

**deposition**
4:15 165:13,16
253:8,9

**depressed**
150:6

**depression**
76:24

**describe**
133:19 179:22

**design**
114:18

**desk**
86:10 155:23
185:6 210:14

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 80 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

234:21 235:2,
17,21 236:7,15
237:3

**desktop**
84:16

**despairs**
77:4

**details**
32:19 186:23
215:12

**detective**
187:25 194:5
195:5,11,14
214:18,24

**determine**
119:7

**determined**
127:5 146:1,16
215:10

**determining**
145:16

**device**
104:7

**diagnose**
95:6

**diagnosed**
103:8

**diagnosis**
9:13 12:18

**diary**
22:10,18,19
71:15

**died**
6:23 7:1,17
14:13 16:7
54:11 74:7
75:9 76:20
82:17 84:24
217:24 223:23
232:19

**difference**
242:3,4,7

**differently**
212:11

**difficult**
86:20 231:15

**digest**
88:19

**digging**
84:24

**dinner**
84:9 121:14
123:6 170:24
182:25 183:2
210:24 213:25
224:8

**dinners**
121:15 123:17

**direct**
19:16 157:4

**directed**
154:16

**direction**
136:8

**directly**
19:14 44:6
95:21 121:22
180:19 236:22

**director**
23:6 239:5
245:6,7

**dirty**
210:3,4

**disabilities**
5:18

**disability**
125:15,16
129:8,9,23
130:1 236:1,3

**disagree**

47:8 112:3

**discourage**
157:2

**discovered**
77:8

**discuss**
149:25 245:15

**discussed**
99:10 123:9
191:25 240:9

**discussing**
36:15

**discussion**
52:13 73:18
117:23 163:3
199:3

**discussions**
37:2,13 132:4

**disease**
103:6 105:2,20

**disorder**
95:8 109:11

**disorders**
136:3 165:11

**dispute**
154:24 196:12
242:22

**distract**
166:17

**distress**
86:14

**distressed**
174:25

**district**
10:8 12:3

**doctor**
56:19 58:2,5
63:6 65:24
100:14 102:18,
19 108:19

114:1,19,21
115:12 138:10
173:6 213:20

**doctor's**
98:20

**doctors**
9:11 46:18
65:22

**doctors'**
165:20

**document**
22:9 236:16
238:8 244:14

**documentaries**
26:19,24

**documentary**
26:17,21 27:2

**documentation**
243:12

**documented**
42:8

**dog**
228:9,14

**dollars**
176:14

**domestic**
24:7 34:21

**door**
18:10,13 61:19
62:10 63:1
65:19 150:19,
23 164:23
166:3,7,15,22
168:14

**doors**
28:7 142:17
144:16 147:17,
22 148:4,8

**Dos**
26:6,7 246:25

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 81 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**dose**
118:6

**draft**
225:4

**drafted**
244:24

**drawing**
230:19 231:5,
25

**drive**
120:17 122:9
212:13

**driving**
165:1,2,23
166:18 201:19,
20,21 212:9

**dropped**
104:7

**drove**
64:5

**due**
61:9 63:10
65:20 140:23

**duly**
4:2

**dumped**
85:15

**dying**
86:24

---

**E**

---

**e-mail**
141:25 213:15
222:23,24
223:3,5,6
225:3,4,16
236:11

**e-mailed**
90:25 222:22

**E-S-P-I-R-I-T-U**
26:7

**E-V-A-N-S**
69:6

**earlier**
90:19 91:2
116:16 123:10
207:8 208:10

**early**
10:5 15:7
17:23 39:24
99:1 110:17
152:8 162:10

**earn**
11:4,10,21
12:2,3

**earned**
10:23 12:5
13:7 250:12
252:3

**earning**
250:8

**earnings**
252:11,18

**easier**
159:18

**easily**
46:19 47:6,10

**East**
4:10

**eat**
5:9

**eating**
176:3 224:7

**edge**
237:13

**education**
8:13,14

**educational**
8:9,15

**effect**
49:8,21 55:11
158:7 163:25
183:15 195:9
201:19

**effective**
156:23 157:5

**effects**
55:9 116:23,24
117:2,6 119:5,
8

**Electric**
40:21

**electronically**
253:10

**elementary**
8:13

**Elmbrook**
169:21,25

**embarrassed**
169:16

**emergency**
46:17 103:16
107:17

**emeritus**
11:20,24,25

**EMG**
105:17

**emotional**
33:17 106:11

**emotions**
156:25

**emphasis**
66:22

**emphasized**
129:14,15

**employed**
28:23

**employee**
54:9 91:19

92:2 94:24
140:25 141:18,
19 142:3
148:11 158:16,
20 160:1 218:1
250:8

**employees**
24:6 27:22
28:21 33:5,11,
13,21 63:14
84:9 90:5
128:8 140:22
141:19 146:12
246:9,11,22
247:9 248:6

**employer**
13:4 218:1

**employment**
34:1 158:23

**encounter**
55:1

**encourage**
104:25 220:23

**encouraged**
231:8

**encouragement**
106:19 132:10
133:8

**encouraging**
158:5

**end**
9:15 10:10
22:25 34:12,24
40:14 57:15
59:24 90:3
102:15 146:1
152:8,9 160:4
242:5

**ended**
13:20 16:1
57:1

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 82 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**energy**
24:5 49:6 94:3

**enforcement**
168:18

**engage**
147:14 160:2

**enhancement**
130:15

**entering**
178:3

**entire**
27:14 40:10
80:21

**environment**
22:23

**environmental**
8:14

**envisioned**
44:21

**epiphany**
126:14

**episode**
151:7

**ER**
107:5,12

**Espiritu**
26:6,7 246:25

**estate**
28:9 178:17,23
242:24 249:2,
5,6,12

**evaluated**
155:1 169:21

**Evan**
218:8,9 237:21

**Evans**
69:6

**evening**
182:17 186:13
199:20

**event**
65:17 152:17

**events**
215:15 216:19

**eventually**
28:24 29:10
50:8 106:18
138:10 190:10
241:11

**everyday**
123:14

**exacerbated**
57:9

**examined**
4:3

**examiner**
214:8,20

**examiner's**
215:17 216:7

**exasperated**
157:13

**exchange**
15:13,17,24
16:12 17:25

**exchanged**
190:24

**exercise**
64:19 101:12
122:25 156:24
162:14

**exercises**
122:20 157:2
231:7

**Exh**
233:6

**exhibit**
140:18 217:7,
20 218:4
219:23 229:24,
25 230:5,7,13
231:11,17,18

232:12 233:4
234:12,15,19,
25 237:2
238:10 244:4,
7,25 249:1
251:2 253:9

**exhibited**
53:17

**exhibits**
253:11,12

**expand**
26:25

**expect**
30:15 127:6

**expectation**
125:24

**expected**
30:10,12
245:18

**expenses**
129:18

**experience**
62:2 126:16,22
138:13 178:4
233:19

**experienced**
107:19

**expertise**
136:3

**experts**
217:3 251:12

**explain**
107:25

**explained**
100:10,14
114:14 156:22

**explains**
73:12

**express**
92:23

**expressed**
42:21 124:19

**expressing**
141:21

**extended**
31:2 177:23

**extent**
112:19

**extra**
16:6 160:14
171:22,24
173:5 211:17,
18,22 212:22

**extreme**
107:20

**extremities**
107:8

---

**F**

---

**F-E-L-D**
56:1

**F-R-E-D-E-R-I-C-
K-S**
93:14

**face**
27:19 49:5
92:20

**face-to-face**
19:21 216:13

**facility**
46:8 167:22
172:11 174:3,
19 176:14
177:13,18,19
178:12 187:2,
10 189:21
190:5 191:6,12
192:7,16
201:4,12 202:9
230:17,20
233:1 234:3,

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 83 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

10,16

**fact**
28:16 66:1
78:15 80:1,20
99:8 128:10
129:15 148:1,
8,22 154:13
156:8 157:15
166:25 173:6
194:18 206:12
220:9 225:8

**facts**
206:21

**fail**
134:11

**fair**
19:1 21:15
23:11 32:15
43:22,23 46:21
47:20,21 60:9
82:20 111:25
125:8 134:24,
25 155:10,11
160:20 179:16,
23,24 181:16,
18 195:17
200:4 206:16
208:23 209:3,
12 211:25
214:20 240:17,
18

**fairly**
11:12 34:18
57:7 72:18

**faith**
42:12

**fall**
99:20 101:22
102:4 105:18
119:22 120:1
129:2 162:7

**fallen**
109:1

**falter**
161:20

**family**
15:14,15 33:21
38:5,19 40:17
84:6 85:25

**fantasies**
43:6

**fantasy**
43:25

**fast**
57:11 128:15

**faster**
104:14 115:1

**father**
15:9 16:7
218:10

**fault**
139:20

**favor**
32:20 67:13

**FBI**
185:12 186:7,
24,25 192:17
198:15,16,18

**FDA**
119:11,12

**fear**
66:21 121:23

**fears**
198:20

**feature**
26:23,24

**February**
128:25

**feed**
205:1

**feel**
59:16 64:7
70:6 73:15
82:2 103:4
107:21,22,24
121:19 124:13
126:4 134:6
153:17 174:8,9
177:22 204:8,
14 207:4
214:10

**feeling**
51:24 61:4
73:5 76:25
79:6 81:25
103:9,10
108:1,8,15
110:5,8 117:8
119:5,25
120:11,22
122:22 144:18
160:4 202:17
206:6

**feelings**
220:20 221:9,
16 225:22

**feels**
67:20 71:6
73:11 101:12
155:6

**fees**
248:4

**feet**
210:16

**Feld**
55:24 56:23

**fell**
61:20 62:12
130:11 145:7
243:6,19

**felt**
35:10 38:11

58:7 63:13,17
64:8 65:10
66:25 72:24
73:2 92:18
94:2 96:5,10
99:21 103:7
106:15,25
108:9 111:4
114:4 121:1
123:20 124:7,9
126:23 134:10
140:11 144:10
156:21 158:25
160:7 167:1,10
168:15 174:7,
21 177:1,2
204:9,22,23,25
208:6 238:25

**Ferry**
18:7

**fevers**
152:1

**FHW0135**
45:4

**fighting**
72:12

**figure**
15:9 89:2
165:15 201:15
217:18 218:10
232:3

**figured**
196:24

**file**
35:17 219:16

**fill**
44:11

**filled**
84:16

**films**
26:24

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 84 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**final**
  34:22

**finally**
  201:10

**financial**
  44:6 127:22
  140:24 141:5
  148:5 241:7
  243:25 251:11
  252:13

**financially**
  27:13 130:10
  131:11

**find**
  28:22 75:25
  89:5 115:5
  141:13,14
  143:12 146:19
  148:1 171:16
  174:2,3 181:7
  212:3 215:22
  217:13,14,23
  222:19 223:25
  230:22 232:25
  244:2 247:21
  248:10,14,23
  250:2 251:10,
  13,24

**finding**
  82:16 133:15
  147:21

**fine**
  47:1 57:24

**finished**
  10:17

**fired**
  24:21,24 28:15
  33:8 145:24
  245:21

**firing**
  245:11

**firm**
  178:24

**first-year**
  218:22

**fit**
  14:20 136:2

**five-minute**
  60:12 250:20

**flabbergasted**
  185:13

**flap**
  85:18

**flash**
  195:21,22,25
  196:1

**flashlight**
  195:25 196:9

**fleeting**
  101:13 109:16

**floor**
  182:2,4,9

**Florida**
  35:5,6

**flowers**
  141:21

**Fluvoxamine**
  78:7 93:24
  110:11 116:18

**focus**
  63:23 64:11
  70:11 79:3
  80:10 110:2

**focused**
  64:3 144:2

**folder**
  84:18,19,21
  219:16

**follow**
  73:21 170:7
  212:17 251:10

**follow-up**
  70:8 106:5

**food**
  84:8 162:25

**forceful**
  158:11

**forcefully**
  157:1,4

**foreclose**
  142:20

**foreclosure**
  241:9,20 243:8

**foreign**
  15:24 16:11
  17:25

**forever**
  125:22 128:17
  129:16 131:9
  133:9,22

**forget**
  90:14 244:4

**forgive**
  76:17 221:23

**forgiveness**
  220:15

**forgotten**
  113:22 166:12

**form**
  34:9 45:22
  112:19 167:14
  193:18 194:2,
  18 197:14

**formal**
  11:25

**formally**
  32:6

**forward**
  97:18

**forwarded**
  76:4

**fostering**
  15:2

**found**
  18:15 27:3
  34:1 40:18
  74:6,8,17
  76:9,19 77:14
  81:19 82:18
  83:18,20 84:1,
  3,15 85:14,17
  144:15 148:3
  173:5 174:1
  200:20,23
  217:9,11,19,25
  218:6,7 219:7,
  25 222:12
  226:21,24
  227:3,13
  229:14,20
  234:5 246:21,
  22

**foundation**
  80:24 191:8
  239:4,5

**Foundations**
  56:4

**four-story**
  159:19

**fragile**
  43:11 73:5
  86:11 164:17,
  21 165:24
  184:20 194:6
  195:7

**frame**
  36:9 39:10
  71:17

**framed**
  86:9

**frames**
  161:13

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 85 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**Fredericks**
93:13

