UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF JAMES RIVETT,

        Plaintiff,

  v.                                    Case No. 21-cv-0972-bhl

WAUKESHA COUNTY, et al.,

        Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

On August 23, 2018, James Rivett hanged himself from a bathroom door at the Waukesha County Mental Health Center (WCMHC) where he had been involuntarily committed only days prior. As personal representative of Rivett's Estate, his widower, Peter Angilello, subsequently filed this Section 1983 lawsuit, seeking to hold Defendants Waukesha County, Psychiatric Technician Kevin Reilly, and Psychiatric Technician Bregitta Peavy accountable. The Estate's complaint alleges that all three violated Rivett's Fourteenth Amendment rights, causing his suicide. Defendants have moved for summary judgment. Because the record cannot support a finding of liability against either Waukesha County or Reilly, the Estate's claims against both will be dismissed. But because a reasonable jury could find Peavy's actions objectively unreasonable, the claims against her must proceed to trial.

### FACTUAL BACKGROUND[1]

On August 16, 2018, during his monthly appointment with psychologist Dr. Jennifer Christenson, James Rivett divulged his present intent to commit suicide either via hanging or overdose. (ECF No. 89 at 11.) Alarmed, and believing that Rivett needed immediate inpatient treatment, Dr. Christenson called 9-1-1. (*Id.* at 12.) Jon France of the Waukesha County mobile crisis intervention team responded and, after a brief evaluation, agreed with the doctor's

---
[1] These facts are drawn from the parties' proposed statements of undisputed facts (and responses). (ECF Nos. 89 & 96.) Disputed facts are viewed in the light most favorable to the Estate of James Rivett as the non-moving party.

assessment. He placed Rivett on emergency detention and transported him to WCMHC. (*Id.* at 12-13.)

At WCMHC, Rivett admitted suicidal ideation but denied intent. (*Id.* at 13-14.) Because of this, staff scheduled him for observation and safety checks every 15 minutes, a precaution commonly taken in mental health facilities when patients pose some risk of suicide. (*Id.* at 14.) Over the next several days, Rivett appeared to show improvement. He denied both suicidal ideation and intent, expressed forward-looking sentiments, and displayed appropriate behavior, affect, and mood. (*Id.* at 17-23.) He also registered his satisfaction when informed that he would be transferred to Brown County Mental Health Center (closer to his home in Green Bay) on August 23, 2018. (*Id.* at 16-17.)

Unfortunately, Rivett did not maintain his positive trajectory. His sister, Julia Rolfsen, visited him the night before his planned transfer to Brown County. (*Id.* at 24.) She left in tears. (*Id.* at 25.) On her way home, she relayed to Peter Angilello (Rivett's husband) that Rivett had threatened suicide. (*Id.*) Angilello then called Rivett. (*Id.* at 25.) In the ensuring conversation, Rivett insisted that he had sneaked a peek at a nurse's call sheet and learned that the supposed Brown County transfer was a cover story; the FBI was actually on their way to arrest and imprison him. (*Id.* at 24-25.) Angilello and Rolfsen conferred and decided to call the WCMHC staff and inform them of this latest development. (*Id.* at 26.) But because they did not want to delay the transfer to Brown County, they agreed not to tell WCMHC staff about Rivett's explicit threat to kill himself or the extent of his delusions. (*Id.*)

At 9:53 p.m., Angilello phoned WCMHC and spoke with Psychiatric Technician Kevin Reilly. (*Id.* at 2, 27.) The exact contents of their conversation are disputed. But it is undisputed that, at a minimum, Angilello raised general concerns about Rivett's welfare and asked that staff check up on him. (ECF No. 96 at 9.) It is also undisputed that Angilello did not tell Reilly that Rivett had threatened suicide. (*Id.*; ECF No. 89 at 27.) And everyone agrees that Reilly did not document the contents of this phone call, nor did he share details of the conversation with fellow staff members. (ECF No. 96 at 11.)