**free**
213:8

**freely**
209:19

**frequent**
156:13 194:9
195:9 208:24

**frequently**
57:21 72:18
73:2,4 153:7
157:20

**Friday**
154:12 170:17

**friend**
16:2 49:15
50:16 91:20
96:1 130:16
133:2

**friend's**
11:1 62:13,20
64:6

**friendly**
190:23

**friends**
18:7 29:7
30:11 32:23
68:23,24
179:10 207:6

**frightened**
59:7 62:2

**front**
106:11 163:18,
22

**frustrated**
61:4 143:24
156:16 157:11

**frustration**
147:4

**fulfilling**
44:11

**full**
12:17 115:17
162:18 248:11

**function**
93:1

**funds**
26:13 35:19

**funeral**
68:18 84:5
87:20 223:18,
22,23 224:6

**future**
126:12

**fuzzy**
152:18

---

### G

**G-O-L-T-Z**
17:4 49:17

**G-O-U-L-D**
17:2 49:14

**gains**
251:4

**garbage**
55:15

**Gary**
133:17

**gassed**
200:24

**gave**
21:7 29:18
86:3,6 87:17
88:10,13 89:10
91:2 93:15
112:20 128:11
132:13 133:21
135:18 136:4
165:9 206:5

229:22 230:24,
25 231:2,24,25
236:11,23,24
244:17 245:11
248:6

**gay**
39:6

**general**
65:2 115:13
193:1

**generally**
11:11 73:21
123:13 176:2

**genetic**
110:17,19
116:13,15
117:16

**gentleman**
127:12 139:14
143:23 147:3

**gentleman's**
51:1

**gentlemen**
18:23 85:23
131:5

**gesture**
66:2 67:3
113:15 136:13
142:10 151:22

**gestures**
19:24 20:3
21:22 47:18
60:8 69:11
79:13 80:21
81:6 157:20
167:3,12
174:12

**girls**
15:1

**give**
22:7 29:18

67:22 84:22
88:12 113:4
127:18 129:10
131:16 133:7
179:13 183:3
195:16 201:7,
20,23 228:13,
16 236:12
245:13 249:21

**giving**
53:7,19 113:10
160:11 226:3
227:24

**glad**
218:18

**goal**
124:21,23

**goals**
124:2,4

**Goltz**
16:23 17:4
49:17 50:6,9,
14

**good**
4:22 9:9 36:12
56:16 94:21
96:1 97:5
123:20 125:3
130:16 131:15
133:2 154:14
160:15 185:8,
24 193:4 219:9
242:25 250:22

**good-bye**
74:3,13,15
75:16 81:12,17
87:5,7,12 88:4
90:17 122:19
217:6,8

**goodnight**
180:9 186:21

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 86 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**gosh**
  50:25

**gossip**
  148:12

**Gould**
  49:14,16

**grab**
  209:18

**grade**
  38:1

**graduated**
  8:12

**grand**
  27:7

**graphic**
  114:18

**grasping**
  107:25

**grateful**
  40:4 82:4
  174:6

**gratitude**
  75:16 82:13

**grave**
  122:7

**great**
  30:6 89:14
  163:6

**greatest**
  40:13

**green**
  4:10 10:18
  16:1,11 18:1,
  13,15 47:16
  138:6,13 153:7
  171:21 173:14
  174:3 191:1
  218:9 219:1
  232:11 238:4
  239:7,8,9

**greenhouse**
  11:1 246:6,14

**Greg**
  147:24

**grew**
  39:14

**grief**
  58:17 65:7
  102:7 120:12,
  25

**grip**
  221:17

**groove**
  94:19

**ground**
  134:21

**group**
  13:13 29:11,16
  30:14 31:9
  41:5 42:2
  177:9 229:21
  230:16 239:6

**grow**
  39:13 141:4

**guard**
  245:17,23
  246:12

**guess**
  64:10 80:4,9
  85:13 87:9
  88:5 131:10,15
  133:18 165:18
  195:11 196:13
  208:21 215:17

**guessing**
  233:16 250:9

**guilt**
  102:6 122:21
  126:22 140:11
  159:6 198:1

**gun**
  44:23

**guy**
  140:7

**guys**
  131:5 132:7
  134:3,15

**GWL010033**
  69:9

**GWL010048**
  71:21

**GWL010062**
  72:11

**GWL010073**
  72:23

**GWL010076**
  108:24

**GWL010086**
  101:7

**GWL010103**
  111:12

**GWL010124**
  149:10

**GWL01026**
  154:11

**GWL01027**
  117:21

**GWL010372**
  136:15

**GWL010571**
  107:4

**GWL010803**
  53:4

**GWL010825**
  49:12

**GWL010888**
  43:15

**GWL0109022**
  43:1

**GWL018466**
  47:23

**GWL1010769**
  56:24

**GWL10885**
  44:19

———————————

**H**

———————————

**H-O-P-P**
  6:15

**half**
  13:9 72:9
  114:10 146:15
  175:16 249:7,
  21

**halftime**
  177:21

**halfway**
  166:1,4

**halter**
  104:1,2,3
  114:25

**hand**
  67:11 155:22
  182:10

**handbag**
  74:9

**handcuffed**
  169:17,20

**handcuffs**
  169:13,25

**handle**
  221:8

**handling**
  37:7 150:1

**hands**
  71:10 122:18
  175:20

**handwriting**
  237:14,16

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 87 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**handwritten**
85:5,6 218:2
226:20

**hang**
62:11 183:17
202:3 207:9,
17,23 208:3
211:22

**hanging**
62:25 63:19,20
65:18 71:18,22

**happen**
37:25 50:24
51:22 59:12
64:16 68:12
69:25 70:14
71:8,11 94:23
97:10 127:15
143:9 155:19
156:2 159:11
180:12 204:5
209:23 219:2

**happened**
12:16 16:13
21:6,16 22:13
26:1 27:21
29:25 30:13
32:8 38:3 39:2
43:10 44:8
51:3 63:2
69:21 86:12
120:7 122:3
128:7 134:14
138:2 145:15
149:6 152:6
155:10 157:16
164:23 166:13,
20 176:4
178:18,21
189:3 202:18
203:8 205:16,
19 212:9,10

215:7 216:4,8,
16,19,22
235:23 246:13
248:2

**happening**
42:23 57:11
91:4 94:20
107:14 129:5
137:20 139:4
144:25 166:14
198:6

**happy**
159:1 174:5
185:20

**hard**
54:8 58:19
59:13 68:3,19
70:22 108:21
119:4,7 127:17
135:8,12 137:6
155:23 176:19
186:22 187:12
208:18

**harm**
221:23

**Harper's**
18:7

**he'll**
187:19

**head**
4:23 29:20
34:13 51:17
64:12 67:2
122:2 176:22
184:8 186:4,10
197:6 198:2
204:23 237:19
248:15 250:4

**headed**
62:12

**heading**
204:17

**healing**
174:9 176:24
177:3

**health**
6:16 8:22,23
9:8 13:3,8
19:5,10 101:24
105:7 116:7
170:1,5,7
179:9 181:4
185:1 189:9
192:16 195:24
196:19 199:19
200:18 201:4,
11 202:9
203:13 205:21
206:16 214:5
227:17,19
239:13 240:2,
13,21

**hear**
23:17 65:13
73:7 109:22
112:14 134:7
144:10 181:12
224:12 242:5

**heard**
58:15 94:23
132:7 141:11,
20 147:6,20
148:19 149:4
178:18,20,22
179:1 181:9
191:2 196:24
197:12 198:13
199:5 200:17

**hearing**
112:10 144:4

**heart**
103:18,22,24
104:3,6 107:5,
21 114:25
221:24

**heavier**
234:9

**heavy**
87:25

**heck**
231:17 232:4

**held**
176:16

**helped**
16:24 28:5
30:19 85:21,23
87:22 114:17
117:7 120:14
124:8 128:16
131:6 132:8,22
169:1 228:12
248:5

**helpful**
38:11 40:3
45:17 223:19

**helping**
101:12 115:16
121:20 123:4
124:14 156:22
174:9

**hey**
60:11 96:13
115:19 123:18
127:16 132:18
134:1

**hide**
67:19,21

**high**
176:24

**higher**
95:2

**highlighting**
100:11

**highly**
193:11 194:16

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 88 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

highs
95:2

Highway
166:23

hip
178:5

hired
12:5

history
19:23 32:22
43:4 58:8

hit
12:24 135:9
174:23

hm-mmm
4:23 22:21
132:3 216:24
239:14 240:10

hold
9:1,2 24:10
54:23 55:24
82:6 100:6
103:3 151:19
168:16 171:4
189:17 193:8
201:16,17
206:8 231:12,
16 237:2 250:5

holds
143:22

home
4:12 7:6 9:22
38:20 50:22
52:3,4 59:17
61:6 62:13,16
63:1 96:17
119:23 137:7
150:12,13
152:6 155:4
162:19 164:9
168:14 170:5,
14,25 171:6,

10,12,19 172:1
173:14 174:16,
21 179:15
181:10 183:10,
11,16 185:8
186:5 204:7
206:6,8 207:1,
2,4,16,22
212:18 213:16,
22 214:2 219:2
227:10,13
235:8,12 239:8
245:17,19

homeless
243:22

hometown
39:11

honestly
42:4 52:16
58:11,19 59:20
71:14 129:16
135:6 159:12
231:23 233:2

honey
129:7

hook
243:9,11

hooked
187:13

hope
86:8 126:13
130:18 134:20

hopeless
119:25

Hopp
6:15

hospital
9:20 46:16,20
47:7,11,20
48:2 52:11
112:9 136:20
138:1,5,6,14,

15 139:12
142:11,14
169:22,23,25
170:11 200:22
201:2,6,13

hospitalization
168:5

hospitalized
9:16 66:22
136:12 149:2

hospitals
46:18

hot
210:1

hotdog
176:11

hour
64:6,8 170:18
175:16 245:19
249:21

hours
19:12 104:22
160:24 170:17,
18 182:2,18
183:9

house
38:17,21,23
84:8 158:3
179:13 182:15,
16 213:23
218:1 226:22
245:16 248:19

humid
210:1

hundred
242:10

hung
50:21 61:18
62:9 202:3
203:2 212:21

hurt

47:25 61:5
172:14 191:17
221:20,23

hurting
55:3 61:7

husband
16:16 175:19
203:6 237:25

hyperventilating
107:22

hyperventilation
107:9,16

I

idea
36:21 52:11
65:16 82:21
97:5 117:16,19
126:8 130:2,10
132:1,5 160:15
185:24 189:23
191:15 225:23
247:19 251:6

ideas
34:13

ideation
21:22 42:18
44:3 101:13

ideations
19:23 20:3
22:13 43:18
44:14 45:3,11
47:25 55:23
56:20 60:8
72:5 79:13
80:7,21 81:6
89:22 107:6
109:9,15 110:1
167:12

identification
253:10

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 89 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

identified
190:12

Illinois
158:1

illness
40:17 70:21
86:25

images
225:15

imagine
44:8 86:8

imagining
198:23

immediately
29:14

impact
39:4

important
219:19 224:12

impression
130:22 176:23

inaudible
109:20 242:3

incapable
156:21,23

incident
53:3 61:17
62:7,17,19,24,
25 63:22 67:3
68:12 69:13
71:8,19 76:1
79:14 152:17
155:15 164:2

incidents
176:4,7

including
202:6 212:12
216:23

income
10:23 11:2

250:7

increase
118:10

increased
70:18

incredibly
77:3

individual
177:7 213:4,5

individuals
86:3,4 130:9

informal
32:16 249:2

information
104:14 144:11
148:5 149:4,14
201:8,21,24
202:15,22
236:12 244:17
247:22

informed
147:19 177:10

inherited
7:6,8 249:11

initial
32:5 178:19
200:13

initially
205:16

inpatient
45:20 46:8,13
47:15 58:13
61:9 63:10,14
65:16,20
66:12,20 71:5
73:11 97:21,23
98:21,24 99:3,
5,16 100:15
111:22 112:4,
16 113:11
139:10 167:22