Reilly did, however, keep his promise to check on Rivett. The two interacted twice after Angilello's phone call, and on both occasions, Reilly noted amiable demeanor, eye contact, and forward-looking sentiments. (ECF No. 89 at 29.) Other staff members who interacted with Rivett that night agreed that he did not display any outward indicators of suicidality. (*Id.* at 30-31.)

Sometime between 11:15 and 11:30 p.m., Psychiatric Technician Bregitta Peavy relieved Reilly. (ECF No. 96 at 12.) From that point until 7:00 a.m. the next morning, Peavy was responsible for performing Rivett's observation and safety checks. (*Id.* at 13, 19.) According to WCMHC policy and training, a psychiatric technician conducting an observation and safety check must enter the patient's room and look or listen for signs of breathing. (ECF No. 89 at 3.) If the technician sees or hears breathing, the check is sufficient. (*Id.*) If a patient is in the bathroom during a safety check, the technician must knock on the door. (*Id.*) If the patient responds appropriately, the technician is to afford them privacy, though the technician must physically see the patient during the next round of checks. (*Id.* at 3-4.) For every check she performed from late on August 22 through the early morning hours of August 23, 2018, Peavy recorded that Rivett was "resting quietly with eyes closed." (ECF No. 96 at 15.)

Around 7:00 a.m. on August 23, 2018, Psychiatric Technician Brian Leon relieved Peavy. (ECF No. 89 at 36.) Shortly before 7:36 a.m., Leon entered Rivett's room. (*Id.* at 37.) He did not see Rivett in his bed, so he knocked on the bathroom door. (*Id.*) When Rivett did not respond, Leon opened the door, and as he did, Rivett fell to the floor with a bedsheet wrapped around his neck. (*Id.*) Rivett was pronounced dead about an hour later. (*Id.*)

Rivett's was the first completed suicide at WCMHC in at least five years. (*Id.* at 42.) As recently as December 2017, however, a patient had attempted suicide in a similar fashion. (*Id.*) In response, WCMHC ordered four ligature-resistant bathroom doors, with plans to get more if the initial batch proved successful. (*Id.* at 39.) The first four doors were installed in May 2018, and another 20 were ordered later that same month. (*Id.*) While waiting for the additional doors to arrive, WCMHC policy instructed staff to "use the 4 rooms with ligature resistant doors for those individuals who are identified as high risk through active suicidal intent and actions." (*Id.*) "In the event a room with a ligature resistant door is not available, 1:1 staffing may be considered." (*Id.*) Because WCMHC did not consider Rivett a patient with "active suicidal intent and actions," he was not placed in a room with a ligature-resistant door. (ECF No. 96 at 5.) And although the 20 new doors arrived on August 21, 2018, (two days prior to Rivett's suicide), they were not installed until a few days later. (ECF No. 89 at 39-40.)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed.

R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *See E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.432, 437 (7th Cir. 2000).

## ANALYSIS

Rivett's Estate highlights several inflection points at which, it argues, an objectively reasonable intervention would have prevented the tragedy that spawned this case. It contends that individual Defendants Kevin Reilly's and Bregitta Peavy's failure to make these interventions establishes their liability for Rivett's suicide. The Estate also blames Waukesha County, itself, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Defendants seek summary judgment on each claim. The motion will be granted with respect to the claims against Reilly and Waukesha County because, on the record as currently constructed, no reasonable jury could hold either liable. But disputes of fact preclude resolution of the Estate's claim against Peavy at this stage, and that claim must proceed to trial.