168:5

insert
99:7

inside
75:2 83:7
84:21 85:2,18
138:20 222:12

insisting
157:1

instrument
234:18

insurance
6:22,25 8:4
13:3,8,13,15,
16,17,18,21,
24,25 14:1,3
129:23 130:1
236:1

intake
61:7 71:5
98:15,18
111:8,10,13,
14,21 112:8

intended
221:23

intense
205:14

intensified
159:3 173:4
184:9 204:1
205:22

intensify
204:16

intensifying
70:21 120:5

interested
132:1,5

interior
61:19 62:10
63:1 65:18

interrogatories
20:15 21:17,25
209:21

Interrogatory
20:1 62:5
209:14

interrupt
91:22 115:3,
20,25

interrupting
124:19

intervention
90:9 97:2,6
129:4

interview
188:4,8

interviewed
141:9 187:23
215:24 216:25
217:2

introduce
175:19

introduced
16:2

invest
26:13

invested
27:2,4 30:21
251:21

invited
16:5 177:6,10

involuntary
47:16 140:13

involved
23:2

issue
23:25 117:3
176:4 238:23

issues
6:17 23:3 24:3

www.phippsreporting.com
(888) 811-3408

41:7,16 117:12
132:17 140:24
141:5

**itemization**
249:3

**itemizing**
249:9

**items**
53:7,18 227:25
229:14 237:3

---

**J**

---

**J-O-A-N-N**
96:7

**jail**
192:18 196:3,
6,10,16 197:22
198:3 199:4,18
204:19,24,25

**James**
149:13

**Janesville**
39:14

**January**
53:2 85:10
102:10,11
128:23 138:8
154:6

**Jason**
16:16,20 17:19
95:16,17,18
240:25

**Jason's**
16:25

**Jean**
14:22,23 158:3
218:8 237:15
240:23

**Jeep**
64:5

**Jenna**
17:11 20:18
90:14 224:19

**Jim**
14:21,23 16:3,
22,24 19:11
22:16 23:5
25:4,7 26:9
27:19,21 28:2,
7,12,20 29:10,
12,13,18,25
30:2,3,8,10,
12,14,20 31:7
32:7,10 33:13,
19 34:14,21
35:1,9,16,21
38:2 39:23
40:3 41:18,25
43:8,13 45:7
49:2,19 50:3,
10,22 51:24
53:7,17,18,19
54:11 56:5
58:16 59:1,17
61:12 62:8
65:22 68:2
74:25 75:11
78:6 80:2,6
81:22 83:17
84:24 90:3
92:4,18 93:6,9
94:19 95:25
100:3 101:21
103:2,7 104:24
108:13 110:16
112:5 113:2,
15,21,22,25
114:3,17
115:15,16
116:16,22
117:4,5 118:3
119:2 120:10,
16,20,22,25
122:6,11,12,18

123:4,21,25
124:6,13
125:2,14,18,21
126:3 127:16
128:3,4 130:18
133:5,13
134:1,7,9
136:2,21
137:10 139:16,
18,19 140:1,4,
10 141:20
142:4,7 144:1,
2,4 145:4,12,
24 146:8
148:20 149:2,
23 153:6,9,11,
14,17 155:18,
19,20 156:2,8,
17 157:11,13
158:24 159:23
160:9 166:9
170:7 171:19
175:19 176:19
180:22 183:14,
19 184:19
185:8,14,16
190:21,22
196:22 198:18
201:3 202:7
203:2,21 204:7
207:1 209:16
211:9 212:15
213:19 215:11
216:11 218:10
220:19 221:16
222:1 228:7
234:20 236:19,
23 239:17,19
244:20 245:14,
16,18,19
246:5,13,14
248:7

**Jim's**
11:13,17 12:21

24:10 29:1
30:5 32:20
37:14 51:6
53:6,18 74:18
75:1 84:6,9,15
91:20 104:23
130:16 133:2
140:3 141:19
153:22 177:15
178:22 179:2
182:6 190:15
224:8 238:6,8,
22 245:15

**Jimmy**
228:3

**Joann**
96:7,8,13

**job**
4:22 16:25
18:9,15 94:24
139:16 162:23
238:25 244:22

**Joe**
70:16

**John**
14:24 74:24
75:1,9,25
76:10 77:11,17
81:16,18
83:11,17,19
85:5 101:20
150:7,12
152:14 218:7,
12,14,20
220:2,6 222:11
229:14 240:23

**John's**
152:10 219:6
243:20

**Johnson**
41:10,11 42:1
43:2,9 44:2,19

www.phippsreporting.com
(888) 811-3408

45:1 47:23
49:12 52:9,10
55:24 58:6
67:17 177:16
236:22 238:2,
15,18 239:2,4,
11 240:12,16

**Johnson's**
53:3 54:18

**jointly**
242:13,16

**Josh**
95:12,14
177:14 236:8,
12,18

**journal**
22:15,16 71:15
82:24 162:1,2
231:8 235:21

**journaling**
231:9

**journey**
201:1

**judgment**
241:15

**Julie**
14:18 55:24
56:5 158:1,2,
12 182:13
183:18 186:21,
22,23 187:5,
15,21 191:6,11
192:5 197:8,24
198:12,17
199:2,3 200:4,
12 202:4,6
203:6,7 207:8,
11 214:7 218:8
228:18 240:20
249:16 250:18

**Julie's**
203:6 237:16,

24

**July**
6:5 9:15,21
14:13,14 55:22
68:22 69:19
74:20 77:12,14
93:25 110:17
116:22 117:10,
25 136:9
150:14,15
152:16 218:13,
19

**jump**
92:8 158:17
159:19 166:21

**jumped**
64:5 155:24

**jumping**
101:10,15
159:10

**June**
6:7,9,10 9:25
10:11,20 55:14
69:9,16,17
70:16 94:16
152:8,9

---

**K**

**K-O-C-H**
177:14

**Kevin**
18:17,21,24
51:8,14,16
190:12 192:1,
5,10,22 193:5,
7 194:15
195:5,6

**Key**
35:9

**keys**
179:13

**Khrome**
7:8 9:5 12:17
16:21 27:23,25
28:3 30:21
34:13 43:10
51:18,22 52:5
85:24 92:13,14
96:21 102:5
115:8 127:25
128:11,22
129:25 132:23
144:2 148:18
149:23 161:16,
17 205:17
213:9 234:7
241:25 242:1
245:6 247:4
250:1,8,9,13
251:17

**Khrome's**
50:25

**kicked**
78:10 94:17
120:14

**kill**
110:25 111:3
137:4 138:24
156:5 172:18
188:23 192:11
198:14

**killing**
111:1

**kind**
6:24 15:9
16:8,24 19:6
22:15,16 25:5,
25 26:23 28:1
40:5 41:15,19
42:22 43:9
47:15 49:2
50:10 51:24
63:14 64:21
65:9 67:9

70:8,9 71:17
75:20 77:4
82:1 84:10,17
85:12 93:3
97:9,17,18
102:7 105:8
109:7 112:10
114:7 115:1,12
116:15 119:19
121:16 123:4,
15,17 124:10
126:11 127:2
130:11 131:1,
7,13 132:24
133:14,20
135:11 136:5
138:25 139:2,
15 140:12
145:7 146:22
147:5,13
153:7,10
156:5,7,14
158:4 163:25
164:12 166:6
174:22 177:2
181:7 186:8
195:21,25
196:8 198:20,
21 199:25
203:21 213:19
214:13 218:10
220:18,24
234:5,7,18
238:6

**kinds**
40:16 84:17
95:20 158:24
160:16

**knees**
176:22

**knew**
15:22 16:25
45:11 49:3

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 92 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

59:22 74:14 114:21 116:9, 11 127:14 132:21 133:4, 20 137:19 142:13 144:1 146:8,10 150:4 162:13 164:15 213:13 217:11 218:12,19 236:23 239:14

**knife**
67:25 68:5 163:17,22 164:2

**knives**
68:3,6

**knock**
93:8

**knocked**
212:15

**knowing**
31:9

**knowledge**
17:9

**Koch**
177:14 236:8, 18

**Koch's**
236:12

**Kohl**
187:25

**Koster**
54:20 64:18, 24,25 65:3 71:1 77:9,10, 20,23 78:5 79:7,8,17 80:2,7 97:13 104:12,14,16, 19 105:9,11 110:13,16,21,

23 111:15 113:21,24 114:6,12,17,24 115:1,7,8 116:5,12 117:2 118:20 120:9, 19 122:11,12, 23 123:3,8 124:3 125:7 131:4 135:18, 22 149:9,17, 20,24 152:25 153:3,8,10,18, 20 154:9,16,17 155:13,15,16 156:9,15 202:21 204:3 212:20 213:2, 9,10,15 239:18,21 240:2,3,8

**Koster's**
115:5,11 117:16,20,25 118:19 124:22 151:14 156:19

**Kurt**
24:13,14 26:9 32:23 34:22 35:7,17 133:2, 4,7,10,11 134:2 141:21 143:24 145:4, 5,8,9,13,21 146:6,7 204:5 226:2,6,8 241:13,22 242:9 243:13

---

**L**

---

**L-O-F-Q-U-I-S-T**
133:18

**label**
108:20 210:5

**labeled**
39:23

**lack**
147:4 172:3

**lake**
62:21 69:1

**large**
39:3

**larger**
26:21 248:6

**late**
96:15 162:13

**law**
168:18

**lawn**
37:11

**lawsuit**
22:14 241:12

**lawsuits**
33:4,9

**lawyer**
4:17 21:20 177:12 216:18, 23 217:3 236:8

**lawyers**
21:3,23 216:25 245:2

**lax**
34:18

**lead**
112:15 192:6

**leaders**
29:7,11,17

**leadership**
8:15 139:18 141:10 148:16

**learn**
43:13

**learned**
40:1 111:7 142:19 148:21 149:11 168:19

**learning**
173:11

**leased**
52:6,7

**leather**
84:4,12 217:25 229:8

**leave**
27:21 30:12 50:1 87:2 92:18 131:17 180:7 196:1 234:20 235:20 239:3

**leaving**
82:2 94:24 158:25 171:19 191:4

**left**
13:22 23:3 24:18,20 25:4, 9 29:1 33:3,8 56:4 77:1,5 82:5 150:6 184:2 220:16, 17 221:15 227:9 235:2,17 239:2 242:18

**leg**
200:25

**legal**
32:6 177:24

**legalized**
7:22

**legally**
15:5 90:22

**length**

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 93 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

162:11

**lengthier**
85:20

**lengthy**
166:21 175:21

**letter**
74:6 76:19,21
82:17 84:21,23
88:4,7,9,11,12
185:7 217:22,
23 219:17
220:10,16,24
221:4,14,15
222:20 223:17,
18,25 224:11
226:19 230:12
234:20 235:5,
25

**letters**
74:3,9,13,15,
18 75:2,4,10,
13,16,22 76:2,
3,8 77:15,21,
24 79:7 81:12,
17,19 82:11,
12,14,21 83:19
85:3,22 87:5,
7,12,16,19
88:16,17 89:10
90:17 93:16
217:5,6,8,14,
24 222:8
226:20 227:13
230:16 235:15
246:4

**letting**
184:20 246:16

**librarian**
8:17,18,20
10:20 12:8

**library**
8:18

**lie**
246:20

**lieu**
241:9,20 243:8

**life**
6:22,25 8:4
12:16 34:12
38:13 40:15
49:20 50:9
51:15,21 58:24
64:21 121:17
153:11 156:11
216:12 219:19
221:20

**lifeline**
136:22

**light**
195:21

**liking**
173:16

**limbs**
107:14,24
108:4,6,9

**Linda**
17:13 20:11,15
45:24 52:14
59:21 60:11
61:22 88:21
98:3 112:22
115:19 162:24
193:19 223:1
229:25 233:2
237:8 244:7

**linked**
187:14

**list**
20:2,5 21:21
22:1 67:10
204:8 213:3
228:21

**listed**
146:2

**listen**
46:22 129:7
185:9

**listening**
187:18

**lists**
117:2

**Lithuania**
15:14 16:13,14
18:4

**litigation**
33:9

**live**
5:12,13 18:11
68:24 95:19
179:10

**lived**
4:12 6:6,9
15:6,13,20
16:17 38:19
39:10 191:1

**lives**
59:5 158:1
239:9

**living**
157:14

**load**
35:8

**loan**
241:6

**loaned**
133:13

**located**
169:12

**Lofquist**
133:17

**long**
17:1 29:12
41:9 43:4 58:8
64:9 85:4 93:3
95:25 143:15

163:13 244:23
246:18

**long-term**
124:21

**longer**
26:23 29:8
31:8 50:9
76:19 102:3
153:23 162:20
173:4 174:1
177:19,23
183:24 191:23
192:7 206:4
238:24 245:24

**looked**
76:13 83:5
92:7 104:23
115:2 116:24
137:2 165:4,7
229:19

**loose**
61:20 62:11

**lose**
30:18 107:23
128:8 231:10

**losing**
139:16 186:8

**loss**
109:7 121:25
122:1,21
247:17,18,20
251:5

**lost**
33:24

**lot**
27:3,16 28:17
31:8 34:21
40:1,3,24 41:7
42:22 50:21,23
58:15 66:16,
17,23 68:15
78:25 93:22

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 94 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

94:9,21 103:17
108:8,16
116:23 120:11,
12 121:16
126:4,20
129:19 135:10,
12 136:6 144:3
151:25 153:11,
12 160:4
161:21 162:7
174:24 178:24
186:17 202:10
225:20,21
246:21

**lots**
94:20

**loud**
136:18

**love**
191:14,15
208:17 221:21,
22 222:1

**loved**
233:20

**low**
118:6

**lower**
143:3

**lows**
95:2

**loyal**
33:20 34:15

**lunch**
121:4,5,10,14
123:6 162:19
170:19,23
210:24,25
213:25

**lunchtime**
176:10 210:20

**Luvox**

110:11 116:25
117:17,22
119:8 125:7
136:10

─────────────

**M**
─────────────

**M-E**
23:17

**M-E-I-N-K-E**
23:15,19

**M-I-C-H-E-L-L-E**
118:20

**M-O-L-L-E-T**
140:17

**made**
6:11 11:7 22:1
26:18 39:3
47:18,25
61:12,13 67:9
113:14 136:12
137:2 138:19
155:3,19
158:19 159:1
164:18 175:18
191:25 200:12
204:8 233:17