**I.  A Jury Could Not Find Kevin Reilly's Conduct Objectively Unreasonable.**

As the Estate sees it, a reasonable psychiatric technician in Reilly's position could have prevented Rivett's suicide twice over. First, by pressing Angilello to explain exactly what triggered his sudden concern for Rivett's well-being the night of August 22, 2018. (*See* ECF No. 81 at 1.) And second, even in the absence of that information, by documenting Angilello's worried phone call and making other staff members aware of it. (*Id.* at 2.) Because he took neither of these steps, the Estate casts Reilly as a constitutionally deficient custodian who willfully elected ignorance and consciously chose to conceal life-saving information. (*See id.* at 13-14.) While, in retrospect, Reilly could perhaps have done more to ensure Rivett's safety, that is not the standard for Fourteenth Amendment liability. A defendant is only liable if he acted objectively unreasonably given the facts and circumstances concurrently known. It is irrelevant whether, with the benefit of hindsight, he might have taken a different approach. On the record before the Court today, no rational jury could conclude that Reilly's actions were objectively unreasonable, and he is, therefore, entitled to summary judgment.

"Claims concerning the conditions of confinement of civil detainees are assessed under the due process clause of the Fourteenth Amendment." *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). "[A]n objective standard applies to [these] claims." *Pittman ex rel. Hamilton v. Cnty. of Madison*, 970 F.3d 823, 827 (7th Cir. 2020). "Under this standard, the jury must answer two questions." *Id.* "First, it must decide whether the defendants acted purposefully, knowingly, or perhaps even recklessly." *Id.* (citation omitted). "Second, it must determine whether the defendants' actions were objectively reasonable." *Id.* (citation omitted). The "first inquiry encompasses all state of mind except for negligence and gross negligence." *Id.* at 827-28. The second inquiry asks whether the defendants' actions were objectively reasonable "in light of the totality of the circumstances." *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020).

To survive summary judgment on the first inquiry, the Estate must produce evidence from which a reasonable jury could conclude Reilly was either "aware that [his] actions would be harmful" or "strongly suspected that [his] actions would lead to harmful results." *Pittman*, 970 F.3d at 828 (internal quotations omitted). Suicide is obviously a "harmful result." And Reilly obviously considered Rivett a suicide risk—a mental health facility would not impose regular safety checks on an unshakable bon vivant. But these facts, alone, are insufficient to establish liability. Indeed, Rivett was *already* on suicide watch at the time of Angilello's call. Unless that call created reason to implement even greater precautions, there is no evidence that Reilly acted (or failed to act) purposefully, knowingly, or recklessly.

The Estate admits that Angilello did not tell Reilly that Rivett had just threatened suicide. Instead, he expressed only a vague sense of concern and asked Reilly to pay more attention to Rivett. (ECF No. 82 at 128:4-8.) Reilly did just that, but neither he nor anyone else who observed Rivett that evening noticed any warning signs. (ECF No. 89 at 29-30.) Of course, the character of the investigation might have changed had WCMHC staff known of Rivett's recent threat to commit suicide. But Angilello deliberately withheld that critical information. Yet the Estate faults Reilly for failing to intuit it. Comparing him to the apocryphal ostrich with its head in the sand, (ECF No. 81 at 17), the Estate argues that Reilly "refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences that he strongly suspected to exist." *Mombourquette ex rel. Mombourquette v. Amundson*, 469 F. Supp. 2d 624, 645 (W.D. Wis. 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)). But nothing Angilello divulged in the phone call would have led a reasonable psychiatric technician to think Rivett posed any more of a

suicide risk on August 22, 2018 than he had at any other point during his commitment. To the contrary, in the hours before his untimely death, Rivett continued to deny suicidal thoughts (as he had for most of his stay at WCMHC). (ECF No. 89 at 17-23; 30.) And he appeared no different to Reilly. Angilello's nondescript worries were not enough to override these first-hand observations. *See Pulera*, 966 F.3d at 555 ("When confronted with a healthy patient who mentioned no problems and an outside caller saying the patient was distraught, a reasonable nurse could believe [his] own observations."). At worst, Reilly's failure to document his conversation with Angilello might have been negligent, but mere negligence is insufficient to establish the Estate's Fourteenth Amendment claim. *See id.* at 554.