**magic**
251:12

**magnesium**
119:18

**mailed**
246:5

**main**
26:19 37:6
68:10 78:11
145:20 180:15
210:10 214:17

**maintenance**
37:11

**major**
8:14

**majority**
11:2 24:11

**make**
10:5 17:13,16
25:19 37:15
55:12 58:2
64:1 66:9
76:24 86:23
87:4 90:20
96:14 97:21
116:5 121:22
126:4,17 128:5
153:17 158:8
159:18 170:9
172:10,15
177:18,22
181:15 184:21
204:14 216:14,
21 217:12
221:2 222:4,25
223:12 232:3
237:7 239:24
244:10 247:16
249:20 251:25

**makes**
60:5 95:3
97:23 149:16
226:12 235:15

**making**
29:23 57:3
61:4 121:24
123:19 146:20
148:2 156:16
157:20 232:14
235:8,11

**male**
182:8

**man**
7:4 77:3 211:3
233:20

**manage**
57:25 67:20

112:11

**managed**
86:13 140:25

**manager**
24:8 34:20
84:11

**managing**
127:10

**March**
42:16 45:1
78:8 94:6

**margins**
83:2

**marital**
54:15

**mark**
229:21,23
237:2 238:9

**marked**
140:18 217:7
230:2,6 253:10

**marker**
233:25 234:2,
15

**markers**
230:19

**marketed**
145:18

**Marketplace**
13:21,23

**married**
9:24 13:18
15:11 16:4,16
237:25

**marry**
10:2

**Martha's**
18:4,10

**Mary**
69:6

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 95 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**master's**
8:15

**mattered**
206:22

**Mayflower**
246:6,14

**Mcmann**
46:5 54:19,22
55:12,20 56:10
57:14 65:25
66:7 71:25
72:6,10,11,16,
19 73:19
97:20,25 98:12
99:1,16 100:2
101:8 105:11,
22 106:25
108:25 111:8
113:19,20
114:4,9,11
124:9,24,25
139:7

**Mcmann's**
55:7 61:1
62:15 65:19
69:8 90:2 99:4
100:9

**MEAGHER**
4:6 17:10,15,
18 20:17 21:1
23:21 35:23
36:13 45:25
46:11 60:13,
17,20,22 81:2,
10 88:23 89:1,
7,14,21 90:13,
25 91:10 98:4,
8 99:12
109:19,23
112:23 113:3
115:23 116:1,4
163:2,4,9
167:19 188:17

191:10 193:20
194:11,20
195:13 197:17
198:10 207:20
208:25 209:10
221:11 223:2,
4,21 230:1,14
232:14,17
234:14 237:9,
11,20 242:6
244:8,12,13
249:14,20,24
250:15,20
251:1 253:4

**meaning**
53:12,16 65:25

**means**
45:3 127:22

**meant**
28:3 90:4
91:13 103:5
132:9 221:1
224:23

**media**
139:16

**medical**
20:7,8,9,13,22
21:24 22:4
107:12 109:6
115:11 153:8
165:14,15,19,
20 212:4
214:8,20
215:17 216:6

**medication**
40:5 41:1 71:9
78:7,10 94:17
97:16 105:12
110:5,7,10,15
117:4 124:5,6,
14,16,20,22,25
125:5,11

175:25

**medications**
40:8 55:8 57:9
58:15 66:23
70:24 105:5
114:2,5 116:17
119:21 124:7
162:2

**medicine**
125:12

**meet**
178:6,20

**meeting**
78:22 92:4,6
118:18 175:8
214:16,19,23
215:2

**meetings**
54:18 79:9
80:1,11 90:7
121:10,11,12,
14 145:3,8
213:24

**Megan**
96:22

**Meinke**
23:13,14,22,
23,24 25:2
26:9 29:22
30:25 31:15,
17,22 33:3,8
36:18,24 37:1
41:21 50:6

**member**
175:13 181:22
183:21

**members**
175:2 182:8
216:20

**memorandum**
22:10

**Memorial**
151:1 200:22

**memories**
21:7,9 22:17

**memory**
20:6,19,21
21:3,13,21
22:11 46:4
52:1 76:12
93:17 149:22
152:3,7,10
155:9,12
162:18 176:9
186:20 189:2
195:6 196:13
203:14 207:10,
11,15,19
212:7,8
214:17,19
218:21,23
219:6 226:20

**men**
29:17 38:10

**mental**
6:16 8:21,23
19:4,10 86:25
116:7 170:1,4,
7 179:9 181:4
185:1 189:9
192:16 195:24
196:18 199:18
200:18 201:4,
11 202:9
203:13 205:21
206:16 214:5
227:17,19
239:13 240:1,
13,21

**mention**
117:1 203:18
205:15

**mentioned**

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 96 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

41:3 43:25
45:17 49:23
54:17 67:24
68:20,24 150:9
154:15 157:19
182:6 189:25
208:5,10
209:15 213:25
219:13

**mentions**
157:21

**mentor**
49:14,22

**mentored**
140:1

**message**
64:13 65:6
66:19 73:7
112:14 131:7,
16,17 133:25
157:9 191:5

**messages**
58:11 65:2
112:10 156:13
206:25

**met**
5:19,22 17:24
18:5 37:17
39:8,15 78:3
120:8 172:8
177:16 179:3,
18 214:10
215:23

**Michael**
4:8

**Michelle**
118:20

**mid**
102:12 110:17

**mid-20s**
41:4

**mid-july**
78:11 117:21

**mid-march**
93:25 110:6
116:19

**middle**
40:23 69:16
78:7 93:22
103:13 116:21,
22 209:24

**midst**
162:22

**midway**
102:12,14

**Milda**
15:17,24 17:22
240:25

**Milda's**
16:7

**mill**
148:12

**Milwaukee**
85:9,17 86:13
138:7,11 166:2

**mind**
60:11 127:19
129:11 133:21
154:14

**mine**
221:24

**Ministries**
243:21

**minute**
92:9 243:6

**minutes**
64:19 163:4
171:20 179:11
202:23 245:20

**misappropriated**
35:19

**misappropriately**
204:10

**misappropriation**
34:5 36:4,21
184:5

**mischaracterizes**
112:20

**mismanagement**
141:7

**missed**
122:16

**missing**
88:23 120:1
216:15,21
222:4

**Mission**
4:10

**misspoke**
218:16

**misstates**
194:2,19

**mixed**
58:12

**mode**
157:3

**mojo**
94:3

**molested**
37:22

**Mollet**
140:17

**mom**
14:13 38:6,7
68:16 75:5,8
82:16,17
121:25 152:6
218:25 220:10,
12,14

**mom's**
69:20 70:21

117:11 122:7

**moment**
230:10

**momentum**
128:8

**Monday**
73:12,16

**money**
8:2,7 27:4
28:11 31:4
33:24 34:5,25
36:4 132:13
133:14 184:5
226:7,9 242:25
243:2 248:20
249:11 250:12

**monitors**
103:24

**month**
13:14 25:4
69:20 114:9,10
135:4 149:5
150:13 153:15
252:7

**monthly**
252:23

**months**
143:19 159:5

**mood**
101:13

**Morneau**
42:10

**morning**
44:20 96:10
106:14 164:12,
14 180:7
200:19 212:10

**mortgage**
26:10 134:15
143:1,3,13,16,
22 146:20

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 97 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

148:2,23

**mother**
151:2

**mother's**
74:23 77:18
150:11,16
218:23 249:11

**motion**
137:2 138:19

**motioned**
138:23

**mountains**
101:9,14,17

**mouthed**
137:3 138:23

**move**
6:4 26:23 65:8
66:18 70:10,13
79:5 97:18
107:13 108:5
120:25 121:18
123:4 148:13
160:1,17,25
223:15 239:2

**moved**
16:19 25:25
27:11 51:20,22
64:21 78:20
218:9

**moves**
220:24 221:10

**moving**
16:1 50:20
94:24 127:4
190:18

**MRI**
105:16

**multiple**
45:20 161:3

**Murphy**
96:22

**mute**
9:1

————————————

**N**

————————————

**named**
175:6 228:3,7

**names**
69:4 182:3,12

**nap**
181:12

**narrow**
35:24 80:15
108:2

**necessarily**
35:15 46:24
52:19 66:25
67:8 123:16
124:17 130:14
200:11 235:13

**neck**
61:18 62:9
65:18 69:23
136:13 137:3
151:8 163:12,
20 208:14

**necktie**
68:7 70:3

**needed**
34:17 40:25
46:7 47:14
70:10 79:20
105:12 135:9
143:7 155:6
200:21 223:11
245:24

**negative**
235:6

**neighbor**
37:23 38:2,14

**nephew**
218:9 229:2

237:21

**nephews**
75:4

**nervous**
34:11 85:13
112:8 117:7
145:13

**net**
251:16

**neurological**
103:20 118:23

**newer**
153:22

**news**
94:21 144:11

**newspaper**
139:21,23

**nickname**
40:21

**niece**
84:7 224:8

**night**
19:15 103:17
136:24 182:21
184:12,25
190:17 191:4,5
192:23 193:25
198:11 212:12,
13

**nighttime**
196:7

**nonstop**
70:18,19

**noose**
44:21

**normal**
177:22

**North**
5:22,24

**Nos**

253:9

**note**
17:13,17 52:8
53:4 69:8 86:1
89:23,25 91:11
100:6 101:5
111:18 117:21
142:18 149:9
150:4 151:14,
19 152:19
155:7 156:19
157:18 160:13
230:22 234:24
236:7

**notebook**
232:6

**noted**
71:3

**notes**
51:13 75:3
76:3,15 77:5
80:17 83:7
84:1,3 85:19
86:14 164:25
165:6,8,11
167:18 172:24
175:7 182:7
218:2 227:5
230:21 250:17,
21

**noticed**
225:7

**notification**
216:10

**notified**
140:22

**November**
77:11 89:23,25
91:16 94:6,8
98:4 99:6
100:9 101:6,18
105:8 108:23

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 98 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

120:8

**number**
4:21 12:2,18
43:12 85:3
88:24 103:19
104:9 163:19
164:1 180:20
190:6,7,9
236:11,18,21,
23,24 237:16,
17 251:16,19

**numbers**
7:13 34:22
190:9 237:4
247:19

**numbness**
107:24 108:9

**nurse**
54:25 55:7
61:1,15 65:20
70:16 90:1
98:9,12,13,17
99:24 100:8,23
111:9 175:6
176:6 183:21
185:23 191:5
196:23 210:4

**nurse's**
185:6 190:10
210:13,15
211:7

**nurses**
176:18 200:9

**nurturing**
158:12

**nutrition**
118:25 119:1

———————————

O

———————————

**oath**
4:3

**object**
34:8 45:22
80:23 112:18
167:13 193:17
194:1,17
197:13 207:12,
13

**objection**
36:11 46:3
81:8 99:8
113:1 191:8
195:2 197:20

**obsessed**
101:23

**obvious**
127:11

**occasionally**
163:17

**occur**
38:18 157:23

**occurred**
37:25 190:6

**OCD**
110:12

**October**
47:22 53:1
72:22 74:2,7
76:20 105:22
106:1,20 107:3

**offer**
245:15,25

**offered**
29:18 30:6

**offering**
119:2

**office**
25:16,20 50:25
51:2,18,20,23
52:3 62:15
68:9 90:2 99:5
100:9 104:20

115:21 121:11,
12 149:15
169:5 213:22,
24 216:7

**officer**
147:20 169:15

**officially**
6:5 7:22 15:4

**oftentimes**
96:9

**older**
38:5,8

**oldest**
14:17,18

**onboard**
92:15

**one's**
140:16

**one-night**
15:8

**one-year**
77:17

**open**
168:14 209:17
230:6,9

**opened**
164:23 166:3,
22

**operations**
141:1

**opportunity**
26:25

**opposed**
190:1

**option**
46:6,9 58:13
65:23 98:19
99:8,15,19
100:21 104:11
112:11,13

113:10 130:12

**options**
98:25 99:15
100:3 177:17

**orange**
233:6 236:17

**order**
67:8 201:10

**ordered**
110:20

**orientated**
126:12

**original**
32:1,3 253:11

**outburst**
176:13

**outpatient**
177:20 207:5

**overcome**
141:5

**Overly**
197:14

**overprescribing**
24:4

**overwhelming**
54:1

**owe**
32:10 226:6,9

**owed**
226:4 242:2

**owned**
26:4,8

**owner**
24:12 25:22
32:7,8 49:18
250:12

———————————

P

———————————

P-R-I-C-E

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 99 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