Ultimately, the case against Reilly bears a striking resemblance to both *Pulera* and *Jump v. Village of Shorewood*, 42 F.4th 782 (7th Cir. 2022). In those cases, the Seventh Circuit held that defendants are not liable under the Fourteenth Amendment when the information presented to them would not have alerted reasonable people in their positions to the risk of suicide. *See Pulera*, 966 F.3d at 554-55; *Jump*, 42 F.4th at 793-94. While the issue in this case is about the extent of the patient's suicide risk as opposed to its existence, the same logic applies. Nothing Reilly learned or observed on August 22, 2018 would have put a reasonable psychiatric technician on notice that Rivett was at an increased risk of suicide. *See Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (an inmate's request to see a crisis counselor did not put the defendants on notice that the "inmate pose[d] a substantial and imminent risk of suicide"). For that same reason, Reilly's failure to inform other staff members about Angilello's call is irrelevant. No reasonable WCMHC employee would have gleaned an increased suicide risk from the contents of that call.

Moreover, even if the Estate could satisfy the first inquiry of its claim, it would fail at the second. Reilly's response to Angilello's phone call was eminently reasonable. He increased his interactions with Rivett as requested and concluded, based on those interactions, that Rivett was at no greater risk of suicide than when he arrived. Given the facts known to him, that was not objectively unreasonable behavior. *See Pulera*, 966 F.3d at 555.

**II.     Whether Bregitta Peavy Acted Objectively Unreasonably Is a Question for the Jury.**

When it comes to Peavy, the Estate questions whether she actually performed the essential functions of her job at all. Peavy was responsible for Rivett's overnight safety checks. (ECF No. 96 at 13.) But the Estate contends, based upon the time of Rivett's death, some of these checks never occurred whatsoever. As with Reilly, the question is whether a jury could find (1) Peavy

acted purposefully, knowingly, or recklessly and (2) her actions were objectively unreasonable. *See Pittman*, 970 F.3d at 827. This time around, given the evidence in the record, the answer is yes.

The story of what happened at WCMHC in the early morning hours of August 23, 2018 has a couple different versions. Peavy testified that she properly performed all her safety checks. (ECF No. 89 at 33.) And she swore that she heard Rivett breathing every time she entered his room. (*Id.* at 35.) Other on-duty psychiatric technicians corroborate at least parts of her account. For example, Jason Flegner said he saw Peavy conduct safety checks at 6:15, 6:30, 6:45, and 7:00 a.m. (*Id.* at 33-34.) Marissa Schmidt also observed Peavy performing safety checks during her shift. (*Id.* at 35.)

The Estate does not deny that Peavy performed *some* safety checks. But it disputes her consistency and technique; preventing suicide is not part-time, perfunctory work. According to the Estate's expert, Dr. Anny Sauvageau, Rivett was likely dead by 5:00 a.m. "at the latest." (ECF No. 75-13 at 9.) Yet Peavy continued to chart Rivett as "resting quietly with eyes closed" for the next two hours. (ECF No. 96 at 15.) If Dr. Sauvageau's opinion is correct, Rivett must have already completed his suicide attempt at times that Peavy now claims she saw him alive and resting. The necessary inference is that Peavy never actually checked on Rivett between 5:00 and 7:00 a.m. on August 23, 2018 (or that she found him dead but nevertheless reported him as resting quietly). Nothing in the record explicitly precludes this interpretation of the facts. While Peavy's fellow psychiatric technicians testified to having seen her perform *some* checks, they did not confirm that she performed all of *Rivett's* checks. Jason Flegner specifically stated that he did not have a view of Rivett's room, so he could not confirm whether Peavy ever checked on him in particular. (ECF No. 49-6 at 87:9-18.) Marissa Schmidt testified that it was possible that Peavy "was just kind of cracking the door and sticking her head in [the rooms]." (ECF No. 49-8 at 34:18-25.) And a video exhibit of Peavy demonstrating how she performed safety checks lends credence to the idea that she went about her business in a less-than-thorough manner. (ECF No. 90 at 00:44-02:54.) Thus, there is a plausible version of events that could support a finding of objectively unreasonable conduct.