5:14

**p.m.**
111:10 163:7,8
189:21 211:1
250:24,25
253:8

**package**
13:5

**packed**
200:23

**Packers**
190:25

**pad**
230:19 231:5

**paid**
13:8 26:10
35:12 128:12
178:2 213:3,11
241:21,22
242:9,10,14,
16,19 243:13,
16,23

**pain**
57:15

**Palm**
101:20 103:23
114:23

**palpitations**
103:18

**paper**
83:5 230:19
236:17

**papers**
128:1 185:7

**paperwork**
243:7

**paragraph**
223:13

**paralysis**
107:8 108:5

**paranoia**
198:21

**paranoid**
107:7 190:19,
20 193:11
194:7,16 195:8

**pardon**
78:4 178:10

**parents'**
120:13

**park**
93:8

**parked**
210:11

**Parkinson's**
102:17 105:20

**part**
11:20,22,23,24
13:5,13 25:22
32:5 33:19
117:25 121:20
177:21 196:6,
10 210:10
218:4 223:17
225:12 232:3
241:20

**part-time**
10:25

**participate**
25:17 177:4

**partner**
5:13 7:23 23:2
24:7,13 34:21
42:24 73:15
175:20

**partners**
50:8 146:25

**partnership**
32:3

**parts**
224:11

**pass**
191:5

**passed**
11:13 14:8
63:22 68:16
152:8

**passenger**
166:3

**passive**
45:2

**past**
47:17 76:5
87:8 90:18
104:13 122:9,
10 126:18
167:2,11
168:18 197:12
198:1,13

**path**
97:15 104:25
105:9 114:8
120:10

**patience**
53:23

**patient**
61:7 72:24
73:10,14 90:4,
5 91:14 98:21,
23 100:15
163:17 176:8
180:21,25

**patient's**
73:15

**patients**
135:25 213:13

**pattern**
73:21

**Paul**
23:13 24:8,11
26:9 29:10,13,
20 30:1,9 31:7

32:6,9,23,25
34:15,16,20,22
35:7,17 37:14
41:7,14,17,19
50:6 140:3,5,7
141:21 143:24
145:4,8,9,13,
21 146:5 156:3
225:10 241:13,
22 242:9
243:13 245:14,
18,24 246:1,11

**Paul's**
24:7,13 30:9
34:20 245:16

**pause**
116:3

**pay**
13:4,10,14
31:18,23,24
37:10 134:14
145:2 190:7
241:20,21
242:8 243:8
248:20

**paying**
37:8,10,11
129:18 143:13,
16 146:23
213:7 248:21

**payment**
143:1,3

**payments**
144:17 146:20
147:7 148:2,23

**peace**
127:19 129:11
133:21

**pencil**
230:18

**pens**
230:18

Case 2:21-cv-00972-BHL    Filed 03/21/22    Page 100 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

pension
12:25

people
16:10 19:20
27:4 30:14,21
33:22,24 40:21
59:4 63:15
77:1,6 79:19
84:7 85:4,20,
25 86:6,9,15,
23 88:6 89:9,
13 92:13,14
93:11 94:1
95:20 96:5
106:16,17
121:22 126:2,6
127:12,14
128:3,11 130:4
132:13 133:10,
13,15 134:11
136:22 137:21,
22 141:11
142:5 148:14,
21 160:6
175:17 182:1
191:6,12
195:20,23,25
196:2,8,16
202:5 223:19,
20 235:3,18
238:22 241:1
243:22

perceived
156:23

percent
12:5 27:24
32:7

percentage
11:21 12:4

performance
156:24

period
25:13 29:9,10
31:3,8 38:3,12
39:22 54:12
71:12 78:9
80:13 82:19
92:17 93:24
101:22,23
173:23 189:24,
25

periods
162:19

person
23:13 28:11
33:20 34:15
37:6 41:21
50:16 51:12
58:6 91:22
93:12,15 95:23
123:21 124:1
127:13 132:12
133:1,14,17
135:18 139:25
140:19 145:14
149:8 158:18
175:24 180:24
202:21 214:8
243:18

person's
49:22 213:4

personal
26:13 36:7,16
48:6,14 84:25
216:12

personality
95:8

personally
94:2 95:5
114:21 134:10
159:3,6 206:21

persuaded
46:19 47:7,11

Pete
20:12 34:10
53:6,12,15
59:17 61:5,6,8
90:5,8 202:25
221:21,22

Pete's
91:5

Peter
4:2,8 187:18

petered
124:11

pets
219:21

Pezze
45:25 197:17
208:25

ph
239:6

Ph.d.
118:25

phone
61:11,12,13,23
62:14 63:8,9
66:9 90:11
100:8,22 101:3
106:2,6 136:22
153:13,19,21,
22,24 154:1
155:4,5 173:22
180:15 181:23,
25 186:11
187:3,4 189:14
190:7 199:16
200:4,5,11
213:16 216:15
237:4

phoned
111:6

phones
213:16

photo
219:20

photographed
218:3

photos
84:20 219:3,4,
8,14,19,22

physical
103:3

physically
102:16

physician
102:20 115:13

pick
106:17 167:16
172:6

picked
156:7 160:6

picture
44:21 145:21
237:3

pictures
76:2

pieces
83:5

pile
119:6

pills
67:11,18,23
68:5 71:11
159:17

place
26:2 50:10
67:22 126:9
127:12,14
140:1,4 142:3
150:20 160:5
174:9 176:24,
25 177:2,3
178:16 185:19
204:21,24

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 101 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

207:3,6 232:24

**Plaintiff**
217:20 218:3

**plan**
11:14 18:14
86:17 101:14
126:4,5,24,25
127:4,23
145:2,12
174:18,19
181:8 221:19

**planned**
150:13

**planner**
252:13

**plans**
10:2 45:3
158:16

**plates**
137:22,24

**play**
162:9

**pocket**
85:16 247:25
248:11,13

**point**
9:7,11,16 15:1
21:20 29:24
30:24 32:21
48:2 52:9,16
71:4 93:23
97:20,22,24
98:3 101:17
103:16 104:24
105:10 106:7
108:18,20
109:4 127:15
129:6 137:19
139:3,6,11
140:2 143:3,11
144:23 145:25
146:21 147:2

149:3,6 152:9
153:23 155:22
157:6 174:17
181:5 186:3
195:17 199:7
200:5 201:9
214:24 216:9
224:14 227:15
241:7 246:3
247:24

**pointed**
209:17

**police**
60:3 167:7
168:25 169:8,
10,15 187:23
212:4

**pool**
8:7 69:3

**poorly**
149:13 191:24

**pornographic**
225:15

**portion**
87:19

**position**
96:20

**positions**
25:14

**positive**
64:3 94:20
134:7 175:4
199:6 235:14

**positives**
235:6

**possibility**
99:10 191:16

**possibly**
42:22 121:7
147:11 206:5
207:5 232:22

237:17 250:10

**potato**
176:10,12

**potential**
243:5

**pouch**
85:2,16

**pour**
71:9

**pouring**
102:8

**practice**
80:2 115:15

**pray**
221:22

**prepare**
7:13

**prepared**
250:6

**prescribe**
105:12

**prescribing**
79:23

**presence**
149:17

**present**
57:16 71:23
123:7 145:4
206:20

**presentation**
87:17

**presentations**
88:2

**presented**
22:1

**presenting**
144:5,8

**president**
23:7 24:16,18,
25 25:8 34:4

36:2 140:6
245:8 246:15

**President/
creative**
245:5,7

**presidents**
97:1

**pressure**
31:10 142:24
144:12,14,19

**pretty**
7:24 12:17,23
19:3,8 22:23
23:7,10 27:13
40:10 41:24
43:11 48:21
70:19 73:2
111:22 119:15
120:15 126:11
130:16 145:19,
21 146:23
148:13 154:5,
14 155:17
156:15 164:21
168:21 190:23
197:10 210:1
238:19 240:23
243:3

**previous**
16:22 49:19
136:6 144:21
167:4 197:25
200:1 205:12

**price**
5:13,15 10:2
243:23 247:17,
20

**priest**
42:9

**printed**
84:22 224:4

Case 2:21-cv-00972-BHL   Filed 03/31/23   Page 102 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

**prior**
18:21 65:17
74:15 79:14
81:6 144:14
147:21 165:16
222:6 227:7,8,
18 230:22
243:17

**priority**
130:8

**prison**
177:1

**private**
68:25 174:3
177:13,18
178:12 233:1

**problem**
60:14,17 116:1
143:6

**problems**
40:12 139:17

**procedure**
155:5

**procedures**
169:2

**PROCEEDINGS**
4:1

**proceeds**
251:4

**process**
39:11 40:6
99:23 113:12
168:23

**processing**
76:23

**produce**
27:6

**produced**
17:13,15 88:21
90:18

**product**
15:8

**production**
89:3 90:16
91:2

**productive**
40:18

**professional**
48:6,13 132:8
153:9

**prognosis**
9:10

**program**
11:23 16:12
18:3 38:9

**programs**
224:25

**progress**
121:24 123:18
156:16,22
164:19 235:8,
11

**progressing**
235:19

**project**
27:5,8

**projects**
40:20 248:19

**promise**
162:11

**pronounce**
47:4

**pronounced**
23:14,22

**proper**
113:25

**property**
227:25 241:18

**proposal**
29:25 30:1

**prostate**
9:7,13 117:12

**protection**
111:5

**protocol**
209:5

**proud**
104:17

**prove**
243:1

**provided**
20:1

**provider**
55:18

**providers**
57:8 58:16
64:14 65:4,5,
12 66:17,23
75:20 93:7

**psychiatric**
111:6 168:22

**psychiatrist**
46:5 111:7
116:10,11
124:4 135:16
173:7 177:8

**psychologist**
113:23 124:3
135:15

**public**
10:19 180:15

**pull**
28:24 201:21
202:25

**pulled**
28:4 166:6,15,
22

**punitive**
177:2 204:22,
23

**puppy**
228:3,7

**purchase**
247:3

**purchased**
25:21

**purge**
81:24

**purple**
230:12 233:22
234:15

**purpose**
161:17

**push**
112:7

**pushed**
140:4

**pusher**
124:25

**pushers**
125:5

**pushing**
158:4 204:4

**put**
12:9 17:7
20:14 21:2
27:7 29:8,25
32:17 40:4
49:6 61:17
62:9 67:11,15
68:5 69:23
78:6 83:7,9
85:8,12 90:14
91:1 114:3,5
116:19 119:10
122:18 124:11
125:8,10
132:22 145:22
146:17 173:7
175:25 201:16,
17 208:23

Case 2:21-cv-00972-BHL   Filed 03/21/22   Page 103 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

210:4 244:5,
14,15,17
248:18

**putting**
65:17 119:13
144:13 160:21
242:25

---

**Q**

**question**
5:1,3 28:13
34:9 35:24
45:9,23 46:2
77:20 82:7
108:2 112:19,
25 152:23
159:11 167:9,
14 175:12
188:22 193:18
194:2,18,21
197:14,19
202:12 205:5,7
209:1,2 239:24
242:5 246:24

**question's**
80:15

**questions**
20:18 32:11
79:1 105:24
174:13 188:9
251:14

**quick**
60:12 105:14
115:22 237:1
250:17

**quicker**
114:25

**quickly**
90:3 91:12
144:25 148:13
196:9

**quit**
129:12 131:14
246:14

**quitting**
129:20 131:10

**quote/unquote**
35:18

---

**R**

**R-E-I-M-E-R**
96:8

**rack**
209:17

**raised**
42:13 49:1

**raising**
48:25

**random**
42:17

**range**
161:23 208:9

**rapid**
107:5

**rate**
13:11 107:5

**rational**
59:5 186:9

**re-read**
197:18 209:1

**reached**
104:15

**react**
30:9

**reaction**
30:10

**read**
14:25 21:18
32:17 46:2
83:16,18 90:22

100:16 112:25
115:2 117:6
167:18 168:9
185:23 188:10,
25 196:23
197:3,19 209:2
211:18,20,21,
24 212:1,5
220:25 221:3,
5,6,12,14
222:3 223:18
225:19 231:15
234:22 235:18,
22

**reading**
75:1 83:1,10,
12 194:12
226:5

**ready**
246:4

**real**
28:9 57:6
80:15 82:7
105:14 120:6
122:2 178:17,
23 237:1
242:24 250:17

**reality**
123:4 157:14

**realize**
67:6 128:16
186:1 197:3

**realized**
30:23 144:17
174:22

**realm**
191:16

**realtor**
37:7 144:21,23
145:6 146:2,3
243:20

**reason**
66:14 103:9
108:15 152:3
206:11,19
218:23 221:18
245:11,13

**reasons**
36:7,16 66:11

**reassure**
55:10

**recall**
142:7 164:6
188:22 199:15
200:3,10

**recalling**
70:3

**receive**
252:6,11

**received**
8:3 200:19
216:9 244:1
249:4 252:3,24

**recently**
45:2 75:21
76:5,13 93:19
220:5 252:9

**receptionist**
96:7,8

**recess**
60:18 89:19
163:7 250:24

**recession**
23:5 26:1
28:19,25 44:9

**recognize**
120:11

**recollection**
21:15 69:19
75:14

**recommend**
178:12

Case 2:21-cv-00972-BHL    Filed 03/21/22    Page 104 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

recommendations
45:20 119:19

recommended
78:6 79:18

recommending
98:20 99:5,16
100:14

record
20:15 43:1
60:21 66:5,9
89:8 90:15,16
107:4 163:3
165:19 212:4

recorded
216:1

records
20:7,8,10,13,
22,23 21:4,10,
11,24 22:4
23:9 42:14,16
69:8 80:17
91:6 104:23
151:15 165:5,
15,16,20 168:9
250:11

recovered
9:12

recovering
137:18

recreate
154:1

Red
49:1

reduce
48:5,13

reduced
13:11

referred
87:7 177:15

referring
26:20 74:17

134:3

reflect
99:9

refresh
22:11 203:14

refreshed
21:13

regard
63:8 70:1

registered
139:1

regular
19:21 213:20

reigns
114:7

Reilly
18:17,21 189:7
190:12 192:2,
6,11,14
193:10,16
194:15,23
195:15 196:15
206:13 207:21,
24 208:22
209:11