In response, Defendants posit that Dr. Sauvageau is incorrect, her time of death estimate the product of faulty algor, livor, and rigor mortis assessments. Indeed, defense expert, Dr. Andrew Baker, concluded that it is more likely that Rivett died "shortly after [7:00 a.m.] than

before [5:00 a.m.]." (ECF No. 49-36 at 11-12.)  But a battle of the experts cannot be resolved on summary judgment.  *See Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009).  Such disputes are for the finder of fact to resolve.  *Id.* (when presented with "a classic battle of the experts," the jury should "determine what weight and credibility to give the testimony of each expert").  The Court cannot, therefore, discredit Dr. Sauvageau's medical jurisprudence at this juncture—the credibility of a forensic pathologist is assessed from the witness stand.  And unable to exclude Dr. Sauvageau's expert opinion, Defendants cannot show that they are entitled to summary judgment on this claim.

Peavy knew that Rivett posed a suicide risk, and she also knew that one of the reasons psychiatric technicians perform safety checks is to prevent suicides.  (ECF No. 80 at 37:4-22; ECF No. 96 at 13-14.)  If, as Dr. Sauvageau's opinion suggests, Peavy elected not to perform those safety checks on Rivett, then the finder of fact could hold that she "strongly suspected that [her] actions would lead to harmful results."  *Pittman*, 970 F.3d at 828 (internal quotations omitted).  Allowing those harmful results to materialize would establish objectively unreasonable behavior.  This claim must go to the jury.

### III. A Reasonable Jury Could Not Find Waukesha County Liable Under *Monell*.

In its complaint, the Estate arguably disclosed four theories of *Monell* liability against Waukesha County, but at summary judgment, it zeroed in on just one: failure to address the known suicide risk posed by WCMHC's bathroom doors.  Waukesha County knew of this risk by at least December 2017, probably sooner.  (ECF No. 81 at 26; ECF No. 89 at 38.)  Yet, at the time of Rivett's commitment in August 2018, the County had replaced only four of the twenty-four problematic doors.  And, according to the Estate, the County adopted a "policy of doing nothing" to mitigate the risk of suicide in rooms without the new, ligature-resistant doors.  (ECF No. 81 at 28.)  This "policy of doing nothing" theory fails based on the undisputed facts.  The record confirms that Waukesha County took several steps to ensure the safety of WCMHC patients, and none of its actions or inactions could possibly rise to the level of deliberate indifference under *Monell*.  The County is, thus, entitled to summary judgment on the *Monell* claim.

Under Section 1983, "local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).  "For *Monell* liability to attach, [a plaintiff] must first trace the deprivation of a federal right to some municipal action." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022).

"Municipal action giving rise to [Section] 1983 liability may take the form of: (1) an express policy, (2) a widespread practice or custom, or (3) action by one with final policymaking authority." *Id.* The plaintiff must also show that "the municipal action amounts to deliberate indifference, a high hurdle to clear." *Id.* Finally, the plaintiff "must produce evidence that the municipal action was the 'moving force' behind [the] constitutional injury, a 'rigorous' causation standard demanding a 'direct causal link between the challenged municipal action and the violation of [the plaintiff's] constitutional rights.'" *Id.* (quoting *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021)).

The Estate characterizes its claim as follows: "A reasonable jury could conclude that WCMHC's policy of doing nothing while it waited for [ligature-resistant] doors to arrive and be installed was deliberate indifference to a known risk of suicide in its patients." (ECF No. 81 at 28.) As previously established, to succeed on this claim, the Estate must show (1) municipal action, (2) deliberate indifference, and (3) causation. *See Pittman*, 970 F.3d at 827.