Reimer
96:7

reiterate
65:11

related
22:12,14 37:4
44:6 59:25
60:7 107:11
116:24 119:1
145:11 155:15
215:1

relation
210:13

relational
123:21 124:1

relationship
17:1 23:10
40:11 41:9
88:15 135:21

relationships
40:20

release
122:20 185:6,7

relevant
91:7

relieve
31:10

religion
42:12

reluctant
92:20 98:23

relying
156:9

remain
168:15

remember
9:20 18:22,24,
25 19:17,19
21:5,8 25:15
26:3 27:5
32:18 33:14
35:3,12 39:2
41:23,24 42:4
46:7 50:18
51:5,16,24
52:16,18,23,25
53:9,21,22
55:17,21
56:12,21 57:3,
5,6 58:23 59:1
61:11,16,25
62:1,7 67:8
68:4,7,16
70:3,23 71:13,
14,19,20,24
72:3,6,14,15,
16 73:18,20

75:12,19 77:22
79:6 82:10,15
83:13,23,25
87:12,21 89:12
90:11,12 92:12
93:21 94:5
98:6 99:4,18
100:1,2,20,22
102:12 103:24
106:2,6,10,23
107:15,18
108:7,8,18
109:17 110:13,
22 111:15
113:9,10
117:14 118:17,
23 119:7
121:21 122:8
123:1 124:10,
13 136:16,24
139:11 141:18
143:17 148:10
149:7,19,21
151:9,17,20,
23,24 154:22,
25 155:14
157:25 158:18,
19 159:12
160:10,19
161:4 163:21
164:2,15,19
165:2,13,22
169:22 172:19,
23 174:14
175:7 181:9
182:3,5,8,11
184:4,6,13
185:2 186:18,
22,25 187:6,
11,15,20
188:24 192:24,
25 194:6 195:4
196:4,6,9
198:12 199:2,

Case 2:21-cv-00972-BHL    Filed 03/21/23    Page 105 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

16,24 200:5,
12,16 201:10
208:4 209:20
210:3,20
211:3,9,21
212:2,6,19,20,
21,25 214:14,
21 215:1,4
216:5,12,17
217:17 224:7
226:11 229:20
231:3 233:15
234:1 235:4
240:4 246:10
247:22 248:3,
14 250:3

**remembered**
75:21 76:1
104:12 195:16

**remind**
65:11,22
174:15

**reminded**
156:20 228:11

**remodel**
25:19

**remodeled**
27:11

**remodeling**
26:2,14

**remotely**
4:3 95:18
239:10

**removal**
37:12 248:22

**rent**
150:18

**rented**
150:19

**renting**
146:15

**Repair**
221:25

**repeat**
19:7 45:24
47:9 53:11
80:25 93:7
112:22 155:20
167:25 175:11
193:19 197:16

**repeated**
155:23

**replay**
198:22

**replaying**
198:7 203:22
204:18 212:10

**report**
163:12 215:18

**reported**
43:6 47:6 53:3

**reporter**
4:24 5:2

**representations**
116:5

**request**
88:17 89:8,9
90:24 91:5,8
154:4,8 219:22
243:15 251:15

**requested**
90:19

**require**
66:12

**reread**
5:3 112:24

**resign**
245:24

**resigned**
246:6

**resigns**

158:16

**resiliency**
95:1

**resistant**
173:8

**resource**
54:10

**resources**
59:22

**respect**
135:14

**respected**
125:1

**respond**
111:6 149:13

**responded**
123:25

**responding**
149:24

**responsibility**
157:16

**rest**
96:16 196:7
242:19 248:10

**restate**
5:2 31:20

**restored**
25:23

**restoring**
120:16

**restroom**
60:16

**result**
252:3,25

**results**
104:4,10,16,19
114:25

**resume**
17:5,8 230:6
244:5,21

**resurfaced**
126:21

**retained**
217:3

**retire**
10:7 126:24
127:18,23
130:2 131:22
132:19 133:23
134:21,24

**retired**
10:20 11:7,15
14:6,7 127:3,
6,17

**retirement**
11:12,14 13:5
128:1 252:12

**return**
105:7 143:25

**returned**
62:8

**review**
22:4 229:22

**reviewed**
165:14,16
212:3

**revisit**
205:18

**revisiting**
226:16

**Rexulti**
124:9

**Rica**
50:4

**rid**
144:21

**right-sided**
231:19

**ring**
180:20

Case 2:21-cv-00972-BHL   Filed 03/31/22   Page 106 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

Rivett
4:13 6:22 7:1,
10,16 9:24
13:15 14:20
17:5 19:10
20:2 24:16
26:13 27:1,16
28:14,17 29:3
30:23 31:15,
18,23,24 33:3,
4,8,10,17 34:3
36:2 37:16
38:17,22 39:5
40:7,11 41:21
43:17 44:13
45:9,19 46:20
47:7,24 48:12
49:12 50:1
52:5,11 53:13,
25 54:15 60:1
61:3,17 65:15
66:13 74:3
79:12 80:20
81:5,17 82:9,
25 83:22 91:7,
8 92:23 95:13
98:20 101:1,8,
23 111:9,18
112:3 113:20
117:18 119:23
122:6,23 123:8
124:2 125:7
136:12 139:9
141:6 146:5
148:7,22
149:17 150:5
151:21 156:20
157:7 164:7
167:11,23
168:6 179:8,19
180:4 181:3
183:4 184:24
186:12 187:4,
8,16 191:13

192:7,11,14
193:8,11
194:16 195:20,
23 196:5 197:9
200:15 203:11
207:9 208:2,6,
22 209:11
213:7 219:15
222:13 236:1
238:17 239:12,
13 240:1,5,12,
14,19 244:15
251:21

Rivett's
8:3 14:8 19:22
20:7 36:19,25
42:12 65:24
74:16,22
112:15 117:19
122:7 153:19
187:24 188:21
214:5 234:25
249:2 250:7
252:4,25

Road
4:10

Robin
175:6,13 182:5

rock
174:23

rocking
176:22

Rogers
228:25

role
23:6 64:22
65:10 161:17

roles
44:12

rolling
140:12

roof
158:17 159:11,
15,19

room
103:16 107:17
138:15 179:20,
21,22,23
180:19,23
195:21,24
196:2 203:3
210:11 211:14
234:21

rope
44:23

Rosanne
112:23

Ross
140:16,17
141:8

rotate
231:16

rough
152:14 164:12

roughly
13:14 25:5,24
50:3 102:15
135:5 210:16

rule
10:14

rules
4:18 34:17

ruminate
35:2

ruminating
35:15,21
110:14 166:10
197:23 206:19
226:16

ruminations
65:8

run
73:23 130:25
137:23 140:7

running
30:16 102:5
128:18 131:8
132:18 134:24
161:18,19

rush
104:8

Ryan
228:25 229:1

_____

S

S-Y-B-L-E
6:15

sabbatical
90:9 92:16
129:5

sadness
101:11 141:22

safe
59:16 71:7
73:11

safer
168:15 169:4

safety
59:9,15 60:3
99:2,24

salary
11:21 12:4,6
250:14

sale
7:8 8:4 9:4
37:5 143:5
145:23 146:17
241:8,24,25
243:17 247:4,
17,20 248:6
251:17

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 107 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

sales
  96:24 251:3
samaritarian
  239:6
sat
  122:14 136:25
  175:21 202:13
  204:6
satisfied
  159:1
saved
  7:16 223:8
  224:13
scan
  196:9
scare
  46:18
scared
  44:21 59:7
  62:12 64:4
  67:6 169:1
scene
  215:10 216:11
Schaumburg
  95:19
schedule
  48:5,13 59:13
  64:14,17
schizophrenia
  95:10
school
  5:17 6:13
  8:19,20 10:7
  12:3,25 13:12
school-year
  10:10
Schools
  10:19
Scott
  49:15,24

50:17,18 51:5,
  14
Scott's
  51:4
screwup
  138:2
scroll
  237:15
seconds
  166:20
security
  125:16 129:9
  236:3 245:17,
  23 246:12
  252:5,6,11,17,
  18
sees
  73:12 157:22
sell
  12:17 130:3,7,
  13,18,19,24
  131:20 132:19
  133:23 134:22,
  23 247:14
selling
  145:11,12
semester
  12:20
semi-retire
  131:22
send
  17:14 223:8
  224:14,25
sending
  131:7 225:15
sense
  31:11 95:3
  97:23
sentence
  76:15

separate
  14:1 62:24
separated
  39:21
separately
  16:18 39:21
  41:19
September
  14:9 44:1
  56:22 72:11
septic
  9:17,19 138:1
services
  98:21 100:15
  213:3
session
  41:5 42:2 57:2
  149:15
sessions
  45:7 52:17
  177:5,8,10
set
  7:18 20:15
  59:13 94:25
  111:22 139:15
  246:20
settled
  170:9 241:9,11
severe
  49:21
sex
  225:11
sexual
  38:10 41:5
  42:3 225:11
sexually
  37:22
shake
  4:22 175:20
  182:10 197:7
  204:2

shame
  102:7 122:21
  126:23 140:11
share
  249:7,8
shared
  83:17 106:13
  158:15 215:19
sharing
  79:6
she'd
  92:14
sheet
  196:19 212:20
  238:7
sheets
  209:16,18,19
  210:2,6
  211:11,13,17,
  19,22 212:7,
  22,23
Shelly
  95:23 96:19
Shelly's
  96:18
shelter
  243:21
sheriff
  171:9 172:6
  185:12
sheriff's
  169:6,7 188:2,
  4 189:16
  192:20 193:14,
  22 194:25
  195:19 196:11
  202:15 203:4,
  10 205:19
  208:5 215:5,
  14,23 216:3
shift

Case 2:21-cv-00972-BHL    Filed 03/31/23   Page 108 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

191:4 193:6
210:17,23

**shirt**
35:11 204:12

**shocked**
30:2 137:5,17
147:18 155:25
223:20

**shocking**
63:22

**shoes**
44:11

**shooting**
178:5

**short**
39:22 41:13
50:6 52:12
76:14 85:3,19
104:21 129:13
174:16 206:24

**shorter**
85:7 184:18

**shot**
50:15

**shouted**
166:4

**show**
67:11 77:8,20,
24 93:9,10
100:7 108:12
140:14 226:3
235:7

**showed**
75:10 116:20
117:2 168:25
235:4 245:14,
16 246:11

**shower**
56:16

**showing**
77:22

**shown**
110:18 128:14

**shows**
243:12

**shrunk**
146:11

**siblings**
75:5 85:7
224:8 240:19

**sic**
44:3 49:16

**sick**
139:5

**side**
55:11 116:23,
24 117:2,6
119:5,8 210:12

**sign**
22:5

**signed**
21:18,19 243:7

**significant**
84:20 164:19

**significantly**
71:3

**similar**
159:16

**sinking**
202:17

**sir**
202:2

**sister**
157:21,24
158:11

**sister's**
58:25 208:12

**sisters**
14:15 38:7
157:24 158:3,
10

**sit**
120:21 151:20
160:12 175:18
185:23 196:23
197:2,3 200:3
205:4

**sits**
90:6

**sitting**
156:25 176:21
235:21

**situation**
135:2

**skin**
92:9

**slammed**
155:22

**slash**
68:1

**sleep**
118:4 119:18,
20 176:3

**slept**
185:17

**slim**
243:4

**slitting**
142:11

**small**
75:3

**smaller**
223:1

**smiling**
101:12

**Smith**
147:24

**snow**
37:11 248:22

**snowball**
163:25

**social**
19:15 40:19
93:1 125:16
129:8 181:2,5
236:3 252:5,6,
11,17,18

**sold**
130:6 144:20
145:17 228:24
241:3,4,6,18
243:10,20,24
247:5,16

**someone's**
30:6 59:6

**someplace**
150:18,24
211:8

**something's**
129:4 139:3,4

**son**
16:5

**sooner**
31:5

**sort**
26:11,17,24
30:19 34:2,6
37:12 39:18
42:25 76:17
78:21 80:8
82:24 96:4
99:25 118:4
136:1,23
138:22 144:13
147:7 151:21
162:15,21
165:21 180:10
193:4 198:7
207:7 252:22

**sorts**
105:17 162:5

**sound**
58:21 60:6

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 109 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

82:3 149:16 250:22

**sounded**
62:16 197:1

**sounds**
136:9 154:10 226:5

**speak**
240:19

**speaking**
216:18

**spearheaded**
133:14

**special**
143:7 149:25 219:14 228:1

**specialized**
116:6

**specific**
9:21 35:3 52:25 53:22 55:18 62:7 71:14 82:7 96:25 106:6 127:4 158:16, 18 161:12 162:5 164:20 205:7 215:1

**specifically**
19:17 45:18 57:19 58:23 67:9 71:20,22 72:6,17 87:21 100:1 136:25 143:17 151:18 155:16 157:25 163:21 164:15 174:14 192:1 210:21

**specifics**
68:4 142:8 169:8

**speculate**
191:20

**speculation**
80:24 191:9

**spell**
17:3 54:7

**spelled**
17:4 23:18

**spend**
209:8

**spent**
50:4 104:22

**spike**
40:13

**spiked**
152:1

**spinning**
137:22 184:8

**spoke**
4:17 18:20 98:18,19 111:8 175:6 181:16, 18 195:19 200:8 208:2 209:17 214:7, 11,22

**spoken**
36:24 187:16 214:4

**sporadically**
71:11

**spouse**
132:7 163:16, 18

**spring**
94:16

**Springs**
101:21 103:23 114:23

**St**

138:6 243:20

**stabilize**
98:21 100:15

**stabilized**
52:12

**staff**
19:4,9,14,19 30:19 115:22 174:19 175:2, 13,24 180:18, 24 181:1,2,21 182:1,4,8 183:21 184:25 185:6 216:20 234:21 235:18, 21,23

**stage**
137:21

**stairs**
159:25

**stamp**
91:1

**stamped**
217:21

**stand**
15:8

**Stars**
49:1

**start**
8:1 27:21 64:25 71:12 90:13 102:14 114:13,16 122:12 126:19 127:2,4 128:11 132:13 175:1 183:7 203:19 205:10 230:11 231:19 252:19

**started**
7:19 13:20

28:8 34:13 35:1,14,21 41:8,17,18 50:10,11 78:2 85:23 88:14 92:19 96:16 102:16 103:14 105:3,9,19 110:1,4,5,8 113:21 115:14 116:23 120:9 123:11 127:24, 25 128:22 131:6 132:9 137:9 140:11 144:23 158:9 161:16,20 163:24 166:7 174:20 183:18, 22 198:6,7 203:21 205:17, 18 221:7

**starting**
44:10 49:19 79:4 97:13 102:10 114:19 115:9 119:6 164:9

**state**
4:7 154:14 190:19 195:7

**stated**
163:16 195:12 204:22

**statement**
81:4 194:3,19 195:16

**statements**
226:3

**States**
16:19

**station**

Case 2:21-cv-00972-BHL    Filed 03/21/23    Page 110 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

18:23 190:10
210:15 211:7

**stationery**
234:7

**stay**
13:23 16:11
24:18 52:12
97:21,23
128:17 150:23
151:3 162:20
171:22 173:4,5
174:1,16
177:24 182:14
183:24 191:23
205:20 206:5
209:24 212:16

**stayed**
114:8 171:7

**staying**
150:17 171:23
179:7,10,15

**steer**
66:24

**stemmed**
139:17

**stemming**
198:22

**STENOGRAPHER**
23:16,20 36:10
109:21 242:4

**steps**
112:2 169:4

**stick**
221:18

**sticking**
64:14

**stigma**
61:9 63:11,13,
16 65:21

**stop**
113:19,20

129:7 180:8
207:6

**stopped**
105:10 114:10
118:14

**story**
184:8 186:9
197:5 198:2
205:1,24

**straight**
108:10,12
239:24

**strange**
82:3

**strangely**
84:22

**stranger**
203:2

**strapped**
176:16

**street**
38:2

**stress**
28:22 29:15
31:9 33:18
40:16 42:23
50:21 131:21
133:24

**stressed**
43:11 185:18

**stressful**
23:7 39:10
48:21 189:5

**stressors**
40:16 117:15
119:6

**strike**
29:2 48:11
49:10 53:1,14
56:24 60:24
74:2 103:12

168:2,16
184:23 189:8
195:22 217:1
238:13 241:3
252:17

**strong**
55:14 75:14
76:17 127:13
128:13 144:10

**stronger**
114:5 136:2

**structure**
132:23

**struggle**
6:16 44:2 58:1
157:1

**struggled**
27:13 56:18
70:15 96:11

**struggles**
44:7

**struggling**
28:17,20 42:10
68:15 78:4
93:5 100:4
119:24 132:17,
22 133:4,6,20
160:7

**stuck**
134:15 183:24
212:8

**student**
15:13,18,24
17:25

**stuff**
45:17 82:1
83:17 84:25
85:12,17
135:10 144:3
153:22 171:11
200:23 211:9
230:19 251:11

**Sturgeon**
150:24 152:5

**style**
56:8 148:16

**subbing**
12:21

**Subject**
99:10

**substitute**
10:19,24 11:3,
5,15,19,24
12:8

**substitutes**
11:10

**success**
131:8 136:7

**successful**
28:3 102:6
134:2

**sudden**
246:10

**suggest**
113:5,7

**suggested**
46:6 48:19
111:21 118:5
245:24

**suggesting**
157:6

**suggestive**
107:9

**suggests**
74:14

**suicidal**
19:23 20:3
21:22 22:13
43:6,17,21,25
44:3,14 45:2,
10 47:18,24
55:23 56:13,20
60:8 66:1 67:3

Case 2:21-cv-00972-BHL   Filed 03/31/22   Page 111 of 119   Document 69

69:10 70:17
71:4 72:5,24
78:20 79:13
80:7,21 81:6
89:22 101:13
107:6 109:9
110:1 113:15
142:10 151:21
154:15 157:20
167:3,12
174:12

**suicide**
42:17 49:13
50:14 52:2
55:15 57:15
71:22 72:12
164:9 172:11,
12 208:7,23
209:4,12

**summary**
20:24

**summer**
10:25 18:9
62:1,6 64:25
68:14 70:20,22
71:2 147:8

**summers**
11:1

**Sunday**
53:18 104:20

**supplement**
118:4

**supplements**
118:2,3 119:3,
10,14,16,21
176:1

**support**
28:5 30:15,19
52:18 58:9
119:2 132:11
180:18 181:1

**supported**
26:12 128:3

**supporter**
130:17

**supporters**
30:5 31:10

**supportive**
43:14

**supposed**
7:21 114:23
116:14 170:25
171:8 252:10

**supposedly**
206:24

**surgery**
85:9 86:2
138:8,11

**surprised**
190:21

**survivors**
38:10 41:6

**swam**
64:7

**swim**
64:10

**swimming**
62:22,23 64:6
68:21 69:2

**switch**
166:11 198:4
217:5

**switchboards**
187:13

**switched**
165:1

**sworn**
4:3

**Syble**
6:15

**symptoms**
103:5 117:12
118:10,23,24

**syndrome**
107:9

**system**
8:19

---

**T**

**tag**
79:21 136:5

**takes**
163:17

**taking**
11:10 24:4
33:13 49:8
57:9 70:23,25
75:12 110:6,11
114:6,8 122:3
143:25 162:3
181:12 252:16,
19,20

**talk**
10:15 19:4,9
34:4 36:4,14
55:12 58:8
66:19 67:15
70:7,9 87:11
92:14 95:12
120:21 121:25
123:7,14
125:16 126:10
127:16 131:3,
4,18 137:6
145:6 153:13
160:2,17
162:25 167:23
168:6,13
175:23 179:25
180:3,18
181:1,14,21
182:4 183:21

184:24 190:24
198:17 205:4
206:18 208:18
216:18 236:22
239:1,11 244:4
246:1

**talked**
36:18 52:10
53:7 58:10
65:16 68:2
71:4 75:15
79:8 80:6
87:20,21 92:13
109:25 119:13
122:16 131:2
138:7,21
148:25 149:19
154:12 176:5
177:14 183:25
184:16,21
185:4 186:20,
23 187:7
192:20 197:22
199:6 201:24
216:22 222:13
230:3 238:14,
18 239:17
240:8,16,22
253:2

**talking**
15:16 18:24
47:17 53:19
61:16 70:4
75:12 80:5
82:10,11 87:15
90:12 91:23
98:3 105:3
107:15 108:19
120:9 121:2
140:19 146:14
152:21 155:14
166:23 174:14
182:8,24

183:15 185:14 186:25 187:4 191:11 196:2 198:20 199:14, 17 200:1 201:17 203:11, 23 205:10 215:21 220:24 232:24 236:9 240:5,14 245:21 251:3

**talks**
223:13

**tax**
250:10

**taxes**
247:16,23 251:3

**teacher**
10:19,24 11:15,19 12:8

**teaching**
11:3,5,24

**team**
79:22

**teaming**
136:5

**telephone**
9:2 55:1 60:25 101:2 180:4 214:9 216:14

**television**
139:24 141:9

**telling**
80:3 97:11 102:24 109:17 119:23 132:16, 18 154:22,25 160:11 184:4 194:15 195:5 198:12 199:2 220:22

**tells**
191:14,17

**ten**
23:10 139:17

**ten-year**
29:9 31:3

**tennis**
162:9

**tension**
225:12

**term**
33:14

**terms**
9:8 11:25 32:13 36:5 42:6,12 102:20 112:4,15,16 216:20 250:1,7 251:16

**Terry**
5:13

**test**
45:25 70:6 116:15,17

**testified**
4:3 207:8

**testimony**
43:20 112:20 207:14

**testing**
105:21 110:18, 19 116:13 117:17

**tests**
105:17

**text**
153:11,20 154:4 156:13 225:20 234:9

**texting**
136:22

**texts**
154:2

**thanked**
87:21 187:17

**therapeutic**
114:1 123:16

**therapist**
6:20 41:12,15 54:3,16 58:10 59:1 71:3 153:7 160:20 208:19

**therapy**
39:18,19 40:2 41:5 42:2,7 46:13 66:19 79:21 91:6 99:17 105:4,13 111:22 112:4

**there'd**
126:14

**thicker**
234:2

**thing**
21:18 26:12,24 30:19 32:25 33:1 34:2,6 37:12 42:25 48:25 49:4 63:19 64:3 68:6 76:17 78:21 80:8 83:9 88:9 89:7 96:4 99:18,25 103:21 105:14 109:6 118:4 125:6,18 126:11 136:1, 24 140:10 144:13 147:7 155:3 156:11 162:15,21

163:5 165:21 180:10 184:10 186:24,25 188:10 193:4 197:22 198:7, 19 200:17 207:7 212:7,20 233:7,9,23 246:9,19

**things**
12:19 22:2,3 30:9 31:11 35:4,13,15 45:16 57:20,22 59:15 65:9 66:17 67:1 68:10 70:13 72:5 73:16 76:23 79:5 80:3,6 81:25 82:4 84:13,14, 17 85:14 86:23 94:20 95:4,20 97:10,18 102:22 103:24 106:4 117:7 118:2 119:20 120:5,19 121:18,20,23 122:16 123:2, 3,14 127:10 128:15 135:13 141:11 146:14, 22 153:5,14 156:18 158:24 159:7,9 160:16 161:21 162:4,5 164:1 170:20 171:8 174:24 183:20 193:3 194:5 198:23 201:10 203:17 208:12 215:18, 20 219:21

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 113 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

221:17 224:25
225:21 228:1,
16,20 229:22
231:13 235:18
248:1,22

**thinking**
75:17 94:24
102:16 103:19
105:6,20
110:14 126:19
147:13 156:17
163:24 165:19
184:11 185:22
186:2 191:20
204:24 206:10
212:21 220:11

**thinks**
199:17 218:14

**thought**
31:6,12 39:23
59:23 62:17
64:24 77:2,14
84:10 91:24
93:19,20 97:4
101:14 102:1,
13 103:21
104:5,9,13,21
109:25 114:24
122:17 129:20,
24 131:10
136:1 152:15,
16 156:23
160:15,25
165:4 169:2,9
170:10 177:25
186:9 192:2,9
193:13 194:4
202:22 209:3,7
215:6 216:3,7
218:21 223:19
224:10 233:21
234:21 242:13
246:12

**thoughts**
42:17 43:17,22
55:2,14 56:13
57:14 63:24
69:10 70:17
71:22 72:12
78:20 101:9
110:12,15
128:2 154:16
164:8 174:12

**thousand**
102:10 164:4
176:14 244:1

**threat**
33:12

**threaten**
172:11,12

**threatened**
33:4,9 192:11
209:12

**threats**
19:23 22:13

**three-quarters**
72:9

**threw**
53:6 176:15

**throat**
138:23 142:11

**throwing**
53:17

**Thursday**
200:20

**till**
10:17 38:5
148:21

**time**
5:6,8 7:17
10:5,23 15:22
18:15,24 19:12
21:4,12 22:12
23:7 24:8

25:12,13 26:15
27:3,14 28:14
29:8,9,12 30:4
31:3,8 33:1
35:9 36:2,3,9
38:3,12 39:7,
8,10,22 40:2
41:13 42:21
43:3 45:19
48:20,21 50:6
54:12 56:10
58:19,23 59:25
62:3 63:19
64:9,19,20
67:2,24 68:8
69:2 71:1,12,
17 72:20 73:24
78:9,11 79:2
80:12,25 82:18
84:20 86:11,19
88:3 91:15
92:16,25 93:3,
24 95:18,25
96:21 97:12,14
101:21,22,23
106:7,22
108:21 109:2
111:20 117:13
119:9 122:14,
15 124:12,23
125:15 128:1
129:2 134:9,23
136:11,21
140:13 141:12,
17 143:8,9,18
146:7 151:4,5
152:13 154:7,
12 157:22
158:1 159:14
160:10,19
161:13,23
162:8,11,19,25
164:18 170:10,
16 171:13

173:11,23
175:23 176:20
177:21 180:2
181:13,16,19,
22 182:20
183:7 184:8
186:4 187:7,9,
10 189:5,14,
17,23,25
199:11,13
203:3 205:15
206:24 208:13
209:8,9,15
215:14 219:4
228:15 229:7
231:17 232:4
240:9 243:3
244:23 251:11

**timeline**
165:9

**times**
18:17,20 20:2
21:21 38:25
39:3 54:2 56:3
57:7 61:15
67:10 68:8
69:24 99:22
100:1 107:17
109:15,16
117:6 122:13
139:2 159:13
161:3,5 162:1,
16 172:17
180:3,5 181:7
201:25 208:15
214:2 219:19
238:18,20

**tingling**
107:24

**tired**
57:9,10 119:25
162:20

Case 2:21-cv-00972-BHL    Filed 03/21/23    Page 114 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

**title**
  215:4

**titles**
  96:25

**today**
  43:20 58:25
  110:25 151:21
  157:3 165:17
  189:4 200:3
  208:11

**told**
  18:8,9 28:9
  29:11 30:3
  38:2,4,6 39:22
  44:1,19 45:1
  56:19 59:8
  62:8 63:4,25
  65:19 69:24
  74:12 75:13
  79:17 80:19
  81:4 83:11
  87:22 94:9,10
  97:7,17,22
  100:18 105:17
  108:25 109:18
  111:4 134:1
  139:25 141:18
  148:7,20
  149:17,21,23
  157:21 158:15
  162:14 164:7,
  20 166:16
  167:21 168:21,
  22 170:6
  171:5,11 172:5
  176:11 186:24
  189:16,20
  192:5 194:23,
  25 195:5,6,10,
  11,14 196:11,
  22 197:11
  198:18 200:9
  201:13 202:14,

  16 203:7
  205:19 206:22
  207:8 208:13,
  22 209:11
  211:16,25
  212:5,15 215:9
  219:6 235:4,9,
  20 236:19
  245:14,23
  246:8 252:2

**tomorrow**
  185:9

**tonight**
  136:14

**top**
  29:19 51:17
  61:18 62:10
  232:3 237:19
  241:21 248:15
  250:4

**tore**
  83:6

**torn**
  234:5

**totaled**
  204:12

**totally**
  30:3 92:6
  113:22 137:5

**touch**
  176:24

**town**
  29:18 135:7

**toxic**
  22:23 23:10,13
  24:5 225:12

**track**
  162:4 231:10

**trade**
  5:16,17

**training**
  8:21,23

**transcribed**
  188:12

**transcript**
  4:1 188:7,14
  194:13,22
  203:9 253:12

**transcription**
  194:19

**transferred**
  153:21 171:17
  178:11 235:11

**transpired**
  76:21

**transportation**
  172:1,3 196:19

**transported**
  171:9 172:5
  178:1 192:15,
  17 199:4

**trauma**
  126:20,21

**travel**
  179:14

**treating**
  157:7

**treatment**
  46:8 63:10,14
  66:13 99:3,5

**trigger**
  158:24

**trip**
  103:23 104:5
  114:23

**trips**
  6:11 103:16

**trooper**
  162:21

**true**

  8:21 9:17
  19:10 31:19
  40:8,12 44:16,
  17 45:21 79:15
  99:17 100:19
  106:9 111:24
  112:1,17
  125:12,13
  154:18 168:20
  180:12 186:10
  192:12,13
  193:12,16,25
  195:1 198:24
  206:13 209:13
  227:22,23

**trusted**
  251:11

**truth**
  156:1 195:15

**Tuesday**
  170:24 171:6
  181:10

**turn**
  126:3,7 211:11

**turned**
  166:11 198:5
  243:21

**turning**
  82:12 128:1

**TV**
  142:1

**type**
  72:14 83:9
  122:24 123:7
  124:1 163:5
  196:4

**typed**
  88:9 219:17
  223:7

**typical**
  55:11

Case 2:21-cv-00972-BHL    Filed 03/31/23    Page 115 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

**U**

**U.S.**
143:22 146:21
147:3,16,20,23
149:7 241:6

**uh-huh**
4:23

**um-hmm**
5:24 9:12
11:20 22:25
24:1 47:5 72:2
107:10 120:3
131:24 134:25
140:15 189:11
214:3 220:8,11
222:5,17 227:2
234:17 244:18
245:4,10 247:7
249:10

**uncannily**
50:25

**uncertain**
102:20

**uncle**
16:25

**unclear**
218:14

**uncomfortable**
51:25

**underneath**
238:7

**understand**
5:1,5,11,15
32:4,22 86:20
155:2 167:24
214:7

**understanding**
22:3,22 27:1
31:14,21
32:12,24 39:17

43:20 74:1
79:17 80:4
116:12 135:21
170:4 172:2
182:19 191:11
213:17 235:13,
22

**understood**
5:4

**unfair**
221:21

**unique**
143:7

**unit**
111:7

**United**
16:19

**university**
18:3

**unpacked**
85:17

**unraveling**
90:3 91:12

**unresolved**
58:17 65:7
120:12

**unresponsive**
200:21

**updated**
97:17

**upper**
220:17 221:15

**upset**
81:22 106:15
155:17 170:8
171:21 173:15
176:5 183:13
203:18

**upside**
185:21

**utilities**
26:11 37:10

**utility**
37:8 248:21

**UW-GREEN**
8:12

**UW-OSHKOSH**
8:16

**V**

**V-O-S-S**
133:11

**vacation**
101:16 179:12

**validated**
35:16

**vehicle**
164:24

**verbally**
4:21 189:12

**versus**
243:13

**vice-president**
96:21,23

**vice-presidents**
96:22

**video**
87:11,14,15

**view**
109:1

**Vincent**
138:6

**Vineyard**
18:5,11

**Virgina**
18:7

**visit**
19:11 46:17
68:23 101:20

104:21 154:10
165:12 170:19,
21,22 178:19
182:13 183:2
187:17 207:7
210:19 213:22

**visitations**
170:23

**visited**
172:17 182:20
183:4 210:23
220:6

**visiting**
19:12 74:19,25
76:9,10 77:12,
17 158:2
170:17,18
182:2 183:9
191:13 209:16
218:13,20

**visitor**
179:19 182:18

**visits**
173:21 210:18

**voicemail**
181:14

**volunteer**
25:14 50:5

**Voss**
133:2,11 204:5

**W**

**W-L**
56:24

**wait**
10:16 139:21
169:15 186:5
207:1 230:5

**walk**
24:6 108:12
115:21 122:9

Case 2:21-cv-00972-BHL    Filed 03/31/22    Page 116 of 119    Document 69
www.phippsreporting.com
(888) 811-3408

131:16 159:24,
25 169:18

**walked**
15:10 122:15
168:1

**walking**
108:10

**walks**
120:23

**wanted**
18:14 29:4,5
31:16 32:9
34:15,16 35:17
40:22 57:10
66:15,16 70:6
73:13 76:22
85:11 86:1,18,
23 87:25 88:6
104:4,5 112:3,
16 131:14,17
140:1,5 150:24
152:4 153:6
173:7 174:7,25
180:7 219:1
225:10 228:2,8
236:21 245:15
246:7 247:9
248:7 251:25

**wanting**
61:5 124:15
135:14 198:14

**warning**
249:21

**warrant**
203:20 206:13

**warrants**
203:11 205:10

**wash**
7:24

**washed**
210:1 211:12

**watch**
160:24 200:24
208:23 209:4

**water**
37:11 248:22

**Waukesha**
19:4,9 169:6
170:1 171:20
172:4 173:7,
14,16 175:4
177:25 179:8
181:4 182:14
184:25 188:1
189:9 193:21
195:24 196:18
200:18,22
203:12 205:21
206:15 214:4
215:5,13
216:16 227:17,
19 239:13
240:1,13,20

**ways**
28:22 40:19
49:22 58:9
103:7 121:17
130:17

**wean**
105:5 153:8

**weaned**
70:24 78:10
116:21 117:18
136:10

**weaning**
110:16

**wedding**
219:20

**Wednesday**
177:16 178:7

**week**
9:23 19:20
57:24 83:17,21

99:1 109:16
111:2 121:8
185:17 197:25
199:9 210:2
223:23 224:5

**weekend**
59:17 73:22
111:4 151:6,
12,13 163:14,
20

**weekends**
59:11,12 64:15
70:15

**weeks**
48:7,14 57:24
69:11,14 78:13
110:8 121:6
135:5,6 152:21
156:21 163:13
205:13 226:14

**weird**
108:9

**Wendy**
54:6,24 61:1,
12,13

**West**
35:9 179:12

**Westbound**
26:20

**whatsoever**
148:6

**wheels**
108:25 186:2

**whispered**
136:13 187:17

**wife**
117:25 118:19
239:8

**window**
92:8

**windows**
212:15

**wing**
15:10 123:22

**Wisconsin**
4:10 6:4 18:11
39:14 62:22

**wise**
173:17

**wit's**
90:3

**withdrawal**
116:25 119:8

**WL010886**
44:3

**woke**
67:5

**wolf**
58:22 59:2
208:8

**woman**
15:5,12,16
41:23 158:21
211:4,5,6
214:10,21
215:2

**women**
127:9 247:11

**wondered**
33:23

**wondering**
90:4 91:13
220:13

**word**
195:8 208:7

**words**
21:2,21 136:17
137:3 138:24

**wore**
103:22

www.phippsreporting.com
(888) 811-3408

**work**
  6:13 7:22 9:19
  10:18 11:15,
  18,22 12:1,6,
  11 13:6 15:2
  16:20 18:4,10
  25:16 33:2
  40:16 41:16
  50:5 56:17
  62:8 64:16,20
  74:10 79:20
  84:4,13 90:10
  92:24 94:1,19
  96:12,14 97:13
  100:7 104:13
  105:24 106:8,
  21 112:12
  114:1,18
  115:7,14
  117:14,15
  119:24 120:1
  123:7 125:20
  126:2 129:3
  130:23 131:19,
  21 132:20
  141:3 159:1
  162:7,15,16,23
  177:21 213:8,
  9,16 220:20
  221:16 227:6,
  9,13,14 228:22
  246:6,7,11,14
  247:10

**worked**
  8:16 10:25
  11:11 12:2
  16:3,22 28:14
  31:22 40:6
  49:19 50:5
  77:6 79:18
  95:18,21,25
  135:24 137:15
  142:7 143:2
  239:4 241:5

**worker**
  19:16 170:6
  181:2,6

**working**
  5:19,25 12:22,
  23,24 22:22
  26:22 27:17
  35:6 50:7,10,
  11 78:2,6
  105:9 120:6
  127:20 129:8,
  12 130:5
  139:15 142:5
  144:23 153:23
  160:3,14
  161:22 169:3
  238:24

**workplace**
  24:5 84:14

**works**
  5:17 239:9

**world**
  178:3

**worn**
  103:23

**worried**
  90:5 91:12,13

**worry**
  24:10 30:7
  33:21,25 140:8

**worse**
  73:16

**worsening**
  55:3

**worst**
  61:3 102:22

**worth**
  7:12

**wrapped**
  151:8

**wrist**
  68:1 163:17,22

**write**
  75:15 76:22
  86:1,14 122:19
  160:12 172:24
  204:13 220:9,
  10 230:15
  234:18 238:2
  248:1

**Writer**
  73:12 100:10,
  14

**writing**
  76:22 82:1
  122:19 209:20
  220:14,18
  221:7,10 231:6

**writings**
  234:22

**written**
  32:20 75:8
  82:21 83:20
  226:14 227:7,
  16,17,18
  236:13,14
  237:6

**wrong**
  34:14 35:3
  63:15,16
  102:17,25
  103:21 104:6
  105:2 106:16
  149:18 152:6
  171:4 204:18
  220:13

**wrongly**
  203:25

**wrote**
  21:14 22:18,19
  51:13 74:3
  75:5,9,23

  81:23 82:5,14
  83:2,7,23
  89:11,13 104:8
  172:24 175:7
  220:12 225:23
  227:5,12,21
  230:17 234:3,
  19,24 235:5,12
  236:17

---

**X**

---

**Xanax**
  24:3

---

**Y**

---

**Y-O-U-N-G**
  96:19

**year**
  10:7 11:4,8,11
  12:13 13:9
  16:14,18 38:4
  39:1 49:3 50:4
  54:11 79:13
  80:22 81:6
  102:8,14 127:4
  128:12 134:5
  152:11 159:4
  161:16 213:4
  219:5 248:7
  250:8

**year's**
  12:4,6

**years**
  8:16,17,19
  12:3,7 15:23
  16:10 18:5
  23:11 32:24
  34:3 35:21
  40:11 41:10
  85:21 125:25
  126:1,6 127:24

Case 2:21-cv-00972-BHL   Filed 03/21/23   Page 118 of 119   Document 69
www.phippsreporting.com
(888) 811-3408

128:19 130:23,
25 131:20
133:23 139:17
199:1 244:22

**YMCA**
39:16

**young**
15:5,12 96:19

**youngest**
14:24

**youth**
8:18

**Youtube**
87:11,14,15

**Yunker**
15:19

---

**Z**

---

**Z-E-R-A-T-S-K-Y**
54:25

**Zeratsky**
54:24 61:1

**zippered**
85:2,16

**Zoom**
92:4

Case 2:21-cv-00972-BHL     Filed 03/31/23     Page 119 of 119     Document 69
**www.phippsreporting.com**
**(888) 811-3408**