The Seventh Circuit has confirmed that "in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable." *Thomas v. Cook Cnty. Sheriff's Dep't.*, 604 F.3d 293, 303 (7th Cir. 2010). In other words, a municipality that turns a blind eye to the danger of its facilities is just as susceptible to a *Monell* claim as one that proactively installs the same perilous accommodations. As alleged, then, Waukesha County engaged in "municipal action."

But the Estate's claim crumbles at the next stage because it is undisputed that the County did not respond to a known suicide risk with a "policy of doing nothing." Rather, the County installed ligature-resistant doors and, after confirming their apparent effectiveness, ordered more. And, while awaiting installation of the additional doors, the County issued affirmative guidance to increase precautions in the interim:

> In the meantime, we will use the 4 rooms with ligature resistant doors for those individuals who are identified as high risk through active suicidal intent and actions. In the event a room with a ligature resistant door is not available, 1:1 staffing may be considered.

(ECF No. 89 at 39.)

In the Estate's view, implementing this guidance is effectively doing nothing because of the bevy of simple, more effective alternative solutions: door stops, replacing doors with curtains, using security blankets instead of bedsheets, subjecting patients to constant video surveillance, and

increasing the number of double-occupied rooms at WCMHC. (ECF No. 81 at 25, 27.) Alternatives that appear appealing in hindsight, though, do not prove a municipality's actions violated the Constitution. "[T]he 'existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent.'" *Lapre v. City of Chicago*, 911 F.3d 424, 431 (7th Cir. 2018) (quoting *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000)). Defendants' reply brief lampoons several of the Estate's proposals (did it really suggest placing patients never convicted of any crime under panoptic surveillance?) (ECF No. 93 at 15-16.) The question, however, is not which litigant is the superior policymaker, but whether the policy Waukesha County implemented is so deficient that it represents deliberate indifference to Rivett's serious medical needs. It is virtually always possible to devise a better policy post hoc; perfect knowledge of the outcome allows one to plan around previously concealed contingencies. If it had to do it over again, perhaps Waukesha County would have taken a different tack. That is irrelevant. What matters is that no reasonable jury could find the approach the County did take deliberately indifferent to Rivett's serious medical needs.

This conclusion squares nicely with the Seventh Circuit's decision in *Frake v. City of Chicago*. That case asked whether Chicago's continued use of horizontal bars in jail cells constituted deliberate indifference—the City knew the bars increased the risk of suicide by hanging. *Frake*, 210 F.3d at 782. The Court held that, because Chicago took "many precautions . . . to ensure the safety of detainees," "the continued use of [horizontal bars in] cells" did not establish deliberate indifference. *Id.* It also noted that "an unfortunate, but not outrageous, number of suicides" would not always amount to deliberate indifference "given other precautions which might be taken." *Id.* This is not the most judicious phrasing; even one suicide is "an unfortunate . . . number." The thrust of the holding, though, is that deliberate indifference is not a counting stat. Considering the capacity of human ingenuity and Robert Burns' immortal advice on best laid plans, no humane policy could categorically eliminate the possibility of suicide for all detainees. The Constitution requires only that a municipality do enough to limit the risk. In *Frake*, the Seventh Circuit found that Chicago met that condition. If that was true in *Frake*, it is equally true here. Like Chicago, Waukesha County took various precautions to ensure the safety of those under its care. It implemented safety checks, created a triage system for rooms with ligature-resistant doors, and ordered additional ligature-resistant doors in a prompt fashion. That these policies did

not prevent James Rivett's suicide is a tragedy. But that alone is not enough to maintain a *Monell* claim.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants Motion for Summary Judgment, ECF No. 44, is **GRANTED**, **in part**, and **DENIED**, **in part**. The motion is granted with respect to the claims against Kevin Reilly and Waukesha County. The motion is denied with respect to the claim against Bregitta Peavy.

Dated at Milwaukee, Wisconsin on May 15, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